**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------- x
                                                        :
HAGGEN HOLDINGS, LLC                                    :
                                                        :
                Plaintiff,                              :
                                                        :
v.                                                      :   Case No.
                                                        :
                                                        :
                                                        :
ALBERTSON'S LLC & ALBERTSON'S                           :
HOLDINGS LLC                                            :
                                                        :
                Defendants.                             :
                                                        :
                                                        :
------------------------------------------------------- x
```

## COMPLAINT

Plaintiff Haggen Holdings, LLC ("Haggen"), files this complaint against Albertson's LLC ("Albertson's LLC") and Albertson's Holdings LLC ("Albertson's Holdings") (collectively, "Albertsons"), stating and alleging upon personal knowledge as to matters relating to itself and upon information and belief obtained during the course of its counsel's investigation as to all other matters, as follows:

## NATURE OF THE ACTION

1.       This action arises from Albertsons' coordinated and systematic efforts to eliminate competition and Haggen as a viable competitor in over 130 local grocery markets in five states.   Albertsons' illegal campaign includes premeditated acts of unfair and anti-competitive conduct that were calculated to circumvent Albertsons' obligations under federal antitrust laws, Federal Trade Commission ("FTC") orders, and contractual commitments to Haggen, all of which acts were intended to prevent and delay the successful entry of Haggen (or

any other viable competitor) into local grocery markets that Albertsons now dominates.  The result of Albertsons' conduct is (i) the reduction of competition in the affected local markets, thereby reducing consumer choice and decreasing quality while increasing prices for thousands of consumers throughout California, Oregon, Washington, Nevada and Arizona; (ii) needless loss of jobs held by innocent workers; and (iii) infliction of severe brand, reputational and financial harm on Haggen.

2.      Albertsons' campaign fits hand-in-glove with its recent acquisition (the "Merger") of Safeway, Inc. ("Safeway"), its largest—and in many cases, Albertsons' *only*—competitor in the affected local markets. In March 2014, Albertsons and Safeway announced that the two supermarket chains intended to merge to create one of the largest food retailers in the United States, with over 2,200 stores and $61 billion in combined sales and the number-one or -two competitive position in over two-thirds of the markets in which it does business. The FTC's review of Albertsons' regulatory filings at the time of the announcement prompted immediate and serious concerns that the Merger could eliminate "substantial competition" and reduce the number of meaningful competitors in the affected markets.  State attorneys general in California, Washington and Nevada also initiated investigations.  Rather than ignoring those concerns or abandoning the Merger, Albertsons decided to sell some of the existing Albertsons and Safeway stores to competing grocers, thereby purporting to address competitive concerns in certain local markets.

3.      In order to convince Haggen to purchase 146 stores, Albertsons made false representations to both Haggen and the FTC about Albertsons' commitment to a seamless transformation of the stores into viable competitors under the Haggen banner. Haggen was induced by Albertsons' false statements to seek the FTC's approval to purchase 146 stores in

five states (the "Stores"), and those false statements impacted the strategies Haggen developed

for the success of *all* Stores.  As noted by the FTC, Haggen was a "highly suitable" candidate for

new ownership of the Stores.[1]   Haggen had recently introduced a new look, "Haggen –

Northwest Fresh," including store remodels, re-merchandising, signage, uniforms, and private-

label goods.   Haggen was also committing almost $100 million to convert the purchased

Albertsons and Safeway stores to "Haggen –Northwest Fresh" and "Haggen – California Fresh."

Haggen had a highly experienced management team and developed a robust integration plan.

Haggen had an authentic grocery brand with over 80 years of history that stands for local fresh

products within a traditional grocery store concept.

     4.     The mandate of the FTC is to protect consumers and competition.  Consistent

with its congressional authority, the FTC evaluated Albertsons' proposed Merger and concluded

that it would create regional monopolies that would harm consumers and competition in scores

of local markets. To remedy this potential harm, the FTC ordered Albertsons—and Albertsons

agreed—to divest itself of 168 stores under detailed terms and conditions, as set forth in the

FTC's Decision and Order dated January 27, 2015 ("January 27, 2015 Order"), and in its Final

Decision and Order issued July 2, 2015 ("Final Order").  Additional safeguards were set forth in

the FTC's Order to Maintain Assets issued on January 27, 2015 ("OMA").  The express purpose

of these orders, as stated by the FTC, was to ensure that the divested stores would continue to

operate as "ongoing, viable enterprises engaged in the Supermarket business and to remedy the

lessening of competition resulting from the Acquisition …." *Id.* § II.H.  Copies of the January

---

[1]  A copy of the FTC's "Analysis of Agreement Containing Consent Order to Aid Public Comment, *In the Matter of Cerberus Institutional Partners V, L.P., AB Acquisition, LLC, and Safeway Inc. File No. 141 0108*," is annexed hereto as Exhibit A ("FTC Analysis").  *See also* Federal Register, Vol. 80, No. 22 Notices, at 5753 (Feb. 3, 2015), *available online at* https://www.ftc.gov/system/files/documents/federal_register_notices/2015/02/150203safewayfrn .pdf

Order, the OMA and the Final Order are annexed hereto as Exhibits B, C, and D, respectively. Collectively, the January 27, 2015 Order, the OMA, and the Final Order are hereinafter sometimes referred to as the "FTC Orders."[2]

5.     Mindful of Albertsons' "incentive not to promote competition with itself,"[3] the FTC would permit Albertsons to sell stores only to buyers who demonstrated the wherewithal and commitment to convert the divested stores into formidable competitors.  By affirmatively misrepresenting the manner in which it planned to implement these sales and transitions, Albertsons obtained the necessary pre-merger approvals from the FTC.   Through false statements to Haggen, Albertsons secured the cooperation and commitment it needed from Haggen in order to meet the conditions that the FTC imposed on the Merger.

6.     The FTC approved Haggen's purchase of the Stores, reaffirming Albertsons' obligation to divest the Stores in a manner consistent with mandated safeguards.  Haggen acquired the Stores pursuant to an Asset Purchase Agreement dated December 10, 2014 (the "Purchase Agreement") for a price in excess of $300 million.

7.     During the transfer process, Albertsons launched its plan to gain market power and/or monopoly power in the Relevant Markets (as defined below), acting in a manner that was designed to (and did) hamstring Haggen's ability to successfully operate the Stores after taking ownership.  In all of the Relevant Markets, Haggen was a new entrant, and Albertsons' improper conduct destroyed Haggen's ability to build essential goodwill among consumers in those markets.  Albertsons also critically damaged Haggen's competitive niche, which was firmly

---

[2]  (Copies of the FTC Orders are also available at https://www.ftc.gov/enforcement/cases-proceedings/141-0108/cerberus-institutional-partners-v-lp-ab-acquisition-llc.

[3]  *See* U.S. Dept. of Justice, Antitrust Division, *Policy Guide to Merger Remedies* at n. 41 (Oct. 2004), *available at* http://www.justice.gov/atr/archived-antitrust-division-policy-guide-merger-remedies-october-2004.

grounded in Haggen's 82-year history of being a neighborhood grocer that earned the trust and respect of its shoppers by:  (1) providing fair pricing and healthy competition; (2) expanding the selection of local product offerings and consistently bringing a unique and broad selection of quality products to its shelves; and (3) focusing resources on supporting local communities through employing local residents, supporting community events and contributing to food banks and other worthy causes.

8.     Contrary to the FTC Orders, the parties' Purchase Agreement and the law, grocer giant Albertsons engaged in anti-competitive activity against Haggen, just as Haggen was seeking to obtain a foothold in the Relevant Markets.  Recognizing that its competitor's success or failure hinged on its initial fair pricing of an appropriate inventory of products, Albertsons embarked on an unlawful scheme to undermine the very competition that the FTC sought to preserve.  As the Stores were nearing the dates on which they would be transitioned to Haggen stores and thereafter, Albertsons used Haggen's confidential, proprietary business information to unfairly compete with, and ultimately destroy the profitability of, Haggen's newly acquired Stores, by among other things:

    a.   Inducing Haggen to acquire the Stores under an aggressive time frame by (i) making false representations about (and failing to disclose material limitations of) the existing merchandising data system, back-office data system and infrastructure that Haggen would be relying on in converting the transferred stores to the Haggen brand, and (ii) falsely promising to provide to Haggen and to the Business Process Outsource provider the information, cooperation and training that was necessary for a seamless and successful transition;

    b.   Misusing Haggen's confidential information as to the cadence, or sequence, of Store conversions and other confidential customer data (including confidential loyalty club card data) to time and coordinate advertising campaigns, discounting, remodeling and rebranding of retained stores, and other strategies to draw customers away from Haggen Stores immediately before and after conversion and lure them to nearby Albertsons and Safeway stores;

    c.   Providing inaccurate data about transferred inventory that was on Store shelves, and burying relevant data in volumes of irrelevant data relating to

phantom inventory that was *not* on Stores' shelves, which was intended to disrupt the transition and to ensure an unsatisfactory customer experience upon grand opening;

d.  Providing inaccurate, incomplete and misleading price information to Haggen about products on transferred Store shelves, causing Haggen to tag products with inflated prices and causing customers to conclude that Haggen was price gouging on products that, just 48 hours earlier, had been priced much cheaper;

e.  Sabotaging the quantity, assortment and quality of inventory transferred to Haggen, so that new consumers would be dissatisfied with Haggen and thus shop at nearby Albertsons and Safeway stores, including (i) deliberate understocking of certain inventory at Haggen-acquired stores below levels consistent with the ordinary course of business just prior to conversion, resulting in out of stocks which negatively impacted the shopping experience upon Haggen grand openings, and (ii) deliberate overstocking of perishable inventory at Haggen-acquired stores beyond levels consistent with the ordinary course of business just prior to conversion such that Haggen had to throw away significant amounts of inventory it paid for;

f.  Removing store fixtures and inventory from Haggen-acquired stores that Haggen paid for;

g.  Strategically cutting off Haggen-acquired store advertising in order to decrease customer traffic prior to and leading into the conversion; and

h.  Failing to perform routine maintenance on stores and equipment prior to conversion, ensuring that Haggen's grand opening would not meet customer expectations.

9.  Albertsons' improper and exclusionary conduct has caused significant harm to competition, local communities, employees and consumers, and undermines the FTC's authority and the FTC Orders, which were meant to preserve competition in the Relevant Markets and protect consumers.  Albertsons' anti-competitive actions critically damaged the operations, customer service, brand goodwill and profitability of the Stores from the outset.  Haggen never intended to close any of the Stores it acquired.  To the contrary, Haggen saw these Stores as an exciting opportunity to transform itself into a super-regional grocer with a presence up and down the west coast, and its plan was to bring new communities under the respected Haggen banner. As a result of Albertsons' anti-competitive conduct and unfair and deceptive practices, Haggen

was recently forced to close 26 of the Stores that it newly acquired as a part of the Albertsons' divestiture, and faces the potential closure of additional stores.

10.     While these closures are attributable to Albertsons' wrongful conduct, it is Haggen who has suffered reputational harm.  For example, "[n]ewspapers in California and Arizona reported customers complained about the cost of Haggen compared to other grocery stores."  Whidbey News Times, Aug. 19, 2015, "Haggen to close, sell 27 stores."  Likewise, in the Times of San Diego, it was noted that "[Haggen] was criticized by customers for its high prices when the stores began opening in the San Diego region earlier this year[.]" Times of San Diego, Aug. 14, 2015, "Haggen Plans 6 Store Closures, Layoffs in San Diego."  The executive director of the Klamath County Chamber of Commerce was also quoted as saying that "There are now folks here who would not consider stopping in a Haggen anywhere else when they travel."  Herald & News, Aug. 18, 2015, "Haggen fallout: Local leaders aim to fill void."

11.     As the above shows, the damage to Haggen is widespread, including but not limited to the following losses caused directly by Albertsons' misconduct: (1) lost sales; (2) damage to reputation and brand; (3) lost goodwill and alienated shoppers; (4) increased conversion costs; (5) inventory expenditures; (6) supplier penalties; and (7) other losses suffered as a result of the closure of 26 Stores that were acquired from Albertsons. Albertsons' misconduct has also forced the diversion of personnel and resources away from the immediate task of establishing Haggen's competitive position in new local markets; instead, Haggen has had to focus on strategies to recover from Albertsons' wrongful acts, which include, sadly, Haggen's efforts to find new jobs for displaced employees who too are victims of Albertsons' actions.  If Albertsons is successful in destroying Haggen as a viable competitor, Haggen's damages, which include the lost prospective value of the acquisition, may exceed $1 billion, with

the ultimate amount of damages to be determined at trial as Haggen continues to suffer injury from Albertsons' wrongful conduct.  Haggen brings this lawsuit against Albertsons for violations of Section 7 of the Clayton Act and Section 2 of the Sherman Act, breach of contract, breach of the implied covenant of good faith and fair dealing, indemnification under the relevant agreement, fraud, misappropriation of trade secrets, conversion and violation of Washington's Consumer Protection Act to recover those damages.

## PARTIES

12.     Haggen Holdings, LLC is a Delaware limited liability company.  The first store opened under the Haggen family name in 1933 in Bellingham, Washington.  Since 1933, the Haggen brand and business has been built on providing shoppers the freshest and most local products with genuine service, while supporting the communities it serves.  Haggen's excellence in the grocer industry has been routinely recognized by such awards as "Best Grocery Store of the Year," "Most Community Minded Company," "Large Business of the Year," and "Best Family-First Business," while Haggen has also been an upstanding member of every community in which it operates, participating in such charities as Multiple Sclerosis fundraisers, clothing drives, and fundraisers for such causes as Seattle's Children's Hospital and Haiti Earthquake victims, among many others.  Haggen reaches these summits, in part, because of its unique partnerships with local farmers, ranchers, fisheries, and other businesses that supply Haggen stores with the highest quality products for its stores.  In the first half of 2015, through the acquisition of the Stores, Haggen expanded from a Pacific Northwest company with locations in Oregon and Washington to a regional grocery store chain with locations in Washington, Oregon, California, Nevada and Arizona.

13.     Albertson's LLC is a Delaware limited liability company, and is one of the largest food and drug retailers in the United States.  It operates over 2,200 stores across 33 states under 18 brands including Albertsons, Safeway, Vons, Jewel-Osco, Shaw's, ACME Markets, Tom Thumb, Randalls, United Supermarkets, Pavilions, Star Market and Carrs.

14.     Albertson's Holdings LLC is a Delaware limited liability company and is the parent company of Albertson's LLC.

## JURISDICTION AND VENUE

15.     This Court has federal question jurisdiction pursuant to 28 U.S.C.A. § 1331 (West) because Haggen's claims under Section 2 of the Sherman Act and Section 7 of the Clayton Act arise pursuant to federal law, and this Court has exclusive jurisdiction over those claims.

16.     This Court has supplemental jurisdiction of Haggen's state law claims pursuant to 28 U.S.C.A. § 1367 (West).

17.     Venue is proper in this district pursuant to 15 U.S.C.A. § 22 (West) because this action arises under the federal antitrust laws and may be brought in any district where the defendant is an inhabitant and/or where it transacts business.  Albertson's LLC and Albertson's Holdings LLC are both formed under the laws of Delaware, both are signatories to the Purchase Agreement, and Albertson's LLC transacts business in Delaware through its ACME brand.

## FACTS COMMON TO ALL CLAIMS

### A.    *Albertsons And Safeway Agree To Merge*

18.     On March 6, 2014, AB Acquisition ("AB Acquisition"), Albertsons' parent company, and Safeway announced that they had entered into an agreement whereby AB

Acquisition agreed to acquire all of the outstanding shares of Safeway for approximately $9.2 billion.

19.     The Merger, as initially contemplated, would have created a nationwide super-food retailer with over 2,400 stores, 27 distribution facilities and 20 manufacturing plants.

**B.     *Supermarket Trade and Commerce and the Relevant Product Market***

20.     For purposes of this Complaint, the relevant line of commerce is the retail sale of food and other grocery products in supermarkets.

21.     For purposes of this Complaint, the term "supermarket" means any full-line retail grocery store that enables customers to purchase substantially all of their weekly food and grocery shopping requirements in a single shopping visit with substantial offerings in each of the following product categories: bread and baked goods; dairy products; refrigerated food and beverage products; frozen food and beverage products; fresh and prepared meats and poultry; fresh fruits and vegetables; shelf-stable food and beverage products; staple foodstuffs; and, to the extent permitted by law, wine, beer and/or distilled spirits.

22.      Supermarkets provide a distinct set of products and services and offer consumers convenient one-stop shopping for food and grocery products.  Supermarkets typically carry more than 10,000 different items, referred to as stock-keeping units (SKUs), as well as a deep inventory of those items.  In order to accommodate the large number of food and non-food products necessary for one-stop shopping, supermarkets are large stores that typically have at least 10,000 square feet of selling space.

23.     Supermarkets compete primarily with other supermarkets that provide one-stop shopping opportunities for food and grocery products.  Supermarkets base their food and grocery prices, in part, on the prices and selection of food and grocery products sold at other nearby

competing supermarkets.  Supermarkets do not regularly conduct price checks of food and grocery products sold at stores other than supermarkets and do not typically set or change their food or grocery prices in response to prices at stores other than supermarkets.

24.     Although retail stores other than supermarkets may also sell food and grocery products, these types of stores—including convenience stores, specialty food stores, limited assortment stores, hard-discounters and club stores—do not, individually or collectively, provide sufficient competition to impact prices at supermarkets.  These retail stores do not offer a supermarket's distinct set of products and services that provide consumers with the convenience of one-stop shopping for food and grocery products.  The vast majority of consumers shopping for food and grocery products at supermarkets would not likely start shopping at other types of stores, or significantly increase grocery purchases at other types of stores, in response to a small but significant price increase by all supermarkets in a relevant geographic market.

25.     Significant barriers to entry exist in the market for supermarkets, including the time and costs associated with conducting necessary market research, selecting an appropriate location for a supermarket, obtaining necessary permits and approvals, constructing a new supermarket or converting an existing structure to a supermarket and generating sufficient sales to have a meaningful impact on the market.

**C.     *Relevant Geographic Markets***

26.     Customers shopping at supermarkets are motivated by convenience and, as a result, competition for supermarkets is local in nature.  Generally, the overwhelming majority of consumers' grocery shopping occurs at stores located very close to where they live.

27.     The relevant geographic markets for this action, defined consistently with the FTC's market definitions, include areas that range from a two- to ten-mile radius around each of

the supermarkets acquired from Defendants (depending on factors such as population density, traffic patterns, and unique characteristics of each market), in each of the following locations: Anthem, AZ; Carefree, AZ; Flagstaff, AZ; Lake Havasu, AZ; Prescott, AZ; Prescott Valley, AZ; Scottsdale, AZ; Tucson (Eastern), AZ; Tucson (Southwest), AZ; Alpine, CA; Arroyo Grande/Grover Beach, CA; Atascadero, CA; Bakersfield, CA; Burbank, CA; Calabasas, CA; Camarillo, CA; Carlsbad (North), CA; Carlsbad (South), CA; Carpinteria, CA; Cheviot Hills/Culver City, CA; Chino Hills, CA; Coronado Island, CA; Diamond Bar, CA; El Cajon, CA; Hermosa Beach, CA; Imperial Beach, CA; La Jolla, California; La Mesa, CA; Ladera Ranch, CA; Laguna Beach, CA; Laguna Niguel, CA; Lakewood, CA; Lemon Grove, CA; Lomita, CA; Lompoc, CA; Mira Mesa (North), CA; Mira Mesa (South), CA; Mission Viejo/Laguna Hills, CA; Mission Viejo (North) CA; Morro Bay, CA; National City, CA; Newbury Park, CA; Newport Beach, CA; Oxnard, CA; Palm Desert/Ranch Mirage, CA; Palmdale, CA; Paso Robles, CA; Poway, CA; Rancho Cucamonga/Upland, CA; Rancho Santa Margarita, CA; San Diego (Clairemont), CA; San Diego, (Hillcrest/University Heights), CA; San Diego (Tierrasanta), CA; San Luis Obispo, CA; San Marcos, CA; San Pedro, CA; Santa Barbara, CA; Santa Barbara/Goleta Heights, CA; Santa Clarita, CA; Santa Monica, CA; Santee, CA;  Simi Valley, CA; Solana Beach, CA; Thousand Oaks, CA; Tujunga, CA; Tustin (Central), CA; Tustin/Irvine, CA; Ventura, CA; Westlake Village, CA; Yorba Linda, CA; Boulder City, NV Henderson (East), NV; Henderson (Southwest) NV; Summerlin, NV; Ashland, OR; Baker County, OR; Bend, OR; Eugene, OR; Grants Pass, OR; Happy Valley/Clackamas, OR;  Keizer, OR; Klamath Falls, OR; Lake Oswego, OR; Milwaukie, OR; Sherwood, OR; Springfield, OR Tigard, OR; West Linn, OR; Bremerton, WA; Burien, WA; Everett, WA; Federal Way, WA; Gig Harbor, WA; Lake Forest, WA; Lake Stevens, WA; Lakewood, WA; Liberty Lake, WA; Milton, WA; Monroe,

WA; Oak Harbor, WA; Olympia (East), WA; Port Angeles, WA; Port Orchard, WA; Puyallup, WA; Renton (New Castle), WA; Renton (East Hill-Meridian), WA; Sammamish, WA; Shoreline, WA; Silverdale, WA; Snohomish, WA; Tacoma (Eastside), WA; Tacoma (Spanaway) WA; Walla Walla, WA; Wenatchee, WA and Woodinville, WA (the "Relevant Markets").

**D.      Recognizing that its Merger would have substantial anticompetitive effects in the Relevant Markets, Albertsons makes false statements to induce Haggen to purchase dozens of stores that Albertsons and Safeway needed to unload in order to consummate the Merger**

28.     Shortly after the Merger was announced in 2014, the FTC received extensive objections and comments that the Merger would substantially harm consumer choice and prices in the Relevant Markets.  The FTC therefore investigated the Merger.

29.     Recognizing that the FTC would likely require it to divest stores as part of the Merger, and that even after such a divestiture it could make a substantial profit if its Merger were approved, Albertsons entered into negotiations with Haggen regarding the purchase of 146 Stores.

30.     Albertsons' success in divesting itself of the Stores hinged on its ability to convince a prospective buyer—and the FTC—that the store transition would be supported by a highly integrated electronic infrastructure platform in a very compressed time period. Albertsons therefore needed to convince Haggen that it could secure the transition by using a "proven" Business Process Outsourcing  ("BPO") service provider with strong transition capabilities in order to combine a vast array of functional areas, including Customer Service; Finance / Accounting / Tax / Treasury; Payroll / Benefits / Compensation; Asset Protection & Food Safety; Logistics / Procurement / DSD; Pharmacy; Digital / Social Media; Merchandising / Pricing; Marketing / Ad Planning; Store Shelf Management; Front-End POS Systems; Vendor Management; Store Ordering; and Labor Management.

31.    On November 4, 2014, at the invitation of Albertsons, Haggen executives attended a meeting at Albertsons' headquarters in Boise, Idaho.   Also in attendance were representatives of the BPO provider that supported 107 of the 146 Stores (*i.e.,* the stores that operated under the Albertsons' banner pre-conversion) (the "November 2014 Meeting").

32.    The purpose of the November 2014 Meeting was to convince Haggen that, through the transition and after conversion, Haggen could operate all 146 Stores (*i.e.,* both the Albertsons and Safeway stores) under a common suite of business processing systems (the "Business Processing Suite").   Albertsons represented to Haggen that the Business Processing Suite was already in place at the 107 Albertsons stores, and Albertsons promised to provide the cooperation and support to Haggen and to the BPO that was needed to "stand up" the Business Processing Suite at all Haggen Stores and provide for a seamless and successful transition at both the Albertsons and Safeway stores.

33.    The capability of the BPO provider to deliver the Business Processing Suite, and Haggen's ability to effect a successful conversion to the Business Processing Suite, depended on Albertsons' cooperation with and support of the BPO provider and Haggen.   Without limitation, it was Albertsons' duty, responsibility and obligation to authorize, initiate, allow and take all commercially reasonable steps to cause the efficient flow of relevant, necessary and "active" data to Haggen; to avoid and/or prevent the flow of irrelevant, extraneous, misleading and/or outdated data to Haggen; to explain the difference between relevant/necessary/active data and irrelevant/extraneous/misleading/outdated data; and to identify relevant/necessary/active data.

34.    Albertsons' promise to provide the necessary cooperation and support, made to Haggen at the November Meeting and thereafter, was false, and Albertsons had no intention to keep its promise at the time it was made.

35.     Albertsons knew and understood that "no immediate price change" was a key part of Haggen's transition strategy, and Albertsons knew and understood that Haggen's successful transformation of the Stores depended on the successful implementation of this short-term pricing strategy.

36.     Despite this knowledge, and in complete disregard of the promises it made to Haggen, Albertsons had no intention of providing, identifying and explaining relevant/necessary/active data, and it had every intention of providing irrelevant/extraneous/misleading/outdated data.  Nor did Albertsons intend to provide the level of cooperation, support and training necessary for the BPO provider to provide essential and accurate pricing information and for Haggen to implement and operate the system.

37.     Had Haggen known Albertsons' true intentions, Haggen would never have purchased the Stores, nor would the FTC have permitted such a purchase.

38.     Albertsons was similarly misleading with respect to certain "underperforming" stores included among the Stores purchased by Haggen.  For example, by e-mail dated November 17, 2014, counsel for Albertsons represented that while those stores were not then profitable, "these stores will get a boost from the rebranding/grand re-opening by new ownership as well as any planned investments" Haggen would make.  Albertsons made similar representations to the FTC only a few days prior, on or about November 14, 2014, where it emphasized that Haggen will "have an even better chance at improving the profitability of these stores" because "[r]e-branding and re-grand opening of stores will give the stores a fresh start in the eyes of consumers."  Albertsons shared this presentation and, on other occasions, shared the substance of this presentation, with Haggen.  At no time did Albertsons disclose to Haggen or the

FTC that it intended to take the anti-competitive steps alleged herein to undermine the grand openings and deprive Haggen of the promised "boost" and "fresh start" from rebranding.

39.    Less than one month later on December 10, 2014, in reliance on these and other similar representations, Haggen entered into the Purchase Agreement with Albertsons, with a purchase price in excess of $300 million, plus inventory, pursuant to which Haggen would acquire the 146 Stores subject to FTC approval.

**E.    *The FTC Holds That The Merger As Proposed Is Anti-Competitive And Orders Divestiture And Maintenance of Assets In Order To Preserve Competition In The Relevant Markets***

40.    On January 27, 2015, the FTC filed a complaint alleging that the Merger was likely to substantially lessen competition for the retail sale of food and other grocery products in supermarkets in the geographic markets where Albertsons would acquire stores.

41.    Specifically, the FTC found that under the 2010 Department of Justice and FTC Horizontal Merger Guidelines and relevant case law, the Merger was presumptively unlawful because, in certain of the Relevant Markets, the Merger would create, enhance or facilitate the exercise of market power.  Thus it was likely that the Merger, if consummated as planned, would eliminate competition by: (a) eliminating direct and substantial competition between Albertsons and Safeway; (b) increasing the likelihood that Albertsons would unilaterally exercise market power; and (c) increasing the likelihood of, or facilitating coordinated interaction between, the remaining participants in each of the markets where the Merger would eliminate Safeway as an independent competitor of Albertsons, including the Relevant Markets.  The FTC also found that the ultimate effect of the Merger would be to increase the likelihood that the prices of food, groceries or services would increase, while the quality and selection of food, groceries or

services would decrease, in the Relevant Markets.  A copy of the January 27, 2015 FTC Complaint is annexed hereto as Exhibit E.[4]

42.     In order to alleviate the anti-competitive effects of the Merger, the FTC issued the January 27, 2015 Order, ordering Albertsons and Safeway to divest 168 stores, as listed in Schedules A through D of that Order.  (Exhibit B).  With express reference to and incorporation of the Purchase Agreement as a "Remedial Agreement," (*id.* § II.D.), the FTC Orders directed Albertsons to divest the Stores to Haggen in accordance with all terms and conditions of Purchase Agreement.  *Id.* § II.A.3.  Exhibits B and D.  Also on January 27, 2015, the FTC issued its Order to Maintain Assets.  Exhibit C.

43.     In its published Analysis of the January 27, 2015 Order, the FTC specifically noted its view that Haggen was a "highly suitable purchaser and was well positioned to enter the Relevant Markets and prevent the likely competitive harm" that otherwise would have resulted from the Merger. (FTC Analysis, Exhibit A).[5]  At the time, neither Haggen nor the FTC anticipated that Albertsons would actively seek to undermine the Stores as they transitioned to Haggen.

44.     The FTC imposed safeguards, terms and conditions (the "FTC Safeguards") on the Merger between Albertsons and Safeway, the express purpose of which was "to ensure the continuation of the Assets To Be Divested as ongoing, viable enterprises engaged in the Supermarket business and to remedy the lessening of competition resulting from the Acquisition …." (January 27, 2015 Order and Final Order § II.H.) (Exhibit B and D).  The FTC Safeguards

---

[4]  A copy is also available at https://www.ftc.gov/enforcement/cases-proceedings/141-0108/cerberus-institutional-partners-v-lp-ab-acquisition-llc.

[5]  *See also* Federal Register, Vol. 80, No. 22 Notices, at 5753 (Feb. 3, 2015), *available online at* https://www.ftc.gov/system/files/documents/federal_register_notices/2015/02/150203safewayfrn.pdf

include those set forth explicitly in the FTC Orders, as well as obligations set forth by the parties

in the Purchase Agreement, each of which the FTC incorporated by reference into the FTC

Orders.  (January 27, 2015 Order and Final Order § II.D.1) ("All Remedial Agreements approved

by the commission … shall be deemed incorporated by reference into this Order, and any failure

by Respondents to comply with the terms of any such Remedial Agreement(s) shall constitute a

violation of this Order.").  (Exhibits B and D.)

45.     Without limitation, the FTC Safeguards in the January 27, 2015 Order and the

Final Order required that Albertson's LLC:

(i)      "Take such actions as are necessary to ***maintain the full economic
         viability, marketability, and competitiveness*** of the Assets To Be
         Divested, to ***minimize any risk of loss of competitive potential*** for the
         Assets To Be Divested, and to ***prevent the destruction, removal, wasting,
         deterioration, or impairment*** of the Assets To Be Divested, except for
         ordinary wear and tear," (§ II.D.1);

(ii)     "Not sell, transfer, encumber, ***or otherwise impair*** the Assets To Be
         Divested (other than ***in the manner prescribed*** in this Decision and Order)
         nor ***take any action that lessens the full economic viability, marketability,
         or competitiveness*** of the Assets To Be Divested," (§ II.F.)

(Exhibits B and D)  (emphasis added).

46.     Without limitation, the FTC Safeguards in the Order to Maintain Assets required

that Albertson's LLC:

(i)      "shall maintain the viability, marketability, and competitiveness of the
         Assets to be Divested" (OMA § II.A);

(ii)     "shall not cause the wasting or deterioration of the Assets To Be
         Divested," *id.*;

(iii)    "shall conduct or cause to be conducted the business of the Assets To Be
         Divested in the regular and ordinary course and in accordance with past
         practice (including regular repair and maintenance efforts)," *id.*;

(iv)    "shall use best efforts to **preserve the existing relationships** with suppliers, **customers,** employees, and others having business relations with the Assets To Be Divested in the ordinary course of business and in accordance with past practice," *id.*;

(v)    "shall continue to **maintain the inventory** of each Supermarket To Be Maintained at levels and selections consistent with those maintained by Respondents at such Supermarket in the ordinary course of business consistent with past practice," (OMA § II.B.);

(vi)    "shall use best efforts to keep the organization and properties of each Supermarket To Be Maintained intact, including current business operations, physical facilities, working conditions, staffing levels, and a work force of equivalent size, training, and expertise associated with the Supermarket To Be Maintained," *id.*;

(vii)    "shall not transfer store managers from any Supermarket To Be Maintained to any store that is not part of the Assets To Be Divested," *id.*;

(viii)    Shall "[m]aintain all operations and departments, and not reduce hours, at each Supermarket To Be Maintained" (OMA § II.B.1);

(ix)    Shall not "**transfer inventory** from any Supermarket To Be Maintained, other than in the ordinary course of business consistent with past practice," (OMA § II.B.2.);

(x)    Shall "[m]ake any payment required to be paid under any contract or lease when due, and otherwise pay all liabilities and satisfy all obligations associated with each Supermarket To Be Maintained, in each case in a manner consistent with past practice," (OMA § II.B.3.);

(xi)    Shall "[m]aintain the books and records of each Supermarket To Be Maintained," (OMA § II.B.4.);

(xii)    Shall not "display any signs or conduct any advertising (e.g., direct mailing, point-of-purchase coupons) that indicates that any Respondent is moving its operations at a Supermarket To Be Maintained to another location, or that indicates a Supermarket To Be Maintained will close," (OMA § II.B.5.);

      (xiii)   Shall "[n]ot conduct any 'going out of business,' 'close-out, 'liquidation,' or similar sales or promotions at or relating to any Supermarket To Be Maintained," (OMA § II.B.6.); and

      (xiv)   Shall "[n]ot change or modify in any material respect the existing pricing or ***advertising practices, programs, and policies*** for each Supermarket To Be Maintained, other than changes in the ordinary course of business consistent with current practice for Supermarkets of the Respondents not being closed, relocated, or sold," (OMA § II.B.7.)

(Exhibit C) (emphasis added).

    47.    Similar to the covenants imposed by the FTC's Order to Maintain Assets, the Purchase Agreement also required Albertsons to maintain each Store in its existing condition through the respective closing and to refrain from taking any steps that would undermine the profitability and competitive capability of the Stores.  Albertsons agreed that, prior to Haggen's acquisition of each Store, Albertsons would operate the Store, "in all material respects, only in the Ordinary Course of Business."  (Purchase Agreement § 21.4.)  At a minimum, with respect to each Store, the Purchase Agreement required Albertsons:

      (i)    to maintain operations, customary hours of operation and departments;

      (ii)   to exercise good faith in pricing merchandise consistent with the Sellers' normal pricing strategy;

      (iii)   to ***maintain customary overall levels of Inventory***;

      (iv)   to perform customary repair and maintenance in accordance with the Sellers' past practices and ***not to transfer any equipment*** to other Albertsons stores;

      (v)    not to enter into any material amendment to any of the Store Leases;

      (vi)   to maintain qualified and experienced managers and workforce and not to transfer store managers and pharmacists to other Albertsons stores;

    (vii)    not to display any signs or ***conduct any advertising (including direct mailing, point-of-purchase coupons, etc.) that indicates Albertsons or Safeway is moving*** its operations to another location or that a Store will close;

    (viii)    not to conduct any "going out of business", "close-out", liquidation or similar sales promotions;

    (ix)    ***not to change or modify in any material respect the existing advertising practices, programs and policies*** for any Store Property; and

    (x)    to use commercially reasonable efforts to ***preserve the existing relationships with each Store Property's suppliers, customers and employees***.

48.     In addition, the Purchase Agreement required Albertsons to cooperate in good faith and to take "all commercially reasonable actions" to ensure that the Stores would be commercially viable competitors as countenanced by the Purchase Agreement and the FTC Orders. (Purchase Agreement §§ 18.2, 24.15.)

49.     The Purchase Agreement between Haggen and Albertsons contained a "Confidentiality" provision whereby the parties agreed that all information received by either party would be treated as confidential. (Purchase Agreement § 21.2.)

50.     Albertsons knew that its compliance with the "Confidentiality" provision was critical. Particularly because Haggen was a new entrant to all of the Relevant Markets, it was imperative to keep the timing of Haggen's market entry confidential in order to prevent unfair competition or predatory practices, such as competitors targeting consumers with coupons or increasing advertising just as a Store was transitioning.

**F.**   ***Albertsons Misuses Confidential Information About Store Transfer Dates To Engage In Anti-Competitive Conduct***

51.     In order to effectuate the Purchase Agreement, Haggen created a schedule whereby each Store would transfer from Albertsons to Haggen (the "Store Closing Cadence"). The first Store Closing Cadence was attached as an Exhibit to the Purchase Agreement. (Purchase Agreement Ex. 2.3.3.)  Weeks in advance of the first conversion in continuing updates thereafter, Haggen provided Albertsons with an updated and more detailed Store Closing Cadence for Albertsons' review on a strictly confidential basis.

52.     The Store Cadence set forth not only the sequence in which all 146 Stores would be converted, but it also provided detail as to the conversion schedule for each Store.  For example, the Store Closing Cadence revealed that the Albertsons store in Oak Harbor Washington would "go dark" at 6 p.m. on Tuesday, March 3, 2015; that Haggen would take ownership on March 4 at 12:01 a.m.; that the store would be closed for a total of two days; and that the grand reopening of the store under the Haggen banner would occur on March 6 at 9:00 a.m.

53.     The FTC Orders and Purchase Agreement prohibited Albertsons from displaying any signs or conducting any advertising (*e.g.,* direct mailing, point-of-purchase coupons) to indicate that any Store would close or was moving its operations to another location (OAM § II.B.5; Purchase Agreement § 21.4(a)(vii)), and Albertsons was further prohibited from conducting any "going out of business," "close-out," "liquidation," or similar sales or promotions.  (OMA § II.B.6.; Purchase Agreement § 21.4(a)(viii)).  Haggen did not advertise or promote the opening of a Haggen store in advance of the grand opening.  Thus, only those who had access to the confidential Store Closing Cadence (*i.e.,* Haggen and Albertsons) had knowledge of the schedule and related details.

54.     During the transition process, in order to effectuate transfer of ownership, Albertsons would close a Store at around 6 p.m. on the "Closing Date," as that term is defined in the Purchase Agreement.   Haggen would then bring in a conversion team to handle any necessary construction, place orders, change all price tags and signage, train the employees and otherwise prepare the Store for reopening as a Haggen Store two days later.   A typical team would include dozens of workers and specialists with the range of skills and talents necessary to address all aspects of store operation, preparedness, and improvement, all of which had to meet Haggen's traditional high standards.   For conversion construction and build-out alone, Haggen budgeted over $59 million collectively to be spent on the transitioned Stores during this forty-eight hour window on store improvements and updates, literally from floor to ceiling.   Another $22 million was budgeted and spent for IT, and more than $20 million for additional expenditures.

55.     The Store transitions took place over a fifteen-week period, which meant that, in some weeks, Haggen was undertaking more than a dozen conversions, with many of them occurring simultaneously.   Success required seamless coordination and sequencing of all aspects of operation in each Store, and it depended on Albertsons' compliance with all requirements under the FTC Orders and the Purchase Agreement.

56.     Only Haggen and Albertsons had advance knowledge of when the Stores would go dark and when they would re-enter the market as Haggen stores.   Other competitors in the market had no such knowledge.   This advance knowledge gave Albertsons an unfair advantage and opportunity to develop strategies to undermine the grand opening of the new Haggen stores and hinder Haggen's market entry.   It is for this very reason that the FTC Orders and Purchase

Agreements prohibited Albertsons from exploiting that knowledge to Haggen's detriment and, ultimately, to the detriment of consumers who would benefit from Haggen's successful entry.

> **i.    Albertsons Misuses the Confidential Store Closing Cadence to time aggressive and unprecedented marketing campaigns to undermine Store grand openings.**

57.    Albertsons used its knowledge of when Haggen would enter the Relevant Markets – the confidential, proprietary Store Closing Cadence – to undercut and erode consumer loyalty to the Stores slated for transition to Haggen.  For example, Albertsons circulated coupons for "$10 off a $50 purchase" or "$20 off a $75 purchase" before and after Haggen entered the market in at least Bakersfield, CA; Goleta CA; Santa Barbara; CA; Newbury Park; CA; San Diego, CA; San Luis Obispo; CA; Mission Viejo, CA; Laguna Beach; CA; Simi Valley, CA; and Torrance CA.

58.    Albertsons' conduct violated the Purchase Agreement, including without limitation Section 21.2(c), and multiple provisions in the FTC Orders, including without limitation Albertsons' obligation to "use best efforts to preserve the existing relationships with … customers" of the Stores. (OMA § II.A.) (Exhibit C).

59.    This timed, targeted and aggressive couponing activity by Albertsons occurred in additional markets beyond the ones enumerated above and was widespread throughout the Haggen closings.  Albertsons timed the coupons to correspond with Haggen's Store Closing Cadence by first dropping the coupon at or just prior to a conversion and then repeating the drop in several weeks when the first coupon was expiring.  The coordination and execution of these campaigns required significant advance planning at the corporate office level.  Therefore, only Albertsons (who was privy to the confidential Store Closing Cadence), was able to plan and execute these campaigns at Stores across the Relevant Markets.

60.     Circulating coupons prior to Haggen entering the market drove traffic to Albertsons stores that would be competing with Haggen before Haggen even had a chance to enter the Relevant Markets and build brand awareness among consumers. Albertsons also circulated deep-discount coupons immediately after closure or placed post-conversion expiration dates on coupons that it circulated immediately prior to the conversion.  When customers presented those coupons to the Haggen store, Haggen was put in the "no-win" posture of either honoring an Albertsons-issued coupon that eroded all profit, or refusing to honor the coupon and alienating customers.

61.     Albertsons wrongfully used Haggen's Store Closing Cadence to undermine customer loyalty to the soon-to-be-converted Stores.  Albertsons did not offer these extreme discounts in the ordinary course of business but instead intentionally designed them to coincide with the timing and location of a Haggen transition.  This was done to increase the likelihood that consumers would continue to visit the competing Albertsons' store due to Albertsons' artificially "lower" pricing for certain products.  Those "lower" prices were based not on fair competition and a legitimate business plan, but solely on the misuse of Haggen's proprietary information.

### ii.     Albertsons Misuses the Confidential Store Cadence to Cut Off Store Advertising and decrease customer traffic Prior to Conversion

62.     Pursuant to the Order to Maintain Assets (OMA § II.B.7) and the Purchase Agreement (§ 21.4(b)), Albertsons was required to maintain existing advertising practices, programs and policies at each Store through conversion to Haggen ownership.

63.     Prior to transitioning the Stores to Haggen ownership and in the ordinary course of business, it was Albertsons' custom and practice to send advertisements for inclusion in a

larger grocery store advertising packet that was sent to customers in the zip code for a particular store location.  In addition, each Store would receive advertisements to place inside the Store.

64.    However, manipulating its knowledge of Haggen's Store Closing Cadence, Albertsons instructed its advertising agency to cease advertising two weeks or more prior to conversion at many Stores.

65.    For example, at Store # 2203, located in Mission Viejo, CA, Albertsons failed to send advertisements to customers of the soon-to-be converted Store no less than three weeks prior to conversion, and Albertsons also failed to provide any advertisements for in-Store use.

66.    At Store # 6028, located in Henderson, NV, Albertsons stopped sending any advertisements two weeks prior to conversion.

67.    Only through its access to and improper exploitation of Haggen's Store Closing Cadence did Albertsons know the timing required to curtail the customary and required advertisements.

68.    As a result, customers who had been receiving ads for a store location for several years no longer received those ads for the converted Store.  They received nothing and/or they received ads for the nearest competing stores that Albertsons retained.  In either case, the message to consumers was the same: Albertsons was leaving the Store.  This adversely impacted customer traffic, sales and profitability at the converted Stores both before and after conversion, which is contrary to the FTC Order and Order to Maintain Assets, the Purchase Agreement, and fair competition.

### iii.    *Albertsons Diverts Haggen Inventory To Albertsons Stores*

69.    Pursuant to the Order to Maintain Assets (OMA § II.B.) and the Purchase Agreement (§ 21.4(a)(iii)), Albertsons was required to maintain inventory at levels and selections that were consistent with the ordinary course of business at each Store.

70.    However, at multiple Store locations, Albertsons manipulated to its benefit Haggen's Store Closing Cadence by charging inventory to a converted Store just prior to conversion, but then delivering or transferring that inventory to Albertsons' stores that were not converted.

71.    For example, Store # 2203, located in Mission Viejo, CA, was billed for several truckloads of inventory that were never received.  The ordered inventory was instead diverted and delivered to an Albertsons' store which was not being acquired by Haggen.

72.    In Las Vegas, NV, only days prior to conversion of the Store, a Store manager ordered inventory prior to conversion that was meant for Haggen.  However, Albertsons diverted the shipment to an Albertsons' store that was not changing ownership and billed the Haggen Las Vegas, NV Store for the inventory that it never received.

### iv.    *Albertsons Misuses the Confidential Store Cadence to Time The Remodeling And Rebranding Of Its Retained Stores to Prevent Haggen From Breaking Into The Relevant Markets*

73.    Misusing the Store Closing Cadence in another fashion, Albertsons intentionally timed large-scale remodeling and rebranding projects for certain of its closest competing retained stores to closely coincide with Haggen Store openings.

74.    For example, Albertsons had detailed and confidential knowledge that the Albertsons store in Oak Harbor Washington would "go dark" at 6 p.m. on Tuesday, March 3, 2015 and that it would reopen under the Haggen banner at exactly 9:00 a.m. on March 6.

75.     Albertsons used its advance knowledge of Haggen's Store Closing Cadence to plan a large-scale remodeling project for its closest competing retained Albertsons store on Southwest Erie Street, less than ½ mile away from the transitioning Haggen Store.  Albertsons began the extensive remodeling at the same time as Haggen's conversion of the Safeway store.

76.     Albertsons not only remodeled its competing store, but also rebranded and remerchandised that store to reopen as a Safeway by early April 2015, preying on the community's familiarity with Safeway.

77.     Through this targeted remodel and rebranding, Albertsons intended to (and did successfully) divert consumer traffic in the Oak Harbor community away from Haggen to Albertsons.  The FTC Orders and the Purchase Agreement recognized that preserving "existing relationships with … customers" was needed if Haggen was to successfully enter the Relevant Markets, including Oak Harbor. (OMA § II.A, Exhibit C; Purchase Agreement § 21.4.)  Rather than honor this commitment, Albertsons misused the Store Cadence and took extreme measures to ensure that customers of the old Safeway had no interest in the new Haggen Store, but instead flocked to the old Albertsons down the street, which Albertsons had reopened as a Safeway.

78.     Albertsons similarly used knowledge of Haggen's Store Closing Cadence to time the remodeling and/or rebranding of other retained stores to undermine Haggen's conversion of the Stores and prevent Haggen from successfully entering new markets.

### v.     *Albertsons Overstocks Inventory Beyond Levels Consistent With The Ordinary Course of Business*

79.     Although the FTC's Orders (OMA § II.B.) (Exhibit C) and Purchase Agreement required Albertsons to maintain Store inventory at levels and selections consistent with the ordinary course of business and past practice, Albertsons overstocked Haggen Stores with certain inventory as of the Closing Date.

80.     For example, at Store #2152, located in Arroyo Grande, CA, Albertsons ordered the Store managers to overstock the perishable inventory of meat and produce although the Store would be closing for roughly two days for conversion.  Similarly, at Store #2131, located in Pasa Robles, CA, and at Store #2210, located at Los Osos, CA, Albertsons ordered the meat department to "cut the cooler"on the last day, resulting in the entire meat inventory being cut on the day of conversion.  Ground beef, ribeyes, and New York strips were cut in the back room, none of which ever made it to the sales floor.  Albertsons knew that this perishable inventory would expire quickly, prior to or during conversion, causing an immediate and preventable loss to Haggen.

81.     At Store #2160, located in Diamond Bar, CA, Albertsons' supervisors arrived at 2 p.m. on the day of conversion, just four hours before the store went "dark," and directed store employees to fill produce tables.  Albertsons overstocked six hundred cases of perishable floral items at an estimated value of $50,000.  Nabisco, Keebler and private label items on shelves and in storage were out of code (out of date).

82.     At Store # 2161, located in Los Angeles, CA, two weeks prior to conversion, Albertsons caused the Store to receive multiple shipments of over-the-counter medicine that were out of code (*i.e.* expired).  Haggen was forced to write off the expired medicine, causing an immediate and preventable loss to Haggen.

83.     At Store # 2137, located in Yorba Linda, CA, Albertsons ordered excess inventory prior to transitioning the Store, which was then billed to Haggen.  The Store closing was scheduled for March 26, 2015; however, the inventory invoices were dated March 27, 2015.  Haggen was forced to write off that inventory, causing an immediate and preventable loss to Haggen.

84.     Just prior to transitioning of Store # 2333, located in El Cajon, CA, Albertsons instructed the bakery manager to purchase and/or bake two times her normal inventory levels. Likewise, at Store # 2131, located in Pasa Robles, CA, Albertsons ordered the bakery department to "bake off everything in the freezer." As Albertsons intended, most of that excess inventory expired prior to the transitioning to Haggen of Store # 2333, causing an immediate and preventable loss to Haggen.

85.     In March 2015, at Store # 2140 and Store #2148, both located in Bakersfield, CA, Haggen entered the Stores to find the meat freezers loaded with 256 *cases* of frozen turkeys that were left over from Thanksgiving and Christmas holidays. Rather than stock the meat freezer with useable and sellable merchandise that Haggen's customers would purchase, Albertsons stocked it with out-of-season and ultimately unsellable merchandise.

86.     At Store # 2199, located in Simi Valley, CA, Albertsons ordered the store manager to increase production of perishable items in the bakery and in produce immediately prior to conversion, although the items would be unsellable after conversion.  Haggen was forced to write off that inventory, causing an immediate and preventable loss to Haggen.

87.      Albertsons' calculated and intentional overstocking of inventory affected at least 25 of the Stores.

88.     As a result of Albertsons' malicious and unfair actions, Haggen was forced to either destroy the inventory or otherwise take a loss.

89.     In addition, because Albertsons' malfeasance strained Haggen's resources during the conversion process (as Albertsons intended), in some instances, Haggen was not able to fully complete its expiration audits. This resulted in (as Albertsons knew it would) customers complaining to Haggen about out-of-date (or very nearly out of date) products on the Store

shelves. As Haggen was a new entrant to the Relevant Markets, Albertsons' malfeasance left consumers with a negative impression of Haggen, which ultimately impacted the profitability of the Stores and the Haggen brand.

90.     Additionally, Albertsons' malfeasance created substantial distraction and diverted the attention of store-level and senior Haggen management, as Albertsons intended, during critical junctures in the conversion process, which hurt employee morale and created confusion among employees at each Store.

***vi.    Albertsons Deliberately Understocks Inventory Below Levels Consistent With The Ordinary Course of Business***

91.     Additionally, Albertsons failed to maintain the required inventory levels at certain Stores transitioning to Haggen, allowing those Stores to become understocked in quantity and selection.

92.     For example, at Store # 422, located in Shoreline, Washington, prior to conversion, Albertsons failed to maintain ordinary levels of inventory and, upon taking ownership, Haggen discovered that inventory conditions were highly substandard with entire sets of stock missing from the shelves. Within ten days after the transition of Store # 422, Haggen was forced to purchase approximately $208,000 of new inventory to sufficiently stock the Store, which represented almost 24% of the total inventory value at Store # 422.

93.     As a result of Albertsons' intentional understocking of inventory, Haggen was forced to place emergency orders in order to compensate for the lack of inventory. Further, Haggen was forced to divert employees away from training and programming in order to address inventory issues. Haggen also was forced to hire, at substantial cost to itself, a third-party vendor in order to get inventory onto Store shelves.

94.     As a result of Albertsons' intentional understocking of inventory, many consumers who were encountering Haggen for the first time were left with the false impression that the Stores were not well operated, which inevitably drove consumer traffic away from Haggen and towards Albertsons.

95.     The inventory issues further damaged Haggen because all of the money used to resolve inventory issues depleted Haggen's marketing budget for the Stores.

96.     Similar to the Stores that were affected by overstocking of inventory levels, Albertsons' malfeasance created substantial distraction and diverted the attention of store-level and senior Haggen management, as Albertsons intended, during critical junctures in the conversion process, which hurt employee morale and created confusion among employees at each Store.

### vii.     Albertsons Improperly Removes Store Fixtures and Inventory

97.     During the conversion process, Haggen discovered that Albertsons intentionally removed and discarded inventory and equipment in violation of the FTC's Order to Maintain Assets and the Purchase Agreement.

98.     For example, at Store # 2048, located in Goleta, CA, Haggen discovered that Albertsons and its subsidiaries intentionally removed and discarded inventory and equipment outside of Albertsons' inventory counting system.  As a result, Haggen was obligated to pay Albertsons for such inventory, without such inventory being present at Store # 2048, causing an immediate and preventable loss to Haggen.

### viii.    *Albertsons Fails to Perform Routine Maintenance on Stores and Equipment*

99.    Under the FTC Orders (OMA § II.A.) and the Purchase Agreement (§ 21.4(iv)), Albertsons was required to perform customary repair and maintenance on Stores and equipment in accordance with past practices.

100.    Albertsons failed to perform regular and customary maintenance in numerous respects, ranging from (without limitation) plumbing problems at Stores to non-functioning deli equipment.   For example, at Store #2160 (Diamond Bar, CA), Haggen found filthy dairy containers and produce wet racks that had not been cleaned in months; mold in fish cases; service meat containers that did not hold temperature; broken refrigerators that had been converted to dry storage rather than repaired; forklift safety issues, including steering problems and dead batteries; broken plumbing; nonworking coolers in dairy, frozen, and produce; and more. At Store #2131 (Pasa Robles, CA), Haggen found broken meat scales and overall poor sanitation in the meat department and deli, with mold in all display cases; two broken ovens; a walk-in cooler with a broken door that was held closed with a trash can; roof leaks in deli and grocery backrooms, and more. Each of these failings caused Haggen to incur additional repair costs.   In addition, not all of Albertsons' maintenance failures were fixable within the short window of time that Albertsons knew had been allotted for the conversion process.   For example, Albertson put a hold on repairs at Store #2140, located in Bakersfield, CA prior to conversion, leaving (among many other problems) a non-functioning cake printer in the bakery department, which forced Haggen—a store that is renowned for its bakery—to decline cake orders or fill them from another store.   Albertsons' failure to perform routine maintenance, therefore, further diminished customers' first impression upon entering a Haggen store after conversion, which was Albertsons' intended effect.

33

101.    Albertsons also removed cleaning materials and supplies from Stores that interfered with efforts to spruce up Stores for grand opening.  For example, on the very day of conversion at Store #2169, Albertsons removed two pallets of supplies, including floor wax, strippers, chemical cleansers, and toilet paper.

102.    The above alleged conduct sets forth only some of the anticompetitive measures that Albertsons timed to the Store Cadence.  Albertsons even removed shopping carts from some locations prior to conversion—*anything* to upset a customer's first experience at a Haggen store.

**G.    *Albertsons Deliberately Provides Haggen With False, Misleading And Incomplete Retail Pricing Data, Undermining Haggen's Pricing Strategy at Grand Opening***

103.    As part of the conversion process, Albertsons was required to cooperate with the BPO provider and provide to Haggen its current retail pricing files on transferred inventory, primarily so that Haggen could implement its consumer-friendly "no immediate pricing change" strategy upon entry to the Relevant Markets.  The retail files were also important to ensure that products would scan at the tag price upon Haggen's reopening of the Stores.

104.    As part of its plan to undermine Haggen's entry into the Relevant Markets, Albertsons failed and/or refused to cooperate with the BPO provider.  It either refused to provide the price information, or it provided false, misleading and incomplete pricing files to Haggen.

105.    Albertsons' conduct prevented Haggen from meeting customer expectations; instead, many customers experienced "sticker shock" upon their first visit to a Haggen Store— just as Albertsons planned and intended.

106.    For example, in many instances, Albertsons represented that it was providing the active or current retail prices, but Haggen later discovered that these prices were not the prices that Albertsons had charged in the ordinary course of business at the Stores prior to conversion. In fact, the customary practice of Albertsons had been to offer those products for sale with a

long-term price reduction, or a much lower *de facto* base retail price, which Albertsons concealed from Haggen.

107.    The practical result of this deception was a consumer walking into a brand new Haggen store and finding the same item on the same shelf, but now priced higher than it was immediately prior to store conversion.  Albertsons achieved its goal of driving away Haggen shoppers by creating an inaccurate first impression that Haggen was far more expensive than Albertsons' own nearby stores.

108.    In addition, the pricing files frequently did not match the physical Store inventory. As an example, Albertsons provided retail pricing data for a Store that included nearly double the amount of items actually stocked in that Store.  Alternatively, in some cases, the pricing files would be missing for thousands of items actually transferred to Haggen and physically stocked in a Store.  These errors were not, and could not be, discovered by Haggen until after Haggen closed on the Store and began the conversion and retagging process.

109.    The pricing files were provided to Haggen in such an unusable condition that it was impossible for Haggen to finalize new tags for all items during its short conversion windows.

110.    Albertsons refused Haggen's request to enter Stores just prior to closing to conduct its own pricing audit based on the physical stock in the Store.  As a result, Haggen had to rely on Albertsons' inaccurate and adulterated pricing files.

111.    Albertsons' anti-competitive conduct caused significant damage to Haggen's image, brand, and ability to build goodwill during its grand openings to the public.

**H.** ***Albertsons' Conduct Causes Haggen To Close 27 Stores, with Further Potential Future Closings, Injuring Competition In Those Markets And Damaging Both Haggen And Consumers***

112.    As a result of Albertsons' anti-competitive conduct and breaches of the Purchase Agreement (described below), on August 14, 2015, Haggen announced that it was closing 27 stores, 26 of which were Stores Haggen had acquired from Albertsons.

113.    Albertsons' anti-competitive conduct has directly and proximately harmed competition in the Relevant Markets where Haggen was forced to close Stores by eliminating a direct competitor to Albertsons, thereby clearing the way for Albertsons to raise the prices of food, groceries or services, and decrease the quality and selection of food, groceries and services, exactly as predicted by the FTC in the absence of an effective remedy to the Merger. Albertsons' actions, which have or will result in the acquisition of substantial market or monopoly power, will therefore tend to reduce competition or create a monopoly, which is exactly the type of antitrust harm to competition and consumers that the FTC sought to avoid by ordering divestiture of the Stores.

114.    Additionally, Albertsons' anti-competitive conduct has directly and proximately harmed competition in the remaining Relevant Markets by diminishing Haggen's ability to constrain the prices charged by Albertsons, by diminishing Haggen's market share, damaging its brand, and deterring customers from patronizing Haggen Stores, such that Albertsons now has a dangerous probability of obtaining monopoly power in the remaining Relevant Markets which will allow it to raise the prices of food, groceries or services, and decrease the quality and selection of food, groceries and services.

115.    Due to the substantial barriers to entry and expansion into each of the Relevant Markets, the effects of Albertson's conduct in marginalizing or eliminating entirely Haggen as a

viable competitor in those markets will harm competition and consumers. In those Relevant Markets where Haggen has been forced to close Stores due to Albertsons' anti-competitive conduct, the substantial barriers to entry that protect Albertsons' competitive position in each of those markets ensure that a vital competitive constraint on Albertsons will be eliminated, and will not be replaced for many years.

116. The measurements of market concentration under the Herfindahl-Hirschman Index ("HHI") as set forth in the FTC Complaint, as well as the specific HHI calculations set forth in Exhibit A to the FTC Complaint, are fully applicable to the Relevant Markets and are expressly incorporated herein by reference. (Exhibit E, ¶¶ 17-19 and Ex. A).

I.     *Haggen Provides Advance Notice to Albertsons of Its Wrongdoing and Albertsons Races to File in State Court*

117. In an attempt to address some of the parties' disputes without the need for litigation, pursuant to Section 21.4(b) of the Purchase Agreement, on June 29, 2015, Haggen provided Albertsons with notice of Albertsons' breaches of the Purchase Agreement (the "June 29, 2015 Notice"). A copy of the June 29, 2015 Notice is annexed hereto as Exhibit F.

118. Pursuant to the Purchase Agreement, the June 29, 2015 Notice was delivered to Albertsons within thirty days of learning of Albertsons' breaches of the Purchase Agreement. Haggen was unable to provide notice earlier due to Albertsons' active concealment of its misconduct and/or Albertsons' misleading directions to Haggen at the store level.

119. In any event, such notice would have been futile, since Haggen's successful entry into the market depended on a favorable first impression with consumers at grand opening.

120. Without responding to Haggen's June 29, 2015 Notice, Albertsons raced to the courthouse and filed identical complaints in California and Delaware alleging that Haggen had breached the Purchase Agreement and committed fraud.

121.   On August 21, 2015, Albertsons voluntarily dismissed without prejudice its California complaint.

122.   Haggen has retained the undersigned counsel to represent it in this action and is obligated to pay its counsel a reasonable fee for services rendered and expenses incurred on its behalf.

## COUNT I
### (Violation of Section 7 of the Clayton Act, 15 U.S.C.A. § 18 (West))

123.   Haggen repeats and realleges each and every allegation contained in paragraphs 1 through 122 as if set forth fully herein.

124.   The FTC Safeguards charted a virtual roadmap by which Albertsons could consummate the Merger without violating the antitrust laws.  Albertsons ignored that roadmap. Instead, it consummated the Merger as it saw fit, engaging in the anticompetitive, unfair and unlawful conduct alleged above in each of the Relevant Markets, which simultaneously harms, or tends to harm, Haggen and consumers in the Relevant Markets.

125.   Each of the anticompetitive, unfair and unlawful acts alleged above was made possible by Albertsons' violation of the FTC Orders, the Purchase Agreement, and the FTC Safeguards, and by its consummation of the Merger in violation of Section 7 of the Clayton Act.

126.   Albertsons' unlawful acts destroyed or substantially lessened the economic viability, marketability and competitiveness of the Stores, depriving consumers in each of the Relevant Markets of the benefits of substantial competition from a new market entrant. Albertsons' conduct has forced Haggen to close 27 stores and release hundreds of employees. Stores in remaining markets are competing well below projected levels, and due to Albertsons' conduct are less able to constrain the exercise of market or monopoly power by Albertsons.

127.    Substantial barriers to entry make the timely entry of other new competitors into each of the Relevant Markets unlikely.  Without limitation, and as more fully alleged above, these barriers include the time and costs associated with conducting necessary market research, selecting an appropriate location for a supermarket, obtaining necessary permits and approvals, constructing a new supermarket or converting an existing structure to a supermarket, and generating sufficient sales to have a meaningful impact on the market.

128.    The effect of the Merger as implemented and consummated by Albertsons, and the effect of the unlawful conduct made possible by the Merger, is to substantially lessen competition for the retail sale of food and other grocery products in supermarkets in the Relevant Markets in the following ways, among others:

   a.    by eliminating direct and substantial competition between pre-Merger Albertson's LLC and Safeway;

   b.    by delaying and/or hampering the entry of Haggen into the Relevant Markets, thereby eliminating and/or lessening direct and substantial competition between Albertsons and Haggen;

   c.    by increasing the likelihood that Albertsons will unilaterally exercise market power.

129.    The ultimate effect of the Merger, and of the unlawful conduct made possible by the Merger, is to increase the likelihood that the prices of food, groceries, or services will increase, and that the quality and selection of food, groceries, or services will decrease, in the Relevant Markets, due to the diminution or elimination of competition between Haggen and Albertsons in the Relevant Markets.

130.    As a result of Albertsons' violations of Section 7, Haggen has been damaged in an amount to be determined at trial.

131.    Further, as a result of Albertsons' violations of Section 7, Haggen is entitled to treble damages, as well as reasonable attorneys' fees pursuant to 15 U.S.C.A. § 15 (West).

## COUNT II
### (Attempted Monopolization Under the Sherman Act, 15 U.S.C.A. § 2 (West))

132.    Haggen repeats and realleges each and every allegation contained in paragraphs 1 through 122 as if set forth fully herein.

133.    In violation of Section 2 of the Sherman Act, 15 U.S.C.A. § 2, Albertsons has knowingly and intentionally, and with specific intent to do so, attempted to monopolize the Relevant Markets.

134.    Albertsons' attempt to monopolize the Relevant Markets has been effectuated by the means and overt acts set forth above, among others.

135.    Albertsons' actions were intended to eliminate, reduce, limit and foreclose Haggen from competing in the Relevant Markets and to injure and eliminate competition in the Relevant Markets.

136.    As a result of the conduct alleged herein, Albertsons controls such a substantial share of the Relevant Markets, which are protected by substantial barriers to entry, that a dangerous likelihood exists that Albertsons will successfully monopolize the Relevant Markets, increasing the likelihood that the prices of food, groceries, or services will increase, and that the quality and selection of food, groceries, or services will decrease, in the Relevant Markets

137.    As a result of Albertsons' violations of Section 2, Haggen has been damaged in an amount to be determined at trial.

138.     Further, as a result of Albertsons' violations of Section 2, Haggen is entitled to treble damages, as well as reasonable attorneys' fees pursuant to 15 U.S.C.A. § 15.

## COUNT III
### (Breach of Contract)

139.     Haggen repeats and reasserts the allegations contained in paragraphs 1 through 122 above as if fully set forth herein.

140.     Pursuant to Section 21.4 of the Purchase Agreement, Albertsons was required to refrain from changing or modifying its current existing advertising practices, programs and policies; maintain customary levels of inventory at each Store; use commercially reasonable efforts to preserve the existing relationships with each of the Store's suppliers, customers and employees; and refrain from removing equipment from the Stores.

141.     Albertsons breached the Purchase Agreement by, among other things, transferring inventory out of the Stores, substantially overstocking and understocking inventory at the Stores, failing to continue normal advertising at the Stores prior to Closing and increasing discounts at Stores prior to Closing.

142.     Haggen fully complied with the Purchase Agreement and performed all of its required obligations under the Purchase Agreement.

143.     As a result of Albertsons' breaches of the Purchase Agreement, Haggen is entitled to damages in an amount to be determined at trial.

## COUNT IV
### (Indemnification)

144.     Haggen repeats and reasserts the allegations contained in paragraphs 1 through 122 above as if fully set forth herein.

145.     Pursuant to Section 21.4 of the Purchase Agreement, Albertsons was required to refrain from changing or modifying its current existing advertising practices, programs and

policies; maintain customary levels of inventory at each Store; use commercially reasonable efforts to preserve the existing relationships with each of the Store's suppliers, customers and employees; and refrain from removing equipment from the Stores.

146.     Albertsons breached the Purchase Agreement by, among other things, transferring inventory out of the Stores, substantially overstocking and understocking inventory at the Stores, failing to continue normal advertising at the Stores prior to Closing, and increasing discounts at Stores prior to Closing.

147.     Pursuant to Section 21.4(b) of the Purchase Agreement, on June 29, 2015, Haggen provided Albertsons with the June 29, 2015 Notice, which detailed Albertsons' breaches of the Purchase Agreement.

148.     Pursuant to Section 21.4(b) of the Purchase Agreement, the June 29, 2015 Notice was delivered to Albertsons within thirty days of learning of Albertsons' breaches of the Purchase Agreement. Haggen was unable to provide notice earlier due to Albertsons' active concealment of its misconduct.

149.     Haggen fully complied with the Purchase Agreement and performed all of its required obligations under the Purchase Agreement.

150.     As a result of Albertsons' breaches of the Purchase Agreement, Haggen is entitled to indemnification pursuant to Section 17 of the Purchase Agreement for all losses suffered, in an amount to be determined at trial.  Due to the intentional and fraudulent conduct alleged, there is no contractual limitation applicable to these claims.

## COUNT V
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

151.     Haggen repeats and reasserts the allegations contained in paragraphs 1 through 122 above as if fully set forth herein.

152.    The Purchase Agreement created duties of good faith and fair dealing on the part of Albertsons to use commercially reasonably efforts to preserve the existing relationships with each Store's suppliers, employees and customers.  The Purchase Agreement also created duties of good faith and fair dealing on the part of Albertsons in executing its obligations with regard to the transition of the Stores to Haggen.  More specifically, and without limitation, these implied covenants and duties obligated Albertsons to:

a.  Provide complete, accurate and current/active data, information, explanation, and training with respect to pricing for each item of transferred inventory;

b.  Provide complete, accurate and current/active data, information, explanation, and training with respect to discounting for each item of transferred inventory;

c.  Provide complete explanation and training with respect to standup of the PM2 system;

d.  Maintain levels of inventory, in both quantity and selection, at levels that would meet consumer expectations upon reopening of the Stores;

e.  Not target Store customers for post-transfer aggressive and unprecedented advertising and discounting that would lure those customers to retained Albertsons and Safeway stores;

f.  Timely and completely perform each of the remedial obligations set forth in the FTC Orders.

153.    Albertsons breached these implied obligations by, among other things, providing incomplete, inaccurate, misleading and out of date pricing information on transferred inventory, refusing to train Haggen and/or the BPO provider; transferring inventory out of the Stores,

substantially overstocking and understocking inventory at the Stores, failing to continue normal advertising at the Stores prior to Closing, and increasing discounts at Stores prior to Closing.

154.    Albertsons is liable to Haggen for Haggen's damages and losses resulting from Albertsons' breaches of their duties of good faith and fair dealing toward Haggen.

155.    As a result of the breach, Haggen is entitled to damages in an amount to be determined at trial.

**COUNT VI**
**(Fraud)**

156.    Haggen repeats and realleges each and every allegation contained in paragraphs 1 through 122 as is set forth fully herein.

157.    The acts engaged in by Albertsons, as alleged herein, constitute fraud, including fraudulent inducement, fraud by intentional misrepresentation, false promise and concealment.

158.    Albertsons' success in divesting the Stores hinged on its ability to convince a prospective buyer that the store transition would be supported by a highly integrated infrastructure platform in a very compressed time period.   Albertsons therefore needed to convince Haggen that it could de-risk the transition by using a "proven" Business Process Outsourcing ("BPO") service provider with strong transition capabilities in order to combine a vast array of functional areas.

159.    At the November 2014 Meeting, as alleged above, Albertsons represented to Haggen that a built-out infrastructure was already in place, and that Albertson would cooperate with Haggen and the BPO provider to ensure a successful and seamless transition.   In particular but without limitation, Albertsons knew that a pivotal aspect of a successful transition was accurate pricing information for transferred inventory.   In connection therewith, and as Albertsons knew, a key component of the Business Processing Suite discussed at the November

2014 Meeting was the merchandising system known as "PM2."  The primary function of PM2 is price management of inventory.  As relevant here, PM2 provides historical and active (or current) retail prices for each product on store shelves.  The efficient operation of PM2 allows for the creation of printed price tags for each item that the store displays on shelves, that consumers rely on in making purchasing decisions, and that cashiers scan at checkout.  The number of "active" prices to be processed through PM2 at any given time in each Store ranged between 60,000 to 100,000 or more.

160.    Albertsons developed PM2 for use at the Albertsons' stores, and since its creation, PM2 has been used exclusively at Albertsons stores.  Neither Safeway nor Haggen used PM2, and neither Haggen nor the Safeway employees who would staff the Safeway stores acquired by Haggen had any expertise or working familiarity with PM2.

161.    Compared to other merchandising systems, PM2 is complicated, and it requires extensive training in order to use it properly.  Albertsons knew that Haggen needed extensive training in order to "standup" and operate the PM2 system at the Stores.  Albertsons also knew and represented that, with respect to PM2, Albertsons' expertise and knowledge was superior even to the BPO provider that had historically supported PM2 at Albertsons' stores.  Albertsons therefore promised to provide PM2 training to no fewer than six Haggen operators for a period of four to six months.

162.    Haggen projected and based the success and profitability of the Stores, in large part, on the fundamental premise and business strategy that, upon entering a Haggen store for the first time, customers would see no pricing changes on familiar items—*i.e.,* the staple basket of groceries that shoppers customarily purchase. Albertsons knew and understood that the "no immediate pricing changes" was a key part of Haggen's transition strategy, and Albertsons knew

and understood that Haggen's successful transformation of the divested Stores depended on the successful implementation of this pricing strategy. Albertsons also knew that, historically and in each of the local grocery markets, even slight changes in prices have a dramatic impact on consumer purchasing.

163.    Albertsons promised to authorize, initiate, allow and take all commercially reasonable steps to cause the efficient flow of relevant, necessary and "active" data to Haggen; to avoid and/or prevent the flow of irrelevant, extraneous, misleading and/or outdated data to Haggen; to explain the difference between relevant/necessary/active data and irrelevant/extraneous/misleading/outdated data; and to identify relevant/necessary/active data.

164.    Albertsons' promises to provide the necessary cooperation and to allow for the free flow of essential data were false. Albertsons had no intention to honor its promise at the time it was made. In fact, Albertsons had already begun to plan its willful and malicious campaign against Haggen to undermine a successful transition. Without limitation, Albertsons had no intention of providing, identifying and explaining relevant/necessary/active data, and it had every intention of providing irrelevant/extraneous/misleading/outdated data, through PM2 or otherwise. Nor did Albertsons intend to provide the level of cooperation, support and training necessary for the BPO provider to provide essential and accurate pricing information and for Haggen to implement and operate the system, through PM2 or otherwise.

165.    Albertsons acted willfully and intended that Haggen rely on its false promises, and Haggen did in fact reasonably rely to its detriment. In November 2014, in reliance on Albertsons' promises, Haggen presented its "no immediate price increase" strategy to the FTC as an essential part of its business plan before the execution of the Purchase Agreement. The "no immediate price increase" was an essential part of the overall business plan which convinced the

FTC that the Stores would succeed under the Haggen banner, and which led the FTC to approve Haggen as a buyer of the divested stores.

166.    Had Haggen known Albertsons' true intentions, Haggen would have known that the transitions were sabotaged and it would not have purchased the Stores, nor would the FTC have permitted the purchase.

167.    By way of further example, and in particular, in November 2014 Albertsons made false representations to Haggen with respect to 21 "underperforming" Stores that Albertsons wished to sell to Haggen.  Those stores were the subject of extensive review and consideration by the FTC to determine whether, in fact, they had a realistic chance to be viable competitors after their conversion to Haggen Stores.  On November 14, 2014, in a presentation to the FTC, Albertsons stated that the stores were showing signs of improvement under Albertsons ownership, and Albertsons further asserted that "the buyers have an even better chance at improving the profitability of these stores" under new ownership because "[r]e-branding and re-grand opening of stores will give the stores a fresh start in the eyes of consumers."

168.    On November 17 and at other times prior to the execution of the Purchase Agreement, Albertsons shared this FTC presentation with Haggen either verbatim or in substance.  For example, by e mail with attachment dated November 17, 2014, counsel for Albertsons transmitted the November 14 PowerPoint to counsel for Haggen, and in the body of the e mail confirmed that Albertsons had assured the FTC that Haggen "will get a boost from the rebranding/grand re-opening by new ownership."

169.    Albertsons' assurances regarding a sales boost and other benefits from a successful grand opening were false and misleading when made:  Albertsons had already begun to plan its campaign against Haggen to undermine a successful grand-opening and transition.

170.    Additionally, these willful and malicious statements regarding price information and the boost Haggen would receive from a successful transition were made in the context of numerous other misrepresentations that Albertsons would not improperly interfere with or undermine Haggen's efforts to become a new competitor in the Relevant Markets.  For example, Albertsons promised to refrain from changing or modifying its current existing advertising practices, programs and policies; maintain customary levels of inventory at each Store; use commercially reasonable efforts to preserve the existing relationships with each of the Stores suppliers, customers and employees; and refrain from removing equipment from the Stores.

171.    However, Albertsons willfully knew at the time that it made those promises and representations to Haggen that it had no intention of fulfilling them.

172.    Instead, consistent with its plan from the very beginning, during the months that ownership of the Stores transferred from Albertsons to Haggen, Albertsons deliberately and overstocked or understocked inventory at the Stores outside of the ordinary course of business; ceased existing advertising practices, programs and policies; engaged in aggressive discounting through coupon drops; provided false and misleading pricing files; and removed and diverted equipment from the Stores to stores that were not changing ownership.

173.    Further, Albertsons intentionally concealed and/or omitted material information, to wit: Albertsons' intent not to allow Haggen to enter the Relevant Markets.

174.    At the time the promises were made by Albertsons, Haggen was unaware of Albertsons' secret intention not to allow Haggen to enter the Relevant Markets and fairly compete, and could not, in the exercise of reasonable diligence, have discovered Albertsons' secret intention.

175.     Haggen relied to its detriment upon Albertsons' aforementioned promises and representations, including acquiring the Stores and entering the Relevant Markets.

176.     As a proximate result of Albertsons' willful and malicious fraud and the facts alleged herein, Haggen has suffered damages in an amount to be determined at trial. Albertsons' acts were fraudulent in nature and done with malice and willful disregard for Haggen's rights, and with the intent to cause economic injury to Haggen.  As a result of such fraud, no limitation on the amount of indemnification and other recovery exists.  In addition, as a result of such fraudulent intent with respect to the divested stores, Haggen is entitled to seek rescission of the Purchase Agreement. Also, as a result of such willful, intentional malicious and oppressive conduct, Haggen is entitled to an award of punitive damages.

### COUNT VII
**(Unfair Competition)**

177.     Haggen repeats and reasserts the allegations contained in paragraphs 1 through 122 above as if fully set forth herein.

178.     Albertsons represented to Haggen that Albertsons would, and the FTC Orders required Albertsons to, afford Haggen a fair opportunity to compete with Albertsons for customers in each of the markets where it acquired Stores.

179.     Instead, Albertsons improperly used its knowledge of Haggen's Store Closing Cadence to decrease or eliminate advertising at Stores prior to conversion; decrease or increase inventory levels outside of the normal course of business; remodel and rebrand its closest competing store to unfairly compete with a newly acquired Haggen Store; and engage in an aggressive couponing campaign, all of which had the effect of diverting customers away from Haggen before Haggen had an opportunity to compete in the Relevant Markets.

180.    Albertsons also undermined Haggen's pricing strategy by intentionally providing false, misleading and incomplete pricing files, and secretly accessing Haggen's private data in order to unfairly compete and gain a competitive edge in the Relevant Markets.

181.    Such conduct, which was willful and malicious, constitutes unfair competition.

182.    Albertsons is liable to Haggen for Haggen's damages and losses resulting from Albertsons' unfair competition.

183.    As a result of Albertsons' unfair competition, Haggen is entitled to damages in an amount to be determined at trial, including but not limited to punitive damages, resulting from Albertsons' willful and malicious unfair competition.

**COUNT VIII**
**(Misappropriation of Trade Secrets Under the Uniform Trade Secrets Acts)**
**(California** Cal. Civ. Code § 3426 (West)**– 3426.11)**
**(Arizona -** Ariz. Rev. Stat. Ann. § 44-401**– 44-407)**
**(Nevada -** Nev. Rev. Stat. Ann. § 600A.010 (West)**– 600A.100)**
**(Oregon -** Or. Rev. Stat. Ann. § 646.461 (West)**– 646.475)**
**(Washington -** Wash. Rev. Code Ann. § 19.108.010 (West)**– 19.108.940)**

184.    Haggen repeats and reasserts the allegations contained in paragraphs 1 through 122 above as if fully set forth herein.

185.    Haggen's Store Closing Cadence derived independent economic value from not being generally known to, and not being readily accessible by proper means by, other persons who could obtain economic value from their disclosure or use.   Therefore, Haggen's Store Closing Cadence constitutes a trade secret within the meaning of the Uniform Trade Secrets Acts of California, Arizona, Nevada, Oregon and Washington.  *See* Cal. Civ. Code § 3426 et seq.; Ariz. Rev. Stat. Ann. § 44-401 et seq.; Nev. Rev. Stat. Ann. § 600A.010 et seq.; Or. Rev. Stat. Ann. § 646.461 et seq.; RCW §§ 19.108.100, *et seq.* (the "Uniform Trade Secrets Acts")

186.     Haggen took measures that were reasonable under the circumstances to maintain the confidentiality of the Store Closing Cadence.

187.     Albertsons had access to Haggen's Store Closing Cadence pursuant to the Purchase Agreement, but such access was limited to use only for the purpose of transitioning Stores to Haggen and not for use to compete with or cause financial harm to Haggen.

188.     As further described above, Albertsons misappropriated Haggen's trade secret, in violation of the Uniform Trade Secrets Acts, by using Haggen's Store Closing Cadence to decrease or eliminate advertising at Stores prior to conversion; decrease or increase inventory levels outside of the normal course of business; remodel and rebrand its closest competing store to unfairly compete with a newly acquired Haggen Store; and engage in an aggressive and unprecedented coupon campaign before and after Store conversions, all of which had the effect of diverting customers away from Haggen before Haggen had an opportunity to compete in the Relevant Markets.

189.     Albertsons' misappropriation of Haggen's trade secrets was willful and malicious.

190.     Albertsons was unjustly enriched and personally benefitted from the misappropriation of Haggen's trade secret.

191.     As a direct and proximate result of Albertsons' unlawful conduct, Haggen has sustained damages in an amount to be determined at trial.

192.     Because Albertsons' misappropriation of Haggen's trade secret was willful and malicious, Haggen is entitled to exemplary damages of twice any award of compensatory damages.

**Count IX**
**(Conversion)**

193.     Haggen repeats and reasserts the allegations contained in paragraphs 1 through 122 above as if fully set forth herein.

194.     Albertsons transferred equipment and inventory out of Stores that were changing ownership and improperly diverted such equipment and inventory to stores that were not changing ownership.

195.     Haggen had a property interest and a right of possession in the equipment and inventory located in each of the Stores it purchased from Albertsons, which were unlawfully converted by Albertsons.

196.     Albertsons' conversion was willful and malicious.

197.     Haggen has suffered damages as a result of Albertsons' conversion of Haggen's property.

198.     As a result of Albertsons' conversion of Haggen's equipment and inventory, Haggen is entitled to damages in an amount to be determined at trial, including punitive damages resulting from Albertsons' willful and malicious acts.

**Count X**
**(Violation of the Washington Consumer Protection Act,** Wash. Rev. Code Ann. § 19.86.020 (West))

199.     Haggen repeats and reasserts the allegations contained in paragraphs 1 through 122 above as if fully set forth herein.

200.     Albertsons' misconduct as alleged herein occurred in the conduct of trade or commerce and directly and/or indirectly affects the people of the state of Washington, where Haggen is headquartered. The impact of Albertsons' conduct affected the Stores in Washington,

Oregon, California, Arizona, and Nevada, and caused damage to Haggen in each of the Relevant Markets.

201.   The following intentional and calculated actions of Albertsons, as more fully alleged above, amount to unfair methods of competition and unfair and deceptive acts or practices in the conduct of trade or commerce pursuant to Wash. Rev. Code Ann. § 19.86.020, and attempts to monopolize supermarket trade or commerce pursuant to Wash. Rev. Code Ann. § 19.86.040 (West); (i) decreasing or eliminating advertising at Stores; (ii) undermining Haggen's pricing strategy by intentionally providing false, misleading and incomplete pricing files; (iii) secretly accessing Haggen's private data in order to unfairly compete and gain a competitive edge in the Relevant Markets; (iv) decreasing inventory levels in Stores; and (v) launching aggressive and unprecedented promotional and discounting campaigns to correspond with Haggen Store openings.

202.   Albertsons' misconduct interfered with the promotion and conduct of Haggen's Stores, thus injuring Haggen in its business and/or property.

203.   Albertsons' misconduct is injurious to the public interest because it created a likelihood of consumer confusion or misunderstanding as to the local supermarket options available in their geographic regions, with the capacity to deceive a substantial portion of the public.

204.   Albertsons' misconduct harmed Haggen by diverting consumers to stores retained by Albertsons and negatively impacting Haggen's sales, profits, and good-will during the time period that was critical to Haggen's successful breakthrough into new markets.

205.    Albertsons used confidential information to deceive consumers and the public at large into reasonably believing that their supermarket options were limited to the stores being retained by Albertsons around the time of Store conversions.

206.    Albertsons' deceptive and unfair trade practices harmed Haggen and are injurious to the public interest because Albertsons unfairly eliminated available grocery products being offered for sale at newly opened Haggen Stores.

207.    Albertsons' deceptive and unfair trade practices harmed Haggen and is injurious to the public interest because it caused the ultimate failure of at least 26 Stores recently acquired from Albertsons, thus impacting a Washington business and eliminating Haggen as an alternative supermarket option to Albertsons' retained stores in those areas.

208.    As a result, Haggen is entitled to damages in an amount to be determined at trial, including actual damages, treble damages, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Haggen respectfully prays for judgment against Albertsons as follows:

a.    Judgment in an amount to be determined at trial, including, but not limited to, compensatory damages; treble damages pursuant to 15 U.S.C.A. § 15; punitive damages for Albertsons' fraud and willful and malicious unfair competition; exemplary damages pursuant to the Uniform Trade Secrets Acts; punitive damages for Albertsons' willful and malicious conversion; and treble damages for Albertsons' violation of the Washington Consumer Protection Act;

b.    Alternatively, declare Haggen has the right to rescind the Asset Purchase Agreement;

c.    Prejudgment and post judgment interest;

d.      Reasonable attorneys' fees, costs and expenses, pursuant to the Purchase Agreement, 15 U.S.C.A. § 15, the Uniform Trade Secrets Acts, the Washington Consumer Protection Act and otherwise; and

e.      Such other relief as the Court may deem just and proper.


OF COUNSEL:

Stuart H. Singer
James M. Grippando
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, #1200
Fort Lauderdale, FL 33301
(301) 351-9354

Richard A. Feinstein
Christopher G. Renner
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue NW, Suite 800
Washington, DC 20015
(202) 237-6131

September 1, 2015

MORRIS, NICHOLS, ARSHT &
   TUNNELL LLP

/s/ S. Mark Hurd
S. Mark Hurd (#3297)
Ryan D. Stottmann (#5237)
1201 N. Market Street
Wilmington, DE  19801
(302) 658-9200
   *Attorneys for Plaintiff Haggen Holdings, LLC*