# Exhibit A

**ANALYSIS OF AGREEMENT CONTAINING CONSENT ORDER**
**TO AID PUBLIC COMMENT**

*In the Matter of Cerberus Institutional Partners V, L.P.,*
*AB Acquisition, LLC, and Safeway Inc.*
*File No. 141 0108*

## I.  INTRODUCTION AND BACKGROUND

The Federal Trade Commission ("Commission") has accepted for public comment, subject to final approval, an Agreement Containing Consent Order ("Consent Order") from Cerberus Institutional Partners V, L.P. ("Cerberus"), its wholly owned subsidiary, AB Acquisition, LLC ("Albertson's"), and Safeway Inc. ("Safeway") (collectively, the "Respondents").  On March 6, 2014, Albertson's and Safeway entered into a merger agreement whereby Albertson's agreed to purchase 100% of the equity of Safeway for approximately $9.2 billion (the "Acquisition").  The purpose of the proposed Consent Order is to remedy the anticompetitive effects that otherwise would result from the Acquisition.  Under the terms of the proposed Consent Order, Respondents are required to divest 168 stores and related assets in 130 local supermarket geographic markets (collectively, the "relevant markets") in eight states to four Commission-approved buyers.  The divestitures must be completed within a time-period ranging from 60 to 150 days following the date of the Acquisition.  Finally, the Commission and Respondents have agreed to an Order to Maintain Assets that requires Respondents to operate and maintain each divestiture store in the normal course of business, through the date the store is ultimately divested to a buyer.

The proposed Consent Order has been placed on the public record for 30 days to solicit comments from interested persons.  Comments received during this period will become part of the public record.  After 30 days, the Commission again will review the proposed Consent Order and any comments received, and decide whether it should withdraw the Consent Order, modify the Consent Order, or make it final.

The Commission's Complaint alleges that the Acquisition, if consummated, would violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45, by removing an actual, direct, and substantial supermarket competitor in the 130 local supermarket geographic markets.  The elimination of this competition would result in significant competitive harm; specifically the Acquisition will allow the combined entity to increase prices above competitive levels, unilaterally or by coordinating with remaining market participants.  Similarly, absent a remedy, there is significant risk that the merged firm may decrease quality and service aspects of their stores below competitive levels.  The proposed Consent Order would remedy the alleged violations by requiring divestitures to replace competition that otherwise would be lost in the relevant markets because of the Acquisition.

## II.     THE RESPONDENTS

AB Acquisition, LLC, owned by New York-based private equity firm Cerberus Capital Management, L.P., is the parent company of Albertson's LLC and New Albertson's, Inc. (together "Albertson's").  As of March 19, 2014, Albertson's LLC operated 630 supermarkets, primarily under its Albertson banner.  Presently, Albertson's stores are located in Arkansas, Arizona, California, Colorado, Florida, Idaho, Louisiana, Montana, Nevada, New Mexico, North Dakota, Oregon, Texas, Utah, Washington, and Wyoming.  Albertson's LLC also operates supermarkets in Texas under the Market Street, Amigos, and United Supermarkets banners.  United Supermarkets is a traditional grocery store, while Market Street offers specialty and "whole-health" products, and Amigos has an international and Hispanic format.  As of March 19, 2014, New Albertson's, Inc., owned and operated 445 supermarkets under the Jewel-Osco, ACME, Shaw's, and Star Market banners, dispersed throughout Iowa, Illinois, Indiana, Delaware, Maryland, Pennsylvania, New Jersey, Massachusetts, Maine, New Hampshire, Rhode Island, and Vermont.

As of December 2013, Safeway owned 1,332 supermarkets, making it one of the largest food and drug retailers in the United States.  Stores are operated under the Safeway banner in Alaska, Arizona, California, Colorado, District of Columbia, Delaware, Hawaii, Idaho, Maryland, Montana, Nebraska, Nevada, New Mexico, Oregon, South Dakota, Virginia, Washington, and Wyoming.  Safeway also operates stores under the following banners: Pavilions, Pak 'n Save, and The Market in California; Randall's and Tom Thumb in Texas; Genuardi's in Pennsylvania; Vons in California and Nevada; and Carr's in Alaska.

## III.     RETAIL SALE OF FOOD AND OTHER GROCERY PRODUCTS IN SUPERMARKETS

The Acquisition presents substantial antitrust concerns for the retail sale of food and other grocery products in supermarkets.  Supermarkets are defined as traditional full-line retail grocery stores that sell, on a large-scale basis, food and non-food products that customers regularly consume at home – including, but not limited to, fresh meat, dairy products, frozen foods, beverages, bakery goods, dry groceries, detergents, and health and beauty products.  This broad set of products and services provides a "one-stop shopping" experience for consumers by enabling them to shop in a single store for all of their food and grocery needs.  The ability to offer consumers one-stop shopping is a critical differentiating factor between supermarkets and other food retailers.

The relevant product market includes supermarkets within "hypermarkets," such as Wal-Mart Supercenters.  Hypermarkets also sell an array of products that would not be found in traditional supermarkets.  However, hypermarkets, like conventional supermarkets, contain bakeries, delis, dairy, produce, fresh meat, and sufficient product offerings to enable customers to

purchase all of their weekly grocery requirements in a single shopping visit.

Other types of retailers – such as hard discounters, limited assortment stores, natural and organic markets, ethnic specialty stores, and club stores – also sell food and grocery items. These types of retailers, however, are not in the relevant product market because they offer a more limited range of products and services than supermarkets and because they appeal to a distinct customer type. Shoppers typically do not view these other food and grocery retailers as adequate substitutes for supermarkets.[1] Further, although these other types of retailers offer some competition, supermarkets do not view them as providing as significant or close competition as traditional supermarkets. Thus, consistent with prior Commission precedent, these other types of retailers are excluded from the relevant product market.[2]

The relevant geographic markets in which to analyze the effects of the Acquisition are areas that range from a two- to ten-mile radius around each of the Respondents' supermarkets, depending on factors such as population density, traffic patterns, and unique characteristics of each market. Where the Respondents' supermarkets are located in rural, isolated areas, the relevant geographic areas are larger than areas where the Respondents' supermarkets are located in more densely populated suburban areas. A hypothetical monopolist of the retail sale of food and grocery products in supermarkets in each relevant area could profitably impose a small but significant non-transitory increase in price.

The 130 geographic markets in which to analyze the effects of the Acquisition are local areas in and around: (1) Anthem, Arizona; (2) Carefree, Arizona; (3) Flagstaff, Arizona; (4) Lake Havasu, Arizona; (5) Prescott, Arizona; (6) Prescott Valley, Arizona; (7) Scottsdale, Arizona; (8) Tucson (Eastern), Arizona; (9) Tucson (Southwest), Arizona; (10) Alpine, California; (11) Arroyo Grande/Grover Beach, California; (12) Atascadero, California; (13) Bakersfield, California; (14) Burbank, California; (15) Calabasas, California; (16) Camarillo, California; (17) Carlsbad (North), California; (18) Carlsbad (South), California; (19) Carpinteria, California; (20) Cheviot Hills/Culver City, California; (21) Chino Hills, California; (22) Coronado, California; (23) Diamond Bar, California; (24) El Cajon, California; (25) Hermosa Beach, California; (26) Imperial Beach, California; (27) La Jolla, California; (28) La Mesa, California; (29) Ladera Ranch, California; (30) Laguna Beach, California; (31) Laguna Niguel, California; (32) Lakewood, California; (33) Lemon Grove, California; (34) Lomita, California; (35) Lompoc, California; (36) Mira Mesa (North), California; (37) Mira Mesa (South),

---

[1] Supermarket shoppers would be unlikely to switch to one of these other types of retailers in response to a small but significant increase in price or "SSNIP" by a hypothetical supermarket monopolist. *See* U.S. DOJ and FTC Horizontal Merger Guidelines § 4.1.1 (2010).

[2] *See, e.g.*, Bi-Lo Holdings, LLC/Delhaize America, LLC, Docket C-4440 (February 25, 2014); AB Acquisition, LLC, Docket C-4424 (December 23, 2013); Konkinlijke Ahold N.V./Safeway Inc., Docket C-4367 (August 17, 2012); Shaw's/Star Markets, Docket C-3934 (June 28, 1999); Kroger/Fred Meyer, Docket C-3917 (January 10, 2000); Albertson's/American Stores, Docket C–3986 (June 22, 1999); Ahold/Giant, Docket C-3861 (April 5, 1999); Albertson's/Buttrey, Docket C-3838 (December 8, 1998); Jitney-Jungle Stores of America, Inc., Docket C-3784 (January 30, 1998). *But see* Wal-Mart/Supermercados Amigo, Docket C-4066 (November 21, 2002) (the Commission's complaint alleged that in Puerto Rico, club stores should be included in a product market that included supermarkets because club stores in Puerto Rico enabled consumers to purchase substantially all of their weekly food and grocery requirements in a single shopping visit).

California; (38) Mission Viejo/Laguna Hills, California; (39) Mission Viejo (North), California; (40) Morro Bay, California; (41) National City, California; (42) Newbury, California; (43) Newport, California; (44) Oxnard, California; (45) Palm Desert/Rancho Mirage, California; (46) Palmdale, California; (47) Paso Robles, California; (48) Poway, California; (49) Rancho Cucamonga/Upland, California; (50) Rancho Santa Margarita, California; (51) San Diego (Clairemont), California; (52) San Diego (Hillcrest/University Heights), California; (53) San Diego (Tierrasanta), California; (54) San Luis Obispo, California; (55) San Marcos, California; (56) San Pedro, California; (57) Santa Barbara, California; (58) Santa Barbara/Goleta, California; (59) Santa Clarita, California; (60) Santa Monica, California; (61) Santee, California; (62) Simi Valley, California; (63) Solana Beach, California; (64) Thousand Oaks, California; (65) Tujunga, California; (66) Tustin (Central), California; (67) Tustin/Irvine, California; (68) Ventura, California; (69) Westlake Village, California; (70) Yorba Linda, California; (71) Butte, Montana; (72) Deer Lodge, Montana; (73) Missoula, Montana; (74) Boulder City, Nevada; (75) Henderson, (East), Nevada; (76) Henderson (Southwest), Nevada; (77) Summerlin, Nevada; (78) Ashland, Oregon; (79) Baker County, Oregon; (80) Bend, Oregon; (81) Eugene, Oregon; (82) Grants Pass, Oregon; (83) Happy Valley/Clackamas, Oregon; (84) Keizer, Oregon; (85) Klamath Falls, Oregon; (86) Lake Oswego, Oregon; (87) Milwaukie, Oregon; (88) Sherwood, Oregon; (89) Springfield, Oregon; (90) Tigard, Oregon; (91) West Linn, Oregon; (92) Colleyville, Texas; (93) Dallas (Far North), Texas; (94) Dallas (Farmers/Branch/North Dallas), Texas; (95) Dallas (University Park/Highland Park), Texas; (96) Dallas (University Park/Northeast), Texas; (97) McKinney, Texas; (98) Plano, Texas; (99) Roanoke, Texas; (100) Rowlett, Texas; (101) Bremerton, Washington; (102) Burien, Washington; (103) Everett, Washington; (104) Federal Way, Washington; (105) Gig Harbor, Washington; (106) Lake Forest Park, Washington; (107) Lake Stevens, Washington; (108) Lakewood, Washington; (109) Liberty Lake, Washington; (110) Milton, Washington; (111) Monroe, Washington; (112) Oak Harbor, Washington; (113) Olympia (East), Washington; (114) Port Angeles, Washington; (115) Port Orchard, Washington; (116) Puyallup, Washington; (117) Renton (East Hill-Meridian), Washington; (118) Renton (New Castle), Washington; (119) Sammamish, Washington; (120) Shoreline, Washington; (121) Silverdale, Washington; (122) Snohomish, Washington; (123) Tacoma (Eastside), Washington; (124) Tacoma (Spanaway), Washington; (125) Walla Walla, Washington; (126) Wenatchee, Washington; (127) Woodinville, Washington; (128) Casper, Wyoming; (129) Laramie, Wyoming; and (130) Sheridan, Wyoming.

Each of the relevant geographic markets is highly concentrated and the Acquisition would significantly increase market concentration and eliminate substantial direct competition between two significant supermarket operators. The post-Acquisition HHI levels in the relevant markets vary from 2,562 to 10,000 points, and the HHI deltas vary from 225 to 5,000 points. Under the 2010 Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"), an acquisition that results in an HHI in excess of 2,500 points and increases the HHI by more than 200 points is presumed anticompetitive. Thus, the presumptions of illegality and anticompetitive effects are easily met, and often far exceeded, in the relevant geographic markets at issue.

The relevant markets are also highly concentrated in terms of the number of remaining market participants post-Acquisition. Of the 130 geographic markets, the acquisition will result

in a merger-to-monopoly in 13 markets and a merger-to-duopoly in 42 markets. In the remaining markets, the Acquisition will reduce the number of market participants from four to three in 43 markets, five to four in 27 markets, and six to five in five markets.[3]

The anticompetitive implications of such significant increases in market concentration are reinforced by substantial evidence demonstrating that Albertson's and Safeway are close and vigorous competitors in terms of price, format, service, product offerings, promotional activity, and location in each of the relevant geographic markets. Absent relief, the Acquisition would eliminate significant head-to-head competition between Albertson's and Safeway and would increase the ability and incentive of Albertson's to raise prices unilaterally post-Acquisition. The Acquisition would also decrease incentives to compete on non-price factors, such as service levels, convenience, and quality. Lastly, the high levels of concentration also increase the likelihood of competitive harm through coordinated interaction in markets in which Albertson's will face only one other traditional supermarket competitor post-Acquisition. Given the transparency of pricing and promotional practices among supermarkets and that supermarkets "price check" competitors in the ordinary course of business, the Acquisition increases the possibility that Albertson's and its remaining competitor could simply follow each other's price increases post-Acquisition.

New entry or expansion in the relevant markets is unlikely to deter or counteract the anticompetitive effects of the Acquisition. Moreover, even if a prospective entrant existed, the entrant must secure a viable location, obtain the necessary permits and governmental approvals, build its retail establishment or renovate an existing building, and open to customers before it could begin operating and serve as a relevant competitive constraint. As a result, new entry sufficient to achieve a significant market impact and act as a competitive constraint is unlikely to occur in a timely manner.

## IV. THE PROPOSED CONSENT ORDER

The proposed remedy, which requires the divestiture of Albertson's or Safeway supermarkets in the relevant markets to four Commission-approved up-front buyers (the "proposed buyers") will restore fully the competition that otherwise would be eliminated in these markets as a result of the Acquisition. Specifically, Respondents have agreed to divest:

- 146 stores and related assets in Arizona, California, Nevada, Oregon, and Washington to Haggen, Inc. ("Haggen");
- Two stores in Washington to Supervalu, Inc. ("Supervalu");
- 12 stores and related assets in Texas to Associated Wholesale Grocers ("AWG"); and
- Eight stores and related assets in Montana and Wyoming to Associated Food Stores ("Associated").

The proposed buyers appear to be highly suitable purchasers and are well positioned to enter the relevant geographic markets and prevent the increase in market concentration and likely

---

[3] *See* Exhibit A.

competitive harm that otherwise would have resulted from the Acquisition.  The supermarkets currently owned by any of the proposed buyers are all located outside the relevant geographic markets in which they are purchasing divested stores.

Haggen is a regional supermarket chain with 18 supermarkets in Washington and Oregon. Haggen will purchase all but two of the divested stores in Washington, because Haggen already operates stores in those two geographic markets.  Supervalu will purchase the two stores in Washington that Haggen is not purchasing.  Supervalu is a wholesale distributor that also operates 190 corporate-owned supermarkets and previously owned these two Washington stores. AWG is a member-owned cooperative grocery wholesaler supplying nearly 3,000 supermarkets in 33 states.  Although AWG does not currently own or operate any supermarkets, AWG has owned and operated corporate-owned supermarkets in the past.  Finally, Associated is a member-owned cooperative grocery wholesaler that supplies and operates retail supermarkets. Associated's members operate approximately 424 grocery stores in ten states, and the cooperative, through a subsidiary, owns and operates 43 corporate-owned supermarkets located in Utah and Nevada. It is expected that AWG will assign its operating rights in the 12 Texas stores it is acquiring to RLS Supermarkets, LLC (d/b/a Minyard Food Stores) and that Associated will assign its rights in the eight Montana and Wyoming stores it is acquiring to Missoula Fresh Market LLC, Ridley's Family Markets, Inc., and Stokes Inc.

The Proposed Consent Order requires Respondents to divest:  (a) the Arizona, California, Nevada, Oregon, and Washington assets to Haggen within 150 days from the date of the Acquisition; (b) the two stores in Washington to Supervalu within 100 days of the date of the Acquisition; (c) the Texas assets to AWG within 60 days of the date of the Acquisition; and (d) the Montana and Wyoming assets to Associated within 60 days of the date of the Acquisition.  If, at the time before the Proposed Consent Order is made final, the Commission determines that any of the proposed buyers are not acceptable buyers, Respondents must immediately rescind the divestiture(s) and divest the assets to a different buyer that receives the Commission's prior approval.

The proposed Consent Order contains additional provisions designed to ensure the adequacy of the proposed relief.  For example, Respondents have agreed to an Order to Maintain Assets that will be issued at the time the Proposed Consent Order is accepted for public comment.  The Order to Maintain Assets requires Albertson's and Safeway to operate and maintain each divestiture store in the normal course of business, through the date the store is ultimately divested to a buyer.  Since the divestiture schedule runs for an extended period of time (potentially up to 150 days following the Acquisition date), the Proposed Consent Order appoints Richard King as a Monitor to oversee the Respondents' compliance with the requirements of the Proposed Consent Order and Order to Maintain Assets.  Mr. King has the experience and skill-set to be an effective Monitor, no identifiable conflicts, and sufficient time to dedicate to this matter through its conclusion.  Lastly, for a period of ten years, Albertson's is required to give the Commission prior notice of plans to acquire any interest in a supermarket that has operated or is operating in the counties included in the relevant markets.

*     *     *

6

The sole purpose of this Analysis is to facilitate public comment on the proposed Consent Order.  This Analysis does not constitute an official interpretation of the proposed Consent Order, nor does it modify its terms in any way.

## Exhibit A

| Area Number | City | State | Merger Result | HHI (pre) | HHI (post) | Delta | Divested Store(s) |
|---|---|---|---|---|---|---|---|
| 1 | Anthem | AZ | 4 to 3 | 2768 | 3423 | 655 | SFY 1726 |
| 2 | Carefree | AZ | 5 to 4 | 2298 | 2976 | 678 | ALB 979 |
| 3 | Flagstaff | AZ | 5 to 4 | 2744 | 3365 | 621 | ALB 967 |
| 4 | Lake Havasu | AZ | 4 to 3 | 2609 | 3401 | 792 | ALB 1027 |
| 5 | Prescott | AZ | 4 to 3 | 2675 | 3405 | 730 | ALB 953 |
| 6 | Prescott Valley | AZ | 4 to 3 | 2828 | 3340 | 512 | ALB 965 |
| 7 | Scottsdale | AZ | 3 to 2 | 3797 | 5001 | 1204 | ALB 983 |
| 8 | Tucson (Eastern) | AZ | 4 to 3 | 3341 | 4130 | 789 | SFY 234 & 2611 |
| 9 | Tucson (Southwest) | AZ | 5 to 4 | 2018 | 2909 | 891 | ALB 972 |
| 10 | Alpine | CA | 3 to 2 | 3857 | 5002 | 1145 | SFY 2333 |
| 11 | Arroyo Grande/ Grover Beach | CA | 3 to 2 | 3690 | 6864 | 3174 | ALB 6304 |
| 12 | Atascadero | CA | 3 to 2 | 3456 | 6242 | 2786 | ALB 6390 |
| 13 | Bakersfield | CA | 6 to 5 | 1923 | 2562 | 639 | ALB 6323, 6325 & 6379 |
| 14 | Burbank | CA | 3 to 2 | 4199 | 5011 | 812 | ALB 6315 |
| 15 | Calabasas | CA | 3 to 2 | 3400 | 5415 | 2015 | SFY 2031 |
| 16 | Camarillo | CA | 5 to 4 | 2950 | 4215 | 1265 | ALB 6385 |
| 17 | Carlsbad (North) | CA | 4 to 3 | 2977 | 3888 | 911 | ALB 6701 |
| 18 | Carlsbad (South) | CA | 5 to 4 | 2209 | 3210 | 1001 | ALB 6720 |
| 19 | Carpinteria | CA | 2 to 1 | 5012 | 10,000 | 4988 | SFY 2425 |
| 20 | Cheviot Hills/ Culver City | CA | 4 to 3 | 2394 | 3914 | 1520 | ALB 6168 & 6169 |
| 21 | Chino Hills | CA | 4 to 3 | 3596 | 4047 | 451 | SFY 2597 |
| 22 | Coronado Island | CA | 2 to 1 | 5025 | 10,000 | 4975 | ALB 6747 |
| 23 | Diamond Bar | CA | 3 to 2 | 4466 | 5231 | 765 | SFY 2062 |
| 24 | El Cajon | CA | 4 to 3 | 2983 | 3597 | 614 | ALB 6771 |
| 25 | Hermosa Beach | CA | 5 to 4 | 2752 | 4371 | 1619 | ALB 6127, 6138, 6153 & 6189 |

| Area Number | City | State | Merger Result | HHI (pre) | HHI (post) | Delta | Divested Store(s) |
|---|---|---|---|---|---|---|---|
| 26 | Imperial Beach | CA | 2 to 1 | 5869 | 10,000 | 4131 | ALB 6228 |
| 27 | La Jolla | CA | 3 to 2 | 5505 | 7083 | 1578 | ALB 6788 |
| 28 | La Mesa | CA | 3 to 2 | 3382 | 5997 | 2615 | SFY 2064 & 2137 |
| 29 | Ladera Ranch | CA | 2 to 1 | 5081 | 10,000 | 4919 | SFY 2703 |
| 30 | Laguna Beach | CA | 3 to 2 | 3335 | 5799 | 2464 | ALB 6575 |
| 31 | Laguna Niguel | CA | 4 to 3 | 3190 | 3883 | 693 | SFY 1676 |
| 32 | Lakewood | CA | 6 to 5 | 2073 | 2581 | 508 | ALB 6154 |
| 33 | Lemon Grove | CA | 3 to 2 | 3581 | 6059 | 2478 | SFY 2365 |
| 34 | Lomita | CA | 3 to 2 | 3695 | 5040 | 1345 | ALB 6107 |
| 35 | Lompoc | CA | 4 to 3 | 2566 | 3713 | 1147 | ALB 6339 |
| 36 | Mira Mesa (North) | CA | 5 to 4 | 2412 | 3808 | 1396 | ALB 6742 & 6772 |
| 37 | Mira Mesa (South) | CA | 2 to 1 | 6904 | 10,000 | 3096 | ALB 6770 |
| 38 | Mission Viejo/ Laguna Hills | CA | 4 to 3 | 3157 | 3784 | 627 | ALB 6517 |
| 39 | Mission Viejo (North) | CA | 3 to 2 | 3933 | 5012 | 1079 | SFY 1670 |
| 40 | Morro Bay | CA | 5 to 4 | 2965 | 4056 | 1091 | SFY 2312 |
| 41 | National City | CA | 3 to 2 | 3748 | 5013 | 1265 | SFY 2006, 2336 & 3063 |
| 42 | Newbury Park | CA | 3 to 2 | 3629 | 5833 | 2204 | SFY 1793 |
| 43 | Newport Beach | CA | 5 to 4 | 3160 | 3811 | 651 | ALB 6504 |
| 44 | Oxnard | CA | 4 to 3 | 2939 | 3375 | 436 | ALB 6217 |
| 45 | Palm Desert/ Rancho Mirage | CA | 6 to 5 | 2196 | 3094 | 898 | SFY 2383 & 3218 |
| 46 | Palmdale | CA | 4 to 3 | 3056 | 4039 | 983 | ALB 6329 |
| 47 | Paso Robles | CA | 4 to 3 | 2851 | 5427 | 2576 | SFY 2317 |
| 48 | Poway | CA | 4 to 3 | 2540 | 3526 | 986 | ALB 6741 & 6763 |
| 49 | Rancho Cucamonga/ Upland | CA | 4 to 3 | 3266 | 4118 | 852 | ALB 6523 & 6589 |
| 50 | Rancho Santa Margarita | CA | 4 to 3 | 2628 | 4300 | 1672 | ALB 6521 |
| 51 | San Diego (Clairemont) | CA | 3 to 2 | 4066 | 6374 | 2308 | ALB 6781 |
| 52 | San Diego (Hillcrest/ University Heights) | CA | 3 to 2 | 4436 | 6571 | 2135 | ALB 6714 & 6715 |

| Area Number | City | State | Merger Result | HHI (pre) | HHI (post) | Delta | Divested Store(s) |
|---|---|---|---|---|---|---|---|
| 53 | San Diego, CA (Tierrasanta) | CA | 2 to 1 | 5586 | 10,000 | 4414 | ALB 6760 |
| 54 | San Luis Obispo | CA | 4 to 3 | 2896 | 5306 | 2410 | ALB 6372 & 6409 |
| 55 | San Marcos | CA | 3 to 2 | 5991 | 6282 | 291 | SFY 2174 |
| 56 | San Pedro | CA | 3 to 2 | 3518 | 6442 | 2924 | ALB 6160 & 6164 |
| 57 | Santa Barbara | CA | 4 to 3 | 2741 | 3462 | 721 | ALB 6351 & 6352 |
| 58 | Santa Barbara/ Goleta | CA | 3 to 2 | 3909 | 7469 | 3560 | SFY 2048 & 2691 |
| 59 | Santa Clarita | CA | 4 to 3 | 2646 | 3732 | 1086 | SFY 1669 & 1961 |
| 60 | Santa Monica | CA | 4 to 3 | 3293 | 4879 | 1586 | ALB 6162 |
| 61 | Santee | CA | 3 to 2 | 3477 | 6133 | 2656 | ALB 6727 |
| 62 | Simi Valley | CA | 5 to 4 | 3633 | 7101 | 3468 | ALB 6317 & 6363; SFY 2163 |
| 63 | Solana Beach | CA | 3 to 2 | 3830 | 6188 | 2358 | ALB 6702 |
| 64 | Thousand Oaks | CA | 3 to 2 | 4057 | 6047 | 1990 | ALB 6369 |
| 65 | Tujunga | CA | 3 to 2 | 3688 | 3969 | 281 | ALB 6397 |
| 66 | Tustin (central) | CA | 4 to 3 | 3474 | 4348 | 874 | SFY 2146 & 2324 |
| 67 | Tustin/Irvine | CA | 4 to 3 | 3939 | 4485 | 546 | SFY 2822 |
| 68 | Ventura | CA | 4 to 3 | 2732 | 3550 | 818 | ALB 6318 |
| 69 | Westlake Village | CA | 5 to 4 | 1955 | 3563 | 1608 | ALB 6388 |
| 70 | Yorba Linda | CA | 4 to 3 | 2803 | 4588 | 1785 | ALB 6510 |
| 71 | Butte | MT | 3 to 2 | 4701 | 5189 | 488 | ALB 2007 |
| 72 | Deer Lodge | MT | 2 to 1 | 5000 | 10,000 | 5000 | SFY 3256 |
| 73 | Missoula | MT | 4 to 3 | 3107 | 4063 | 956 | SFY 1573 & 2619 |
| 74 | Boulder City | NV | 2 to 1 | 5051 | 10,000 | 4949 | SFY 2391 |
| 75 | Henderson (East) | NV | 4 to 3 | 2705 | 3356 | 651 | ALB 6014 & 6019 |
| 76 | Henderson (Southwest) | NV | 3 to 2 | 3653 | 5042 | 1389 | ALB 6028 |
| 77 | Summerlin | NV | 4 to 3 | 3107 | 4367 | 1260 | SFY 1688, 2392 & 2395 |
| 78 | Ashland | OR | 2 to 1 | 5013 | 10,000 | 4987 | SFY 4292 |

| Area Number | City | State | Merger Result | HHI (pre) | HHI (post) | Delta | Divested Store(s) |
|---|---|---|---|---|---|---|---|
| 79 | Baker County | OR | 2 to 1 | 5102 | 10,000 | 4898 | ALB 261 |
| 80 | Bend | OR | 6 to 5 | 2632 | 3824 | 1192 | ALB 587 & 588 |
| 81 | Eugene | OR | 5 to 4 | 2392 | 3414 | 1022 | ALB 507 & 568 |
| 82 | Grants Pass | OR | 4 to 3 | 2769 | 3537 | 768 | ALB 501 & 537 |
| 83 | Happy Valley/ Clackamas | OR | 2 to 1 | 5006 | 10,000 | 4994 | ALB 503 |
| 84 | Keizer | OR | 5 to 4 | 2852 | 3367 | 515 | ALB 562 |
| 85 | Klamath Falls | OR | 5 to 4 | 2511 | 2917 | 406 | SFY 1766 & 4395 |
| 86 | Lake Oswego | OR | 4 to 3 | 3176 | 5604 | 2428 | ALB 521 |
| 87 | Milwaukie | OR | 3 to 2 | 5729 | 6082 | 353 | ALB 566 |
| 88 | Sherwood | OR | 3 to 2 | 3989 | 5028 | 1039 | ALB 579 |
| 89 | Springfield | OR | 3 to 2 | 4400 | 5197 | 797 | SFY 311 |
| 90 | Tigard | OR | 5 to 4 | 2261 | 2984 | 723 | ALB 559, 565 & 576 |
| 91 | West Linn | OR | 3 to 2 | 3611 | 6268 | 2657 | ALB 506 |
| 92 | Colleyville | TX | 5 to 4 | 2686 | 3465 | 779 | SFY 3555 & 3576 |
| 93 | Dallas (Far North) | TX | 5 to 4 | 2413 | 2891 | 478 | ALB 4140 |
| 94 | Dallas (Farmers Branch/ North Dallas) | TX | 4 to 3 | 3746 | 5175 | 1429 | ALB 4182 |
| 95 | Dallas (University Park/ Highland Park) | TX | 4 to 3 | 2755 | 4261 | 1506 | ALB 4134 & 4168 |
| 96 | Dallas (University Park/ Northeast Dallas) | TX | 5 to 4 | 2345 | 3065 | 720 | ALB 4132 & 4297 |
| 97 | McKinney | TX | 5 to 4 | 2692 | 3613 | 921 | SFY 3573 |
| 98 | Plano | TX | 4 to 3 | 3105 | 3541 | 436 | SFY 2568 |
| 99 | Roanoke | TX | 3 to 2 | 4680 | 5351 | 671 | ALB 4149 |
| 100 | Rowlett | TX | 3 to 2 | 3386 | 5450 | 2064 | ALB 4197 |
| 101 | Bremerton | WA | 4 to 3 | 2721 | 3399 | 678 | ALB 443 |
| 102 | Burien | WA | 5 to 4 | 1979 | 4489 | 2510 | ALB 411 & 473 |
| 103 | Everett | WA | 5 to 4 | 2301 | 2586 | 285 | SFY 517 |
| 104 | Federal Way | WA | 5 to 4 | 2312 | 2709 | 397 | ALB 496 |
| 105 | Gig Harbor | WA | 3 to 2 | 3396 | 5235 | 1839 | SFY 2949 |

| Area Number | City | State | Merger Result | HHI (pre) | HHI (post) | Delta | Divested Store(s) |
|---|---|---|---|---|---|---|---|
| 106 | Lake Forest Park | WA | 5 to 4 | 3889 | 4352 | 463 | ALB 425 |
| 107 | Lake Stevens | WA | 5 to 4 | 2646 | 3455 | 809 | ALB 477 |
| 108 | Lakewood | WA | 5 to 4 | 2333 | 3170 | 837 | ALB 465 |
| 109 | Liberty Lake | WA | 3 to 2 | 3483 | 5090 | 1607 | SFY 1741 |
| 110 | Milton | WA | 3 to 2 | 3960 | 5010 | 1050 | ALB 472 |
| 111 | Monroe | WA | 4 to 3 | 2911 | 3352 | 441 | ALB 476 |
| 112 | Oak Harbor | WA | 3 to 2 | 4296 | 6446 | 2150 | SFY 3518 |
| 113 | Olympia (East) | WA | 6 to 5 | 2205 | 2566 | 361 | ALB 415 |
| 114 | Port Angeles | WA | 3 to 2 | 3773 | 5588 | 1815 | ALB 404 |
| 115 | Port Orchard | WA | 4 to 3 | 2747 | 3362 | 615 | SFY 1082 |
| 116 | Puyallup | WA | 3 to 2 | 4160 | 5072 | 912 | ALB 468 |
| 117 | Renton (East Hill-Meridian) | WA | 4 to 3 | 3304 | 3719 | 415 | ALB 470 |
| 118 | Renton (New Castle) | WA | 4 to 3 | 4417 | 5274 | 857 | SFY 1468 |
| 119 | Sammamish | WA | 2 to 1 | 5761 | 10,000 | 4239 | ALB 403 |
| 120 | Shoreline | WA | 4 to 3 | 3792 | 4017 | 225 | SFY 442 |
| 121 | Silverdale | WA | 4 to 3 | 2845 | 3516 | 671 | ALB 492 |
| 122 | Snohomish | WA | 2 to 1 | 5595 | 10,000 | 4405 | ALB 401 |
| 123 | Tacoma (Eastside) | WA | 4 to 3 | 3260 | 3727 | 467 | ALB 498 |
| 124 | Tacoma (Spanaway) | WA | 5 to 4 | 2707 | 3360 | 653 | SFY 551 |
| 125 | Walla Walla | WA | 5 to 4 | 2624 | 3417 | 793 | ALB 225 |
| 126 | Wenatchee | WA | 3 to 2 | 3744 | 5047 | 1303 | ALB 244 |
| 127 | Woodinville | WA | 3 to 2 | 3568 | 5192 | 1624 | ALB 459 |
| 128 | Casper | WY | 4 to 3 | 3816 | 4353 | 537 | SFY 433 & 2468 |
| 129 | Laramie | WY | 3 to 2 | 3793 | 5000 | 1207 | ALB 2063 |
| 130 | Sheridan | WY | 3 to 2 | 4802 | 5421 | 619 | SFY 2664 |

# Exhibit B

141 0108

# UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

**COMMISSIONERS:**   **Edith Ramirez, Chairwoman**
**Julie Brill**
**Maureen K. Ohlhausen**
**Joshua D. Wright**
**Terrell McSweeny**

---

**In the Matter of**

**Cerberus Institutional Partners V, L.P.**
  **a limited partnership;**

**AB Acquisition LLC,**                          **Docket No. C-**
  **a limited liability company;**

**and**

**Safeway Inc.,**
  **a corporation.**

---

## DECISION AND ORDER
### [Public Record Version]

The Federal Trade Commission ("Commission") having initiated an investigation of the proposed acquisition by Respondents AB Acquisition LLC ("Albertson's") and Cerberus Institutional Partners V, L.P. ("Cerberus"), of Respondent Safeway Inc. ("Safeway"), and Respondents having been furnished thereafter with a copy of a draft of Complaint that the Bureau of Competition proposed to present to the Commission for its consideration and which, if issued by the Commission, would charge Respondents with violations of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45; and

Respondents, their attorneys, and counsel for the Commission having thereafter executed an Agreement Containing Consent Order ("Consent Agreement"), containing an admission by Respondents of all the jurisdictional facts set forth in the aforesaid draft of Complaint, a statement that the signing of said Consent Agreement is for settlement purposes only and does not constitute an admission by Respondents that the law has been violated as alleged in such Complaint, or that the facts alleged in such Complaint, other than jurisdictional facts, are true, and waivers and other provisions as required by the Commission's Rules; and

The Commission having thereafter considered the matter and having determined that it has reason to believe that Respondents have violated the said Acts, and that a Complaint should issue stating its charges in that respect, and having thereupon issued its Complaint and Order to Maintain Assets, and having accepted the executed Consent Agreement and placed such Consent Agreement on the public record for a period of thirty (30) days for the receipt and consideration of public comments, now in further conformity with the procedure described in Commission Rule 2.34, 16 C.F.R. § 2.34, the Commission hereby makes the following jurisdictional findings and issues the following Decision and Order ("Order"):

1.      Respondent Cerberus Institutional Partners V, L.P. is a limited partnership organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its headquarters and principal place of business located at 875 Third Avenue, New York, New York.

2.      Respondent AB Acquisition LLC is a company organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its headquarters and principal place of business located at 250 Parkcenter Boulevard, Boise, Idaho.

3.      Respondent Safeway Inc. is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its headquarters and principal place of business located at 5918 Stoneridge Mall Road, Pleasanton, California.

4.      The Federal Trade Commission has jurisdiction of the subject matter of this proceeding and of the Respondents, and the proceeding is in the public interest.

## ORDER

### I.

**IT IS ORDERED THAT**, as used in this Order, the following definitions shall apply:

A.   "Cerberus" means Respondent Cerberus Institutional Partners V, L.P., its directors, officers, employees, agents, representatives, successors, and assigns; its joint ventures, subsidiaries, divisions, groups, and affiliates controlled by Cerberus Institutional Partners V, L.P. (including Respondent Albertson's), and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

B.   "Albertson's" means Respondent AB Acquisition LLC, its directors, officers, employees, agents, representatives, successors, and assigns; its joint ventures, subsidiaries, divisions, groups, and affiliates controlled by AB Acquisition LLC (including Albertson's LLC, Albertson's Holdings LLC and, after the Acquisition is consummated, Safeway), and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

2

C.   "Safeway" means Respondent Safeway Inc., its directors, officers, employees, agents, representatives, successors, and assigns; its joint ventures, subsidiaries, divisions, groups, and affiliates controlled by Safeway Inc., and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

D.   "Respondents" means Cerberus, Albertson's, and Safeway, individually and collectively.

E.   "Acquirer" means any entity approved by the Commission to acquire any or all of the Assets To Be Divested pursuant to this Order.

F.   "Acquisition" means Albertson's proposed acquisition of Safeway pursuant to the Acquisition Agreement.

G.   "Acquisition Agreement" means the Agreement and Plan of Merger by and among AB Acquisition LLC, Albertson's Holdings LLC, Albertson's LLC, Saturn Acquisition Merger Sub, Inc., and Safeway Inc., dated as of March 6, 2014, as amended on April 7, 2014, and June 13, 2014.

H.   "Assets To Be Divested" means the Supermarkets identified on Schedule A, Schedule B, Schedule C, and Schedule D of this Order, or any portion thereof, and all rights, title, and interest in and to all assets, tangible and intangible, relating to, used in, and/or reserved for use in, the Supermarket business operated at each of those locations, including but not limited to all properties, leases, leasehold interests, equipment and fixtures, books and records, government approvals and permits (to the extent transferable), telephone and fax numbers, and goodwill.  Assets To Be Divested includes any of Respondents' other businesses or assets associated with, or operated in conjunction with, the Supermarket locations listed on Schedule A, Schedule B, Schedule C, and Schedule D of this Order, including any fuel centers (including any convenience store and/or car wash associated with such fuel center), pharmacies, liquor stores, beverage centers, gaming or slot machine parlors, store cafes, or other related business(es) that customers reasonably associate with the Supermarket business operated at each such location.  At each Acquirer's option, the Assets To Be Divested shall also include any or all inventory as of the Divestiture Date.

> *Provided, however*, that the Assets To Be Divested shall not include those assets consisting of or pertaining to any of the Respondents' trademarks, trade dress, service marks, or trade names, *except* with respect to any purchased inventory (including private label inventory) or as may be allowed pursuant to any Remedial Agreement(s).

> *Provided, further,* that in cases in which books or records included in the Assets To Be Divested contain information (a) that relates both to the Assets To Be Divested and to other retained businesses of Respondents or (b) such that Respondents have a legal obligation to retain the original copies, then Respondents shall be required to provide only copies or relevant excerpts of the materials containing such information.  In instances where such copies are provided to an Acquirer, the Respondents shall provide

3

to such Acquirer access to original materials under circumstances where copies of materials are insufficient for regulatory or evidentiary purposes.

I. "Associated Food Stores" means Associated Food Stores, Inc., a corporation organized, existing, and doing business under and by virtue of the laws of the State of Utah, with its offices and principal place of business located at 1850 West 2100 South, Salt Lake City, Utah.

J. "Associated Food Stores Divestiture Agreement" means the Amended and Restated Asset Purchase Agreement dated as of December 5, 2014, by and between Respondent Albertson's and Associated Food Stores, attached as non-public Appendix I, for the divestiture of the Schedule A Assets.

K. "AWG" means Associated Wholesale Grocers, Inc., a corporation organized, existing, and doing business under and by virtue of the laws of the State of Kansas, with its offices and principal place of business located at 5000 Kansas Avenue, Kansas City, Kansas, and its direct and indirect subsidiaries, including LAS Acquisitions, LLC.

L. "AWG Divestiture Agreement" means the Amended and Restated Asset Purchase Agreement dated as of December 11, 2014, by and between Respondent Albertson's, AWG, and LAS Acquisitions, LLC (a wholly owned subsidiary of AWG) ("LAS"), attached as non-public Appendix II, for the divestiture of the Schedule B Assets.

M. "Divestiture Agreement" means any agreement between Respondents and an Acquirer (or a Divestiture Trustee appointed pursuant to Paragraph III of this Order and an Acquirer) and all amendments, exhibits, attachments, agreements, and schedules thereto, related to any of the Assets To Be Divested that have been approved by the Commission to accomplish the requirements of this Order.  The term "Divestiture Agreement" includes, as appropriate, the Associated Food Stores Divestiture Agreement, the AWG Divestiture Agreement, the Haggen Divestiture Agreement, and the Supervalu Divestiture Agreement.

N. "Divestiture Date" means a closing date of any of the respective divestitures required by this Order.

O. "Divestiture Trustee" means any person or entity appointed by the Commission pursuant to Paragraph III of this Order to act as a trustee in this matter.

P. "Haggen" means Haggen Holdings, LLC, a company organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its offices and principal place of business located at 2221 Rimland Drive, Bellingham, Washington.

Q. "Haggen Divestiture Agreement" means the Asset Purchase Agreement dated as of December 10, 2014, by and between Respondent Albertson's and Haggen, attached as non-public Appendix III, for the divestiture of the Schedule C Assets.

4

R.  "Proposed Acquirer" means any proposed acquirer of any of the Assets To Be Divested submitted to the Commission for its approval under this Order; "Proposed Acquirer" includes, as appropriate, Associated Food Stores, AWG, Haggen, and Supervalu.

S.  "Remedial Agreement(s)" means the following:

1. Any Divestiture Agreement; and

2. Any other agreement between Respondents and a Commission-approved Acquirer (or between a Divestiture Trustee and a Commission-approved Acquirer), including any Transition Services Agreement, and all amendments, exhibits, attachments, agreements, and schedules thereto, related to the Assets To Be Divested, that have been approved by the Commission to accomplish the requirements of this Order.

T.  "Relevant Areas" means: Coconino, Maricopa, Mohave, Pima, and Yavapai Counties in Arizona; Kern, Los Angeles, Orange, Riverside, San Bernardino, San Diego, San Luis Obispo, Santa Barbara, and Ventura Counties in California; Deer Lodge, Missoula, and Silver Bow Counties in Montana; Clark County in Nevada; Baker, Clackamas, Deschutes, Jackson, Josephine, Klamath, Lane, Marion, and Washington Counties in Oregon; Collin, Denton, Dallas, and Tarrant Counties in Texas; Chelan, Clallam, Island, King, Kitsap, Pierce, Snohomish, Spokane, Thurston, and Walla Walla Counties in Washington; and Albany, Natrona, and Sheridan Counties in Wyoming.

U.  "Schedule A Assets" means the Assets To Be Divested identified on Schedule A of this Order.

V.  "Schedule B Assets" means the Assets To Be Divested identified on Schedule B of this Order.

W.  "Schedule C Assets" means the Assets To Be Divested identified on Schedule C of this Order.

X.  "Schedule D Assets" means the Assets To Be Divested identified on Schedule D of this Order.

Y.  "Supervalu" means Supervalu Inc., a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its offices and principal place of business located at 7075 Flying Cloud Drive, Eden Prairie, Minnesota.

Z.  "Supervalu Divestiture Agreement" means the Asset Purchase Agreement dated as of December 5, 2014, by and between Respondent Albertson's and Supervalu, attached as non-public Appendix IV, for the divestiture of the Schedule D Assets.

AA. "Supermarket" means any full-line retail grocery store that enables customers to purchase substantially all of their weekly food and grocery shopping requirements in a single shopping visit with substantial offerings in each of the following product categories: bread and baked goods; dairy products; refrigerated food and beverage products; frozen food and beverage products; fresh and prepared meats and poultry; fresh fruits and vegetables; shelf-stable food and beverage products, including canned, jarred, bottled, boxed, and other types of packaged products; staple foodstuffs, which may include salt, sugar, flour, sauces, spices, coffee, tea, and other staples; other grocery products, including nonfood items such as soaps, detergents, paper goods, other household products, and health and beauty aids; pharmaceutical products and pharmacy services (where provided); and, to the extent permitted by law, wine, beer, and/or distilled spirits.

BB. "Third Party Consents" means all consents from any person other than the Respondents, including all landlords, that are necessary to effect the complete transfer to the Acquirer(s) of the Assets To Be Divested.

CC. "Transition Services Agreement" means an agreement that receives the prior approval of the Commission between one or more Respondents and an Acquirer of any of the assets divested under this Order to provide, at the option of each Acquirer, any services (or training for an Acquirer to provide services for itself) necessary to transfer the divested assets to the Acquirer in a manner consistent with the purposes of this Order.

## II.

### IT IS FURTHER ORDERED THAT:

A.  Respondents shall divest the Assets To Be Divested, absolutely and in good faith, as ongoing Supermarket businesses, as follows:

1.  Within 60 days of the date the Acquisition is consummated, the Schedule A Assets shall be divested to Associated Food Stores pursuant to and in accordance with the Associated Food Stores Divestiture Agreement;

2.  Within 60 days of the date the Acquisition is consummated, the Schedule B Assets shall be divested pursuant to and in accordance with the AWG Divestiture Agreement to either (i) LAS or (ii) RLS Supermarkets, LLC (d/b/a Minyard Food Stores) (as LAS's assignee, pursuant to the acquisition agreement between LAS and RLS Supermarkets, LLC);

3.  Within 150 days of the date the Acquisition is consummated, the Schedule C Assets shall be divested to Haggen pursuant to and in accordance with the Haggen Divestiture Agreement;

> *Provided, however*, that if any permit or license necessary for the divestiture of pharmacy assets has not been secured by Haggen as of the divestiture deadline, then the pharmacy assets may be divested following receipt of the necessary

permit(s) and/or license(s), pursuant to and in accordance with the terms of the Pharmacy Transitional Services Agreement (attached as Exhibit 9(a) to the Haggen Divestiture Agreement);

4. Within 100 days of the date the Acquisition is consummated, the Schedule D Assets shall be divested to Supervalu pursuant to and in accordance with the Supervalu Divestiture Agreement.

B. *Provided, that,* if prior to the date this Order becomes final, Respondents have divested the Assets To Be Divested pursuant to Paragraph II.A and if, at the time the Commission determines to make this Order final, the Commission notifies Respondents that:

1. Any Proposed Acquirer identified in Paragraph II.A is not an acceptable Acquirer, then Respondents shall, within five days of notification by the Commission, rescind such transaction with that Proposed Acquirer, and shall divest such assets as ongoing Supermarket businesses, absolutely and in good faith, at no minimum price, to an Acquirer and in a manner that receives the prior approval of the Commission, within 90 days of the date the Commission notifies Respondents that such Proposed Acquirer is not an acceptable Acquirer; or

2. The manner in which any divestiture identified in Paragraph II.A was accomplished is not acceptable, the Commission may direct the Respondents, or appoint a Divestiture Trustee pursuant to Paragraph III of this Order, to effect such modifications to the manner of divesting those assets to such Acquirer (including, but not limited to, entering into additional agreements or arrangements, or modifying the relevant Divestiture Agreement) as may be necessary to satisfy the requirements of this Order.

C. Respondents shall obtain at their sole expense all required Third Party Consents relating to the divestiture of all Assets To Be Divested prior to the applicable Divestiture Date.

D. All Remedial Agreements approved by the Commission:

1. Shall be deemed incorporated by reference into this Order, and any failure by Respondents to comply with the terms of any such Remedial Agreement(s) shall constitute a violation of this Order; and

2. Shall not limit or contradict, or be construed to limit or contradict, the terms of this Order, it being understood that nothing in this Order shall be construed to reduce any rights or benefits of any Acquirer or to reduce any obligation of Respondents under such agreement.  If any term of any Remedial Agreement(s) varies from the terms of this Order ("Order Term"), then to the extent that Respondents cannot fully comply with both terms, the Order Term shall determine Respondents' obligations under this Order.

E. At the option of each Acquirer of any Assets To Be Divested, and subject to the prior approval of the Commission, Respondents shall enter into a Transition Services Agreement for a term extending up to 180 days following the relevant Divestiture Date.  The services subject to the Transition Services Agreement shall be provided at no more than Respondents' direct costs and may include, but are not limited to, payroll, employee benefits, accounting, IT systems, distribution, warehousing, use of trademarks or trade names for transitional purposes, and other logistical and administrative support.

F. Pending divestiture of any of the Assets To Be Divested, Respondents shall:

1. Take such actions as are necessary to maintain the full economic viability, marketability, and competitiveness of the Assets To Be Divested, to minimize any risk of loss of competitive potential for the Assets To Be Divested, and to prevent the destruction, removal, wasting, deterioration, or impairment of the Assets To Be Divested, except for ordinary wear and tear; and

2. Not sell, transfer, encumber, or otherwise impair the Assets To Be Divested (other than in the manner prescribed in this Decision and Order) nor take any action that lessens the full economic viability, marketability, or competitiveness of the Assets To Be Divested.

G. With respect to each Divestiture Agreement:

1. Respondents shall provide sufficient opportunity for the Proposed Acquirer to:

a. Meet personally, and outside of the presence or hearing of any employee or agent of any Respondents, with any or all of the employees of the Supermarket Assets To Be Divested pursuant to the Divestiture Agreement; and

b. Make offers of employment to any or all of the employees of the Supermarket Assets To Be Divested pursuant to the Divestiture Agreement; and

2. Respondents shall: not interfere with the hiring or employing by the Acquirer of employees of the divested Supermarkets; remove any impediments within the control of Respondents that may deter those employees from accepting employment with such Acquirer (including, but not limited to, any non-compete or confidentiality provisions of employment or other contracts with Respondents that would affect the ability or incentive of those individuals to be employed by such Acquirer); and not make any counteroffer to any employee who has an outstanding offer of employment, or who has accepted an offer of employment, from such Acquirer.

H. The purpose of the divestitures is to ensure the continuation of the Assets To Be Divested as ongoing, viable enterprises engaged in the Supermarket business and to remedy the lessening of competition resulting from the Acquisition as alleged in the Commission's Complaint.

8

**III.**

**IT IS FURTHER ORDERED THAT**:

A.  If Respondents have not divested all of the Assets To Be Divested in the time and manner required by Paragraph II of this Order, the Commission may appoint a Divestiture Trustee to divest the remaining Assets To Be Divested in a manner that satisfies the requirements of this Order.  In the event that the Commission or the Attorney General brings an action pursuant to § 5(*l*) of the Federal Trade Commission Act, 15 U.S.C. § 45(*l*), or any other statute enforced by the Commission, Respondents shall consent to the appointment of a Divestiture Trustee in such action.  Neither the appointment of a Divestiture Trustee nor a decision not to appoint a Divestiture Trustee under this Paragraph shall preclude the Commission or the Attorney General from seeking civil penalties or any other relief available to it, including a court-appointed Divestiture Trustee, pursuant to § 5(*l*) of the Federal Trade Commission Act, or any other statute enforced by the Commission, for any failure by the Respondents to comply with this Order.

B.  If a Divestiture Trustee is appointed by the Commission or a court pursuant to this Order, Respondents shall consent to the following terms and conditions regarding the Divestiture Trustee's powers, duties, authority, and responsibilities:

1.  The Commission shall select the Divestiture Trustee, subject to the consent of Respondents, which consent shall not be unreasonably withheld.  The Divestiture Trustee shall be a person with experience and expertise in acquisitions and divestitures.  If Respondents have not opposed, in writing, including the reasons for opposing, the selection of any proposed Divestiture Trustee within ten (10) days after notice by the staff of the Commission to Respondents of the identity of any proposed Divestiture Trustee, Respondents shall be deemed to have consented to the selection of the proposed Divestiture Trustee.

2.  Subject to the prior approval of the Commission, the Divestiture Trustee shall have the exclusive power and authority to assign, grant, license, divest, transfer, contract, deliver, or otherwise convey the relevant assets or rights that are required to be assigned, granted, licensed, divested, transferred, contracted, delivered, or otherwise conveyed by this Order.

3.  Within ten (10) days after appointment of the Divestiture Trustee, Respondents shall execute a trust agreement that, subject to the prior approval of the Commission, transfers to the Divestiture Trustee all rights and powers necessary to permit the Divestiture Trustee to effect the relevant divestitures or transfers required by the Order.

4.  The Divestiture Trustee shall have twelve (12) months from the date the Commission approves the trust agreement described in Paragraph III.B.3. to accomplish the divestiture(s), which shall be subject to the prior approval of the Commission.  If,

9

however, at the end of the twelve-month period, the Divestiture Trustee has submitted a plan of divestiture or believes that the divestiture(s) can be achieved within a reasonable time, the divestiture period may be extended by the Commission; *provided, however*, the Commission may extend the divestiture period only two (2) times.

5. Subject to any demonstrated legally recognized privilege, the Divestiture Trustee shall have full and complete access to the personnel, books, records, and facilities relating to the assets that are required to be assigned, granted, licensed, divested, transferred, contracted, delivered, or otherwise conveyed by this Order or to any other relevant information, as the Divestiture Trustee may request. Respondents shall develop such financial or other information as the Divestiture Trustee may request and shall cooperate with the Divestiture Trustee. Respondents shall take no action to interfere with or impede the Divestiture Trustee's accomplishment of the divestiture(s). Any delays in divestiture caused by Respondents shall extend the time for divestiture under this Paragraph in an amount equal to the delay, as determined by the Commission or, for a court-appointed Divestiture Trustee, by the court.

6. The Divestiture Trustee shall use commercially reasonable best efforts to negotiate the most favorable price and terms available in each contract that is submitted to the Commission, subject to Respondents' absolute and unconditional obligation to divest expeditiously at no minimum price. The divestiture(s) shall be made in the manner and to an Acquirer as required by this Order; *provided, however*, if the Divestiture Trustee receives bona fide offers from more than one acquiring entity for any of the relevant Assets To Be Divested, and if the Commission determines to approve more than one such acquiring entity for such assets, the Divestiture Trustee shall divest such assets to the acquiring entity selected by Respondents from among those approved by the Commission; *provided further, however*, that Respondents shall select such entity within five (5) days of receiving notification of the Commission's approval.

7. The Divestiture Trustee shall serve, without bond or other security, at the cost and expense of Respondents, on such reasonable and customary terms and conditions as the Commission or a court may set. The Divestiture Trustee shall have the authority to employ, at the cost and expense of Respondents, such consultants, accountants, attorneys, investment bankers, business brokers, appraisers, and other representatives and assistants as are necessary to carry out the Divestiture Trustee's duties and responsibilities. The Divestiture Trustee shall account for all monies derived from the divestiture(s) and all expenses incurred. After approval by the Commission and, in the case of a court-appointed Divestiture Trustee, by the court, of the account of the Divestiture Trustee, including fees for his or her services, all remaining monies shall be paid at the direction of Respondents, and the Divestiture Trustee's power shall be terminated. The compensation of the Divestiture Trustee shall be based at least in significant part on a commission arrangement contingent on the divestiture of all of the relevant assets required to be divested by this Order.

10

8.  Respondents shall indemnify the Divestiture Trustee and hold the Divestiture Trustee harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the Divestiture Trustee's duties, including all reasonable fees of counsel and other expenses incurred in connection with the preparation for, or defense of, any claim, whether or not resulting in any liability, except to the extent that such losses, claims, damages, liabilities, or expenses result from malfeasance, gross negligence, willful or wanton acts, or bad faith by the Divestiture Trustee.

9.  If the Commission determines that the Divestiture Trustee has ceased to act or failed to act diligently, the Commission may appoint a substitute Divestiture Trustee in the same manner as provided in this Paragraph III.

10. The Commission or, in the case of a court-appointed trustee, the court, may on its own initiative or at the request of the Divestiture Trustee issue such additional orders or directions as may be necessary or appropriate to accomplish the divestiture(s) required by this Order.

11. The Divestiture Trustee shall have no obligation or authority to operate or maintain the relevant assets required to be divested by this Order.

12. The Divestiture Trustee shall report in writing to the Commission every thirty (30) days concerning the Divestiture Trustee's efforts to accomplish the divestiture(s).

13. Respondents may require the Divestiture Trustee and each of the Divestiture Trustee's consultants, accountants, attorneys, and other representatives and assistants to sign a customary confidentiality agreement; *provided, however*, such agreement shall not restrict the Divestiture Trustee from providing any information to the Commission.

14. The Commission may, among other things, require the Divestiture Trustee and each of the Divestiture Trustee's consultants, accountants, attorneys, representatives, and assistants to sign an appropriate confidentiality agreement relating to Commission materials and information received in connection with the performance of the Divestiture Trustee's duties and responsibilities.

**IV.**

**IT IS FURTHER ORDERED THAT**:

A.  Richard King shall serve as the Monitor pursuant to the agreement executed by the Monitor and Respondents, and attached as Appendix V ("Monitor Agreement") and Non-Public Appendix V-1 ("Monitor Compensation"). The Monitor is appointed to assure that Respondents expeditiously comply with all of their obligations and perform all of their responsibilities as required by this Order, the Order to Maintain Assets, and the Remedial Agreement(s);

B.  No later than one (1) day after the date the Acquisition is consummated, Respondents shall, pursuant to the Monitor Agreement, confer on the Monitor all rights, powers, and authorities necessary to permit the Monitor to monitor Respondents' compliance with the terms of this Order, the Order to Maintain Assets, and the Remedial Agreement(s), in a manner consistent with the purposes of the orders.

C.  Respondents shall consent to the following terms and conditions regarding the powers, duties, authorities, and responsibilities of the Monitor:

　　　1.  The Monitor shall have the power and authority to monitor Respondents' compliance with the divestiture and related requirements of this Order, the Order to Maintain Assets, and the Remedial Agreement(s), and shall exercise such power and authority and carry out the duties and responsibilities of the Monitor in a manner consistent with the purposes of the orders and in consultation with the Commission.

　　　2.  The Monitor shall act in a fiduciary capacity for the benefit of the Commission.

　　　3.  The Monitor shall serve until at least the latter of (i) the completion of all divestitures required by this Order, (ii) the end of any Transition Services Agreement in effect with any Acquirer, and (iii) September 30, 2015.

D.  Subject to any demonstrated legally recognized privilege, the Monitor shall have full and complete access to Respondents' personnel, books, documents, records kept in the ordinary course of business, facilities and technical information, and such other relevant information as the Monitor may reasonably request, related to Respondents' compliance with its obligations under this Order, the Order to Maintain Assets, and the Remedial Agreement(s).

E.  Respondents shall cooperate with any reasonable request of the Monitor and shall take no action to interfere with or impede the Monitor's ability to monitor Respondents' compliance with this Order, the Order to Maintain Assets, and the Remedial Agreement(s).

F.  The Monitor shall serve, without bond or other security, at the expense of Respondents, on such reasonable and customary terms and conditions as the Commission may set.  The Monitor shall have the authority to employ, at the expense of Respondents, such consultants, accountants, attorneys, and other representatives and assistants as are reasonably necessary to carry out the Monitor's duties and responsibilities.

G.  Respondents shall indemnify the Monitor and hold the Monitor harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the Monitor's duties, including all reasonable fees of counsel and other reasonable expenses incurred in connection with the preparations for, or defense of, any claim, whether or not resulting in any liability, except to the extent that such losses, claims, damages, liabilities, or expenses result from gross negligence, willful or wanton acts, or bad faith by the Monitor.  For purposes of this Paragraph IV.G., the term "Monitor" shall include all persons retained by the Monitor pursuant to Paragraph IV.F. of this Order.

12

H.  Respondents shall report to the Monitor in accordance with the requirements of this Order or the Order to Maintain Assets, and as otherwise provided in the Monitor Agreement approved by the Commission.  The Monitor shall evaluate the reports submitted by the Respondents with respect to the performance of Respondents' obligations under this Order and the Order to Maintain Assets.  Within thirty (30) days from the date the Monitor receives the first such report, and every sixty (60) days thereafter, the Monitor shall report in writing to the Commission concerning performance by Respondents of their obligations under the orders.

I.  Respondents may require the Monitor and each of the Monitor's consultants, accountants, and other representatives and assistants to sign a customary confidentiality agreement. *Provided, however,* that such agreement shall not restrict the Monitor from providing any information to the Commission.

J.  The Commission may require, among other things, the Monitor and each of the Monitor's consultants, accountants, attorneys, and other representatives and assistants to sign an appropriate confidentiality agreement related to Commission materials and information received in connection with the performance of the Monitor's duties.

K.  If the Commission determines that the Monitor has ceased to act or failed to act diligently, the Commission may appoint a substitute Monitor:

1.  The Commission shall select the substitute Monitor, subject to the consent of Respondents, which consent shall not be unreasonably withheld.  If Respondents have not opposed, in writing, including the reasons for opposing, the selection of a proposed Monitor within ten (10) days after the notice by the staff of the Commission to Respondents of the identity of any proposed Monitor, Respondents shall be deemed to have consented to the selection of the proposed Monitor.

2.  Not later than ten (10) days after the appointment of the substitute Monitor, Respondents shall execute an agreement that, subject to the prior approval of the Commission, confers on the Monitor all rights and powers necessary to permit the Monitor to monitor Respondents' compliance with the relevant terms of this Order, the Order to Maintain Assets, and the Remedial Agreement(s) in a manner consistent with the purposes of orders and in consultation with the Commission.

L.  The Commission may on its own initiative, or at the request of the Monitor, issue such additional orders or directions as may be necessary or appropriate to assure compliance with the requirements of this Order.

M.  The Monitor appointed pursuant to this Order may be the same Person appointed as a Divestiture Trustee pursuant to the relevant provisions of this Order.

13

## V.

**IT IS FURTHER ORDERED THAT** if Associated Food Stores purchases the Schedule A Assets pursuant to Paragraph II.A.1, Associated Food Stores shall not sell or otherwise convey, directly or indirectly, any of the Schedule A Assets, except to an Acquirer approved by the Commission and only in a manner that receives the prior approval of the Commission. *Provided, however,* that prior approval of the Commission is not required for the following buyers to acquire the following Supermarkets:

A. Missoula Fresh Market LLC  may acquire Safeway Store Nos. 1573 and  2619, pursuant to the assignment and assumption agreement between Missoula Fresh Market LLC and Associated Food Stores;

B. Ridley's Family Markets, Inc. may acquire Albertson's Store No. 2063 and Safeway Store Nos. 433, 2468, and 2664, pursuant to the assignment and assumption agreement between Ridley's Family Markets and Associated Food Stores; and

C. Stokes Inc. may acquire Albertson's Store No. 2007 and Safeway Store No. 3256, pursuant to the assignment and assumption agreement between Stokes Inc. and Associated Food Stores.

Associated Food Stores shall comply with this Paragraph until three (3) years after the date this Order is issued.

## VI.

**IT IS FURTHER ORDERED THAT** if LAS purchases the Schedule B Assets pursuant to Paragraph II.A.2, LAS shall not sell or otherwise convey, directly or indirectly, such Schedule B Assets, except to an Acquirer approved by the Commission and only in a manner that receives the prior approval of the Commission.  *Provided, however,* that prior approval of the Commission is not required for RLS Supermarkets, LLC (d/b/a Minyard Food Stores) to acquire the Schedule B Assets, pursuant to the acquisition agreement between RLS Supermarkets, LLC and LAS.  LAS shall comply with this Paragraph until three (3) years after the date this Order is issued.

## VII.

**IT IS FURTHER ORDERED THAT** if Supervalu purchases the Schedule D Assets pursuant to Paragraph II.A.4, Supervalu shall not sell or otherwise convey, directly or indirectly, any of the Schedule D Assets, except to an Acquirer approved by the Commission and only in a manner that receives the prior approval of the Commission.  Supervalu shall comply with this Paragraph until three (3) years after the date this Order is issued.

## VIII.

**IT IS FURTHER ORDERED THAT**:

A.  For a period of ten (10) years commencing on the date this Order is issued, Respondents shall not, directly or indirectly, through subsidiaries, partnerships or otherwise, without providing advance written notification to the Commission:

 1.  Acquire any ownership or leasehold interest in any facility that has operated as a Supermarket within six (6) months prior to the date of such proposed acquisition in any of the Relevant Areas.

 2.  Acquire any stock, share capital, equity, or other interest in any entity that owns any interest in or operates any Supermarket, or owned any interest in or operated any Supermarket within six (6) months prior to such proposed acquisition, in any of the Relevant Areas.

 *Provided, however,* that advance written notification shall not apply to the construction of new facilities or the acquisition or leasing of a facility that has not operated as a Supermarket within six (6) months prior to Respondents' offer to purchase or lease such facility.

 *Provided, further*, that advance written notification shall not be required for acquisitions resulting in total holdings of one (1) percent or less of the stock, share capital, equity, or other interest in an entity that owns any interest in or operates any Supermarket, or owned any interest in or operated any Supermarket within six (6) months prior to such proposed acquisition, in any of the Relevant Areas.

B.  Said notification under this Paragraph shall be given on the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended, and shall be prepared and transmitted in accordance with the requirements of that part, except that no filing fee will be required for any such notification, notification shall be filed with the Secretary of the Commission, notification need not be made to the United States Department of Justice, and notification is required only of Respondents and not of any other party to the transaction.  Respondents shall provide the notification to the Commission at least thirty (30) days prior to consummating any such transaction (hereinafter referred to as the "first waiting period").  If, within the first waiting period, representatives of the Commission make a written request for additional information or documentary material (within the meaning of 16 C.F.R. § 803.20), Respondents shall not consummate the transaction until thirty (30) days after substantially complying with such request.  Early termination of the waiting periods in this Paragraph may be requested and, where appropriate, granted by letter from the Bureau of Competition.  *Provided, however,* that prior notification shall not be required by this Paragraph for a transaction for which notification is required to be made, and has been made, pursuant to Section 7A of the Clayton Act, 15 U.S.C. § 18a.

## IX.

**IT IS FURTHER ORDERED THAT**:

A. Within thirty (30) days after the date this Order is issued and every thirty (30) days thereafter until the Respondents have fully complied with the provisions of Paragraphs II and III of this Order, Respondents shall submit to the Commission verified written reports setting forth in detail the manner and form in which they intend to comply, are complying, and have complied with Paragraphs II and III of this Order. Respondents shall submit at the same time a copy of their reports concerning compliance with this Order to the Monitor. Respondents shall include in their reports, among other things that are required from time to time, a full description of the efforts being made to comply with Paragraphs II and III of this Order, including a description of all substantive contacts or negotiations for the divestitures and the identity of all parties contacted. Respondents shall include in their reports copies of all material written communications to and from such parties, all non-privileged internal memoranda, reports, and recommendations concerning completing the obligations; and

B. One (1) year from the date this Order is issued, annually for the next nine (9) years on the anniversary of the date this Order is issued, and at other times as the Commission may require, Respondents shall file verified written reports with the Commission setting forth in detail the manner and form in which they have complied and are complying with this Order.

## X.

**IT IS FURTHER ORDERED THAT** Respondents shall notify the Commission at least thirty (30) days prior to:

A. Any proposed dissolution of Respondents;

B. Any proposed acquisition, merger, or consolidation of Respondents; or

C. Any other change in the Respondents, including but not limited to, assignment and the creation or dissolution of subsidiaries, if such change might affect compliance obligations arising out of this Order.

## XI.

**IT IS FURTHER ORDERED THAT**, for the purpose of determining or securing compliance with this Order, and subject to any legally recognized privilege, upon written request and upon five (5) days' notice to Respondents made to their principal United States office, Respondents shall permit any duly authorized representative of the Commission:

A. Access, during office hours of Respondents and in the presence of counsel, to all facilities and access to inspect and copy all books, ledgers, accounts, correspondence, memoranda and all other records and documents in the possession or under the control of Respondents

16

relating to compliance with this Order, which copying services shall be provided by such Respondent at the request of the authorized representative(s) of the Commission and at the expense of Respondent; and

B.  To interview officers, directors, or employees of Respondents, who may have counsel present, regarding any such matters.

## XII.

**IT IS FURTHER ORDERED THAT** this Order shall terminate ten (10) years from the date the Order is issued.

By the Commission.


Donald S. Clark
Secretary

SEAL:
ISSUED:

17

**Schedule A Assets**

<u>**Montana Stores**</u>:

1. Safeway Store No. 1573, located at 3801 S. Reserve Street, Missoula, Montana (Missoula County).

2. Albertson's Store No. 2007, located at 1301 Harrison Avenue, Butte, Montana (Silver Bow County).

3. Safeway Store No. 2619, located at 800 W. Broadway Street, Missoula, Montana (Missoula County).

4. Safeway Store No. 3256, located at 1525 West Park, Anaconda, Montana (Deer Lodge County).

<u>**Wyoming Stores**</u>:

5. Albertson's Store No. 2063, located at 3112 East Grand Avenue, Laramie, Wyoming (Albany County).

6. Safeway Store No. 433, located at 1375 Cy Avenue, Casper, Wyoming (Natrona County).

7. Safeway Store No. 2468, located at 300 S.E. Wyoming Boulevard, Casper, Wyoming (Natrona County).

8. Safeway Store No. 2664, located at 169 Coffeen, Sheridan, Wyoming (Sheridan County).

**Schedule B Assets**

**Texas Stores:**

1. Albertson's Store No. 4182, located at 3630 Forest Lane, Dallas, Texas (Dallas County).

2. Albertson's Store No. 4132, located at 6464 E. Mockingbird Lane, Dallas, Texas (Dallas County).

3. Albertson's Store No. 4134, located at 4349 W. Northwest Highway, Dallas, Texas (Dallas County).

4. Albertson's Store No. 4140, located at 7007 Arapaho Road, Dallas, Texas (Dallas County).

5. Albertson's Store No. 4149, located at 1108 N. Highway 377, Roanoke, Texas (Denton County).

6. Albertson's Store No. 4168, located at 3524 McKinney Avenue, Dallas, Texas (Dallas County).

7. Albertson's Store No. 4197, located at 8505 Lakeview Parkway, Rowlett, Texas (Dallas Counties).

8. Albertson's Store No. 4297, located at 10203 E. Northwest Highway, Dallas, Texas (Dallas County).

9. Safeway (Tom Thumb) Store No. 2568, located at 4836 West Park Boulevard, Plano, Texas (Collin County

10. Safeway (Tom Thumb) Store No. 3555, located at 3300 Harwood Road, Bedford, Texas (Tarrant County).

11. Safeway (Tom Thumb) Store No. 3573, located at 3001 Hardin Boulevard, McKinney, Texas (Collin County).

12. Safeway (Tom Thumb) Store No. 3576, located at 4000 William D. Tate Avenue., Grapevine, Texas (Tarrant County).

**Schedule C Assets**

**Arizona Stores**:

1. Albertsons Store No. 967, located at 1416 E Route 66, Flagstaff, Arizona (Coconino County).

2. Albertsons Store No. 979, located at 34442 N. Scottsdale Road, Scottsdale, Arizona (Maricopa County).

3. Albertsons Store No. 983, located at 11475 E. Via Linda, Scottsdale, Arizona (Maricopa County).

4. Safeway Store No. 1726, located at 3655 W. Anthem Way, Anthem, Arizona (Maricopa County).

5. Albertsons Store No. 1027, located at 1980 McCulloch Boulevard, Lake Havasu City, Arizona (Mohave County).

6. Safeway Store No. 234, located at 8740 East Broadway, Tucson, Arizona (Pima County).

7. Safeway Store No. 2611, located at 10380 East Broadway Boulevard, Tucson, Arizona (Pima County).

8. Albertsons Store No. 972, located at 1350 N. Silverbell Road, Tucson, Arizona (Pima County).

9. Albertsons Store No. 953, located at 174 East Sheldon Street, Prescott, Arizona (Yavapai County).

10. Albertsons Store No. 965, located at 7450 E. Highway 69, Prescott Valley, Arizona (Yavapai County).

**California Stores**:

11. Albertsons Store No. 6323, located at 3500 Panama Lane, Bakersfield, California (Kern County).

12. Albertsons Store No. 6325, located at 7900 White Lane, Bakersfield, California (Kern County).

13. Albertsons Store No. 6379, located at 8200 East Stockdale Highway, Bakersfield, California (Kern County).

14. Albertsons Store No. 6315, located at 3830 W. Verdugo Avenue, Burbank, California (Los Angeles County).

15. Albertsons Store No. 6168, located at 3443 S. Sepulveda Boulevard, Los Angeles, California (Los Angeles County).

16. Albertsons Store No. 6169, located at 8985 Venice Boulevard Suite B, Los Angeles, California (Los Angeles County).

17. Safeway (Vons) Store No. 2062, located at 240 S. Diamond Bar Boulevard, Diamond Bar, California (Los Angeles County).

18. Albertsons Store No. 6329, located at 5038 W. Avenue North, Palmdale, California (Los Angeles County).

19. Albertsons Store No. 6107, located at 2130 Pacific Coast Highway, Lomita, California (Los Angeles County).

20. Albertsons Store No. 6127, located at 1516 S. Pacific Coast Highway, Redondo Beach, California (Los Angeles County).

21. Albertsons Store No. 6138, located at 615 N. Pacific Coast Highway, Redondo Beach, California (Los Angeles County).

22. Albertsons Store No. 6153, located at 21035 Hawthorne Boulevard, Torrance, California (Los Angeles County).

23. Albertsons Store No. 6189, located at 2115 Artesia Boulevard, Redondo Beach, California (Los Angeles County).

24. Albertsons Store No. 6160, located at 1636 W. 25th Street, San Pedro, California (Los Angeles County).

25. Albertsons Store No. 6164, located at 28090 South Western Avenue, San Pedro, California (Los Angeles County).

26. Albertsons Store No. 6388, located at 5770 Lindero Canyon Road, Westlake Village, California (Los Angeles County).

27. Albertsons Store No. 6397, located at 6240 Foothill Boulevard, Tujunga, California (Los Angeles County).

28. Albertsons Store No. 6162, located at 2627 Lincoln Boulevard, Santa Monica, California (Los Angeles County).

29. Albertsons Store No. 6154, located at 6235 East Spring Street, Long Beach, California (Los Angeles County).

30. Safeway (Vons) Store No. 2031, located at 23381 Mulholland Drive, Woodland Hills, California (Los Angeles County).

31. Safeway (Vons) Store No. 1669, located at 26518 Bouquet Canyon Road, Saugus, California (Los Angeles County).

32. Safeway (Pavilions) Store No. 1961, located at 27095 McBean Parkway, Santa Clarita, California (Los Angeles County).

33. Safeway (Pavilions) Store No. 2703, located at 25636 Crown Valley Parkway, Ladera Ranch, California (Orange County).

34. Albertsons Store No. 6575, located at 30922 Coast Highway, Laguna Beach, California (Orange County).

35. Safeway (Vons) Store No. 1676, located at 30252 Crown Valley Parkway, Laguna Niguel, California (Orange County).

36. Safeway (Vons) Store No. 1670, located at 28751 Los Alisos Boulevard, Mission Viejo, California (Orange County).

37. Albertsons Store No. 6517, located at 25872 Muirlands Boulevard, Mission Viejo, California (Orange County).

38. Albertsons Store No. 6504, located at 3049 Coast Highway, Corona Del Mar, California (Orange County).

39. Safeway (Pavilions) Store No. 2822, located at 3901 Portola Parkway, Irvine, California (Orange County).

40. Albertsons Store No. 6510, located at 21500 Yorba Linda Boulevard, Yorba Linda, California (Orange County).

41. Albertsons Store No. 6521, located at 21672 Plano Trabuco Road, Trabuco Canyon, California (Orange County).

42. Safeway (Vons) Store No. 2146, located at 550 E. First Street, Tustin, California (Orange County).

43. Safeway (Vons) Store No. 2324, located at 17662 17th Street, Tustin, California (Orange County).

44. Safeway (Vons) Store No. 2383, located at 72675 Highway 111, Palm Desert, California (Riverside County).

45. Safeway (Pavilions) Store No. 3218, located at 36-101 Bob Hope Drive, Rancho Mirage, California (Riverside County).

46. Safeway (Vons) Store No. 2597, located at 4200 Chino Hills Parkway Suite 400, Chino Hills, California (San Bernardino County).

47. Albertsons Store No. 6523, located at 8850 Foothill Boulevard, Rancho Cucamonga, California (San Bernardino County).

48. Albertsons Store No. 6589, located at 1910 N. Campus Avenue, Upland, California (San Bernardino County).

49. Albertsons Store No. 6701, located at 955 Carlsbad Village Drive, Carlsbad, California (San Diego County).

50. Albertsons Store No. 6720, located at 7660 El Camino Real, Carlsbad, California (San Diego County).

51. Safeway (Vons) Store No. 2006, located at 505 Telegraph Canyon Road, Chula Vista, California (San Diego County).

52. Safeway (Vons) Store No. 2336, located at 360 East H Street, Chula Vista, California (San Diego County).

53. Safeway (Vons) Store No. 3063, located at 870 Third Avenue, Chula Vista, California (San Diego County).

54. Albertsons Store No. 6747, located at 150 B Avenue, Coronado, California (San Diego County).

55. Albertsons Store No. 6771, located at 1608 Broadway Street, El Cajon, California (San Diego County).

56. Safeway (Vons) Store No. 2064, located at 2800 Fletcher Parkway, El Cajon, California (San Diego County).

57. Safeway (Vons) Store No. 2137, located at 5630 Lake Murray Boulevard, La Mesa, California (San Diego County).

58. Albertsons Store No. 6741, located at 14837 Pomerado Road, Poway, California (San Diego County).

59. Albertsons Store No. 6763, located at 12475 Rancho Bernardo Road, Rancho Bernardo, California (San Diego County).

60. Albertsons Store No. 6760, located at 10633 Tierrasanta Boulevard, San Diego, California (San Diego County).

61. Albertsons Store No. 6714, located at 2235 University Avenue, San Diego, California (San Diego County).

62. Albertsons Store No. 6715, located at 422 W. Washington Street, San Diego, California (San Diego County).

63. Albertsons Store No. 6742, located at 7895 Highland Village Place, San Diego, California (San Diego County).

64. Albertsons Store No. 6770, located at 10740 Westview Parkway, San Diego, California (San Diego County).

65. Albertsons Store No. 6772, located at 14340 Penasquitos Drive, San Diego, California (San Diego County).

66. Albertsons Store No. 6788, located at 730 Turquoise Street, San Diego, California (San Diego County).

67. Albertsons Store No. 6781, located at 5950 Balboa Avenue, San Diego, California (San Diego County).

68. Safeway (Vons) Store No. 2174, located at 671 Rancho Santa Fe Road, San Marcos, California (San Diego County).

69. Albertsons Store No. 6727, located at 9870 Magnolia Avenue, Santee, California (San Diego County).

70. Albertsons Store No. 6702, located at 2707 Via De La Valle, Del Mar, California (San Diego County).

71. Safeway (Vons) Store No. 2365, located at 3681 Avocado Avenue, La Mesa, California (San Diego County).

72. Albertsons (Lucky) Store No. 6228, located at 350 W. San Ysidro Boulevard, San Ysidro, California (San Diego County).

73. Safeway (Vons) Store No. 2333, located at 13439 Camino Canada, El Cajon, California (San Diego County).

74. Albertsons Store No. 6304, located at 1132 West Branch Street, Arroyo Grande, California (San Luis Obispo County).

75. Albertsons Store No. 6390, located at 8200 El Camino Real, Atascadero, California (San Luis Obispo County).

76. Safeway (Vons) Store No. 2312, located at 1130 Los Osos Valley Road, Los Osos, California (San Luis Obispo County).

77. Safeway (Vons) Store No. 2317, located at 1191 E. Creston Road, Paso Robles, California (San Luis Obispo County).

78. Albertsons Store No. 6372, located at 771 Foothill Boulevard, San Luis Obispo, California (San Luis Obispo County).

79. Albertsons Store No. 6409, located at 1321 Johnson Avenue, San Luis Obispo, California (San Luis Obispo County).

80. Safeway (Vons) Store No. 2425, located at 850 Linden Avenue, Carpinteria, California (Santa Barbara County).

81. Albertsons Store No. 6339, located at 1500 North H Street, Lompoc, California (Santa Barbara County).

82. Albertsons Store No. 6351, located at 2010 Cliff Drive, Santa Barbara, California (Santa Barbara County).

83. Albertsons Store No. 6352, located at 3943 State Street, Santa Barbara, California (Santa Barbara County).

84. Safeway (Vons) Store No. 2048, located at 163 S. Turnpike Road, Goleta, California (Santa Barbara County).

85. Safeway (Vons) Store No. 2691, located at 175 N. Fairview Avenue, Goleta, California (Santa Barbara County).

86. Albertsons Store No. 6369, located at 1736 Avenida De Los Arboles, Thousand Oaks, California (Ventura County).

87. Albertsons Store No. 6318, located at 7800 Telegraph Road, Ventura, California (Ventura County).

88. Albertsons Store No. 6317, located at 5135 Los Angeles Avenue, Simi Valley, California (Ventura County).

89. Albertsons Store No. 6363, located at 2800 Cochran Street, Simi Valley, California (Ventura County).

90. Safeway (Vons) Store No. 2163, located at 660 E. Los Angeles Avenue, Simi Valley, California (Ventura County).

91. Albertsons Store No. 6385, located at 2400 East Las Posas Road, Camarillo, California (Ventura County).

92. Albertsons Store No. 6217, located at 920 N. Ventura Road, Oxnard, California (Ventura County).

93. Safeway (Vons) Store No. 1793, located at 2100 Newbury Road, Newbury Park, California (Ventura County).

**Nevada Stores**:

94. Safeway (Vons) Store No. 2391, located at 1031 Nevada Highway, Boulder City, Nevada (Clark County).

95. Albertsons Store No. 6028, located at 2910 Bicentennial Parkway, Henderson, Nevada (Clark County).

96. Safeway (Vons) Store No. 1688, located at 820 S. Rampart Boulevard, Las Vegas, Nevada (Clark County).

97. Safeway (Vons) Store No. 2392, located at 7530 W. Lake Mead Boulevard, Las Vegas, Nevada (Clark County).

98. Safeway (Vons) Store No. 2395, located at 1940 Village Center Circle, Las Vegas, Nevada (Clark County).

99. Albertsons Store No. 6014, located at 575 College Drive, Henderson, Nevada (Clark County).

100. Albertsons Store No. 6019, located at 190 North Boulder Highway, Henderson, Nevada (Clark County).

**Oregon Stores**:

101. Albertsons Store No. 261, located at 1120 Campbell Street, Baker City, Oregon (Baker County).

102. Albertsons Store No. 503, located at 14800 S.E. Sunnyside Road, Clackamas, Oregon (Clackamas County).

103. Albertsons Store No. 521, located at 16199 Boones Ferry Road, Lake Oswego, Oregon (Clackamas County).

104. Albertsons Store No. 506, located at 1855 Blankenship Road, West Linn, Oregon (Clackamas County).

105. Albertsons Store No. 566, located at 10830 S.E. Oak Street, Milwaukie, Oregon (Clackamas County).

106. Albertsons Store No. 587, located at 1800 N.E. 3rd Street, Bend, Oregon (Deschutes County).

107. Albertsons Store No. 588, located at 61155 S. Highway 97, Bend, Oregon (Deschutes County).

108. Safeway Store No. 4292, located at 585 Siskiyou Boulevard, Ashland, Oregon (Jackson County).

109. Albertsons Store No. 501, located at 340 N.E. Beacon Drive, Grants Pass, Oregon (Josephine County).

110. Albertsons Store No. 537, located at 1690 Allen Creek Road, Grants Pass, Oregon (Josephine County).

111. Safeway Store No. 1766, located at 2740 S. 6th Street, Klamath Falls, Oregon (Klamath County).

112. Safeway Store No. 4395, located at 211 North Eighth Street, Klamath Falls, Oregon (Klamath County).

113. Albertsons Store No. 507, located at 1675 W. 18th Avenue, Eugene, Oregon (Lane County).

114. Albertsons Store No. 568, located at 3075 Hilyard Street, Eugene, Oregon (Lane County).

115. Safeway Store No. 311, located at 5415 Main Street, Springfield, Oregon (Lane County).

116. Albertsons Store No. 562, located at 5450 River Road North, Keizer, Oregon (Marion County).

117. Albertsons Store No. 559, located at 8155 S.W. Hall Boulevard, Beaverton, Oregon (Washington County).

118. Albertsons Store No. 565, located at 16200 S.W. Pacific Highway, Tigard, Oregon (Washington County).

119. Albertsons Store No. 576, located at 14300 S.W. Barrows Road, Tigard, Oregon (Washington County).

120. Albertsons Store No. 579, located at 16030 S.W. Tualatin Sherwood Road, Sherwood, Oregon (Washington County).

**<u>Washington Stores</u>**:

121. Albertsons Store No. 244, located at 1128 N. Miller, Wenatchee, Washington (Chelan County).

122. Albertsons Store No. 404, located at 114 E. Lauridsen Boulevard, Port Angeles, Washington (Clallam County).

123. Safeway Store No. 3518, located at 31565 SR 20 #1, Oak Harbor, Washington (Island County).

124. Albertsons Store No. 411, located at 15840 1st Avenue South, Burien, Washington (King County).

125. Albertsons Store No. 473, located at 12725 First Avenue South, Burien, Washington (King County).

126. Albertsons Store No. 425, located at 17171 Bothell Way NE, Seattle, Washington (King County).

127. Albertsons Store No. 470, located at 14215 SE Petrovitsky Road, Renton, Washington (King County).

128. Safeway Store No. 1468, located at 4300 N.E. 4th Street, Renton, Washington (King County).

129. Albertsons Store No. 403, located at 3925 236th Avenue NE, Redmond, Washington (King County).

130. Safeway Store No. 442, located at 15332 Aurora Avenue North, Shoreline, Washington (King County).

131. Albertsons Store No. 496, located at 31009 Pacific Highway South, Federal Way, Washington (King County).

132. Albertsons Store No. 443, located at 2900 Wheaton Way, Bremerton, Washington (Kitsap County).

133. Albertsons Store No. 492, located at 2222 NW Bucklin Hill Road, Silverdale, Washington (Kitsap County).

134. Safeway Store No. 1082, located at 3355 Bethel Road SE, Port Orchard, Washington (Kitsap County).

135. Safeway Store No. 2949, located at 4831 Point Fosdick Drive NW, Gig Harbor, Washington (Pierce County).

136. Albertsons Store No. 472, located at 2800 Milton Way, Milton, Washington (Pierce County).

137. Albertsons Store No. 468, located at 11012 Canyon Road East, Puyallup, Washington (Pierce County).

138. Safeway Store No. 551, located at 15805 Pacific Avenue South, Tacoma, Washington (Pierce County).

139. Albertsons Store No. 498, located at 111 S. 38th Street, Tacoma, Washington (Pierce County).

140. Albertsons Store No. 465, located at 8611 Steilacoom Boulevard SW, Tacoma, Washington (Pierce County).

141. Safeway Store No. 517, located at 7601 Evergreen Way, Everett, Washington (Snohomish County).

142. Albertsons Store No. 476, located at 19881 SR 2, Monroe, Washington (Snohomish County).

143. Albertsons Store No. 401, located at 17520 SR 9 Southeast, Snohomish, Washington (Snohomish County).

144. Safeway Store No. 1741, located at 1233 N. Liberty Lake Road, Liberty Lake, Washington (Spokane County).

145. Albertsons Store No. 415, located at 3520 Pacific Avenue SE, Olympia, Washington (Thurston County).

146. Albertsons Store No. 225, located at 450 N. Wilbur Avenue, Walla Walla, Washington (Walla Walla County).

**Schedule D Assets**

**<u>Washington Stores</u>**:

1.Albertson's Store No. 459, located at 14019 Woodinville-Duvall Road, Woodinville, Washington (King County).

2. Albertson's Store No. 477, located at 303 91st Avenue NE, Lake Stevens, Washington (Snohomish County).

**APPENDIX I**
**Associated Food Stores Divestiture Agreement**

**[Redacted From the Public Record Version, But Incorporated By Reference]**

**APPENDIX II**

**AWG Divestiture Agreement**

**[Redacted From the Public Record Version, But Incorporated By Reference]**

**APPENDIX III**

**Haggen Divestiture Agreement**

**[Redacted From the Public Record Version, But Incorporated By Reference]**

**APPENDIX IV**

**Supervalu Divestiture Agreement**

**[Redacted From the Public Record Version, But Incorporated By Reference]**

**APPENDIX V**

**Monitor Agreement**

**APPENDIX V-1**

**Monitor Compensation**

**[Redacted From the Public Record Version]**

# Exhibit C

141 0108

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS:**  **Edith Ramirez, Chairwoman**
**Julie Brill**
**Maureen K. Ohlhausen**
**Joshua D. Wright**
**Terrell McSweeny**

---

**In the Matter of**

**Cerberus Institutional Partners V, L.P.,**
 **a limited partnership;**

**AB Acquisition LLC,**
 **a limited liability company;**

**and**

**Safeway Inc.**
 **a corporation.**

**Docket No. C-4504**

---

**ORDER TO MAINTAIN ASSETS**

The Federal Trade Commission ("Commission") having initiated an investigation of the proposed acquisition by Respondents AB Acquisition LLC ("Albertson's") and Cerberus Institutional Partners V, L.P. ("Cerberus"), of Respondent Safeway Inc. ("Safeway"), and Respondents having been furnished thereafter with a copy of a draft of Complaint that the Bureau of Competition proposed to present to the Commission for its consideration and which, if issued by the Commission, would charge Respondents with violations of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45; and

Respondents, their attorneys, and counsel for the Commission having thereafter executed an Agreement Containing Consent Orders ("Consent Agreement"), containing an admission by Respondents of all the jurisdictional facts as set forth in the aforesaid draft of Complaint, a statement that the signing of said Consent Agreement is for settlement purposes only and does not constitute an admission by Respondents that the law has been violated as alleged in such Complaint, or that the facts as alleged in such Complaint, other than jurisdictional facts, are true, and waivers and other provisions as required by the Commission's Rules; and

1

The Commission, having thereafter considered the matter and having determined that it had reason to believe that the Respondents have violated the said Acts, and that a Complaint should issue stating its charges in that respect, and having determined to accept the executed Consent Agreement and to place the Consent Agreement on the public record for a period of thirty (30) days for the receipt and consideration of public comments, the Commission hereby issues its Complaint, makes the following jurisdictional findings, and issues this Order to Maintain Assets:

1. Respondent Cerberus Institutional Partners V, L.P. is a limited partnership organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its headquarters and principal place of business located at 875 Third Avenue, New York, New York.

2. Respondent AB Acquisition LLC is a company organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its headquarters and principal place of business located at 250 Parkcenter Boulevard, Boise, Idaho.

3. Respondent Safeway Inc. is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its headquarters and principal place of business located at 5918 Stoneridge Mall Road, Pleasanton, California.

4. The Federal Trade Commission has jurisdiction of the subject matter of this proceeding and of Respondents, and the proceeding is in the public interest.

## I.

**IT IS ORDERED** that, as used in this Order to Maintain Assets, the definitions used in the Consent Agreement and the Decision and Order shall apply.  In addition, "Supermarket To Be Maintained" means any Supermarket business identified as part of the Assets To Be Divested under the Decision and Order.

## II.

**IT IS FURTHER ORDERED** that:

A. Respondents shall maintain the viability, marketability, and competitiveness of the Assets To Be Divested, and shall not cause the wasting or deterioration of the Assets To Be Divested.  Respondents shall not cause the Assets To Be Divested to be operated in a manner inconsistent with applicable laws, nor shall they sell, transfer, encumber, or otherwise impair the viability, marketability, or competitiveness of the Assets To Be Divested.  Respondents shall conduct or cause to be conducted the business of the Assets To Be Divested in the regular and ordinary course and in accordance with past practice (including regular repair and maintenance efforts) and shall use best efforts to preserve the existing relationships with suppliers, customers, employees, and others having

business relations with the Assets To Be Divested in the ordinary course of business and in accordance with past practice.

B.  Respondents shall not terminate the operation of any Supermarket To Be Maintained. Respondents shall continue to maintain the inventory of each Supermarket To Be Maintained at levels and selections consistent with those maintained by Respondents at such Supermarket in the ordinary course of business consistent with past practice. Respondents shall use best efforts to keep the organization and properties of each Supermarket To Be Maintained intact, including current business operations, physical facilities, working conditions, staffing levels, and a work force of equivalent size, training, and expertise associated with the Supermarket To Be Maintained, and shall not transfer store managers from any Supermarket To Be Maintained to any store that is not part of the Assets To Be Divested.  Included in the above obligations, Respondents shall, without limitation:

1.  Maintain all operations and departments, and not reduce hours, at each Supermarket To Be Maintained;

2.  Not transfer inventory from any Supermarket To Be Maintained, other than in the ordinary course of business consistent with past practice;

3.  Make any payment required to be paid under any contract or lease when due, and otherwise pay all liabilities and satisfy all obligations associated with each Supermarket To Be Maintained, in each case in a manner consistent with past practice;

4.  Maintain the books and records of each Supermarket To Be Maintained;

5.  Not display any signs or conduct any advertising (e.g., direct mailing, point-of-purchase coupons) that indicates that any Respondent is moving its operations at a Supermarket To Be Maintained to another location, or that indicates a Supermarket To Be Maintained will close;

6.  Not conduct any "going out of business," "close-out," "liquidation," or similar sales or promotions at or relating to any Supermarket To Be Maintained; and

7.  Not change or modify in any material respect the existing pricing or advertising practices, programs, and policies for each Supermarket To Be Maintained, other than changes in the ordinary course of business consistent with current practice for Supermarkets of the Respondents not being closed, relocated, or sold.

# III.

**IT IS FURTHER ORDERED** that:

A. Richard King shall serve as the Monitor pursuant to the agreement executed by the Monitor and Respondents, and attached as Appendix V ("Monitor Agreement") and Non-Public Appendix V-1 ("Monitor Compensation") to the Decision and Order.  The Monitor is appointed to assure that Respondents expeditiously comply with all of their obligations and perform all of their responsibilities as required by this Order to Maintain Assets, the Decision and Order, and the Remedial Agreement(s);

B. No later than (1) day after the date the Acquisition is consummated, Respondents shall, pursuant to the Monitor Agreement, confer on the Monitor all rights, powers, and authorities necessary to permit the Monitor to monitor Respondents' compliance with the terms of this Order to Maintain Assets, the Decision and Order, and the Remedial Agreement(s), in a manner consistent with the purposes of the orders.

C. Respondents shall consent to the following terms and conditions regarding the powers, duties, authorities, and responsibilities of the Monitor:

   1. The Monitor shall have the power and authority to monitor Respondents' compliance with the divestiture and related requirements of this Order to Maintain Assets, the Decision and Order, and the Remedial Agreement(s), and shall exercise such power and authority and carry out the duties and responsibilities of the Monitor in a manner consistent with the purposes of the orders and in consultation with the Commission.

   2. The Monitor shall act in a fiduciary capacity for the benefit of the Commission.

   3. The Monitor shall serve until at least the latter of (i) the completion of all divestitures required by the Decision and Order, (ii) the end of any Transition Services Agreement in effect with any Acquirer, and (iii) September 30, 2015.

D. Subject to any demonstrated legally recognized privilege, the Monitor shall have full and complete access to Respondents' personnel, books, documents, records kept in the ordinary course of business, facilities and technical information, and such other relevant information as the Monitor may reasonably request, related to Respondents' compliance with its obligations under this Order to Maintain Assets, the Decision and Order, and the Remedial Agreement(s).

E. Respondents shall cooperate with any reasonable request of the Monitor and shall take no action to interfere with or impede the Monitor's ability to monitor Respondents' compliance with this Order to Maintain Assets, the Decision and Order, and the Remedial Agreement(s).

F. The Monitor shall serve, without bond or other security, at the expense of Respondents, on such reasonable and customary terms and conditions as the Commission may set.  The Monitor shall have the authority to employ, at the expense of Respondents, such consultants,

accountants, attorneys, and other representatives and assistants as are reasonably necessary to carry out the Monitor's duties and responsibilities.

G.   Respondents shall indemnify the Monitor and hold the Monitor harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the Monitor's duties, including all reasonable fees of counsel and other reasonable expenses incurred in connection with the preparations for, or defense of, any claim, whether or not resulting in any liability, except to the extent that such losses, claims, damages, liabilities, or expenses result from gross negligence, willful or wanton acts, or bad faith by the Monitor.  For purposes of this Paragraph III.G., the term "Monitor" shall include all persons retained by the Monitor pursuant to Paragraph III.F. of this Order to Maintain Assets.

H.   Respondents shall report to the Monitor in accordance with the requirements of this Order to Maintain Assets or the Decision and Order, and as otherwise provided in the Monitor Agreement approved by the Commission.  The Monitor shall evaluate the reports submitted by the Respondents with respect to the performance of Respondents' obligations under this Order to Maintain Assets and the Decision and Order.  Within thirty (30) days from the date the Monitor receives the first such report, and every sixty (60) days thereafter, the Monitor shall report in writing to the Commission concerning performance by Respondents of their obligations under the orders.

I.   Respondents may require the Monitor and each of the Monitor's consultants, accountants, and other representatives and assistants to sign a customary confidentiality agreement. *Provided, however,* that such agreement shall not restrict the Monitor from providing any information to the Commission.

J.   The Commission may require, among other things, the Monitor and each of the Monitor's consultants, accountants, attorneys, and other representatives and assistants to sign an appropriate confidentiality agreement related to Commission materials and information received in connection with the performance of the Monitor's duties.

K.   If the Commission determines that the Monitor has ceased to act or failed to act diligently, the Commission may appoint a substitute Monitor:

   1.   The Commission shall select the substitute Monitor, subject to the consent of Respondents, which consent shall not be unreasonably withheld.  If Respondents have not opposed, in writing, including the reasons for opposing, the selection of a proposed Monitor within ten (10) days after the notice by the staff of the Commission to Respondents of the identity of any proposed Monitor, Respondents shall be deemed to have consented to the selection of the proposed Monitor.

   2.   Not later than ten (10) days after the appointment of the substitute Monitor, Respondents shall execute an agreement that, subject to the prior approval of the Commission, confers on the Monitor all rights and powers necessary to permit the Monitor to monitor Respondents' compliance with the relevant terms of this Order to

Maintain Assets, the Decision and Order, and the Remedial Agreement(s) in a manner consistent with the purposes of the orders and in consultation with the Commission.

L.  The Commission may on its own initiative, or at the request of the Monitor, issue such additional orders or directions as may be necessary or appropriate to assure compliance with the requirements of this Order to Maintain Assets.

M.  The Monitor appointed pursuant to this Order to Maintain Assets may be the same Person appointed as a Divestiture Trustee pursuant to the relevant provisions of the Decision and Order.

**IV.**

**IT IS FURTHER ORDERED** that Respondents shall notify the Commission at least thirty (30) days prior to:

A.  Any proposed dissolution of Respondents;

B.  Any proposed acquisition, merger, or consolidation of Respondents; or

C.  Any other change in the Respondents, including but not limited to assignment and the creation or dissolution of subsidiaries, if such change might affect compliance obligations arising out of this Order to Maintain Assets.

**V.**

**IT IS FURTHER ORDERED** that within thirty (30) days after this Order to Maintain Assets is issued, and every thirty (30) days thereafter until this Order to Maintain Assets terminates, Respondents shall submit to the Commission a verified written report setting forth in detail the manner and form in which they intend to comply, are complying, and have complied with all provisions of this Order to Maintain Assets.  Respondents shall submit at the same time a copy of their reports concerning compliance with this Order to Maintain Assets to the Monitor. Respondents shall include in their reports, among other things that are required from time to time, a full description of the efforts being made to comply with this Order to Maintain Assets.

**VI.**

**IT IS FURTHER ORDERED** that, for the purpose of determining or securing compliance with this Order to Maintain Assets, and subject to any legally recognized privilege, and upon written request with reasonable notice to Respondents made to their principal United States offices, Respondents shall permit any duly authorized representative of the Commission:

A.      Access, during office hours of Respondents and in the presence of counsel, to all facilities, and access to inspect and copy all books, ledgers, accounts, correspondence, memoranda, and all other records and documents in the possession or under the control of Respondents relating to compliance with this Order to Maintain Assets, which copying services shall be provided by

6

Respondents at the request of the authorized representative(s) of the Commission and at the expense of Respondents; and

B.    Upon five (5) days' notice to Respondents and without restraint or interference from Respondents, to interview officers, directors, or employees of Respondents, who may have counsel present, regarding any such matters.

**VII.**

**IT IS FURTHER ORDERED** that this Order to Maintain Assets shall terminate at the earlier of:

A.    Three (3) business days after the Commission withdraws its acceptance of the Consent Agreement pursuant to the provisions of Commission Rule 2.34, 16 C.F.R. § 2.34; or

B.    With respect to each Supermarket To Be Maintained, the day after Respondents' (or a Divestiture Trustee's) completion of the divestiture of Assets To Be Divested related to such Supermarket, as described in and required by the Decision and Order.

*Provided, however*, that if the Commission, pursuant to Paragraph II.B. of the Decision and Order, requires the Respondents to rescind any or all of the divestitures contemplated by any Divestiture Agreement, then, upon rescission, the requirements of this Order to Maintain Assets shall again be in effect with respect to the relevant Assets To Be Divested until the day after Respondents' (or a Divestiture Trustee's) completion of the divestiture(s) of the relevant Assets To Be Divested, as described in and required by the Decision and Order.

By the Commission.


Donald S. Clark
Secretary

SEAL:
ISSUED:  January 27, 2015

# Exhibit D

141 0108

## UNITED STATES OF AMERICA
## BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:    Edith Ramirez, Chairwoman
                    Julie Brill
                    Maureen K. Ohlhausen
                    Joshua D. Wright
                    Terrell McSweeny

|  |  |
|---|---|
| In the Matter of<br><br>Cerberus Institutional Partners V, L.P.<br> a limited partnership;<br><br>AB Acquisition LLC,<br> a limited liability company;<br><br>and<br><br>Safeway Inc.,<br> a corporation. | Docket No. C-4504 |

## DECISION AND ORDER
### [Public Record Version]

The Federal Trade Commission ("Commission") having initiated an investigation of the proposed acquisition by Respondents AB Acquisition LLC ("Albertson's") and Cerberus Institutional Partners V, L.P. ("Cerberus"), of Respondent Safeway Inc. ("Safeway"), and Respondents having been furnished thereafter with a copy of a draft of Complaint that the Bureau of Competition proposed to present to the Commission for its consideration and which, if issued by the Commission, would charge Respondents with violations of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45; and

Respondents, their attorneys, and counsel for the Commission having thereafter executed an Agreement Containing Consent Order ("Consent Agreement"), containing an admission by Respondents of all the jurisdictional facts set forth in the aforesaid draft of Complaint, a statement that the signing of said Consent Agreement is for settlement purposes only and does not constitute an admission by Respondents that the law has been violated as alleged in such Complaint, or that the facts alleged in such Complaint, other than jurisdictional facts, are true, and waivers and other provisions as required by the Commission's Rules; and

The Commission having thereafter considered the matter and having determined that it has reason to believe that Respondents have violated the said Acts, and that a Complaint should

issue stating its charges in that respect, and having thereupon issued its Complaint and Order to Maintain Assets, and having accepted the executed Consent Agreement and placed such Consent Agreement on the public record for a period of thirty (30) days for the receipt and consideration of public comments, and having duly considered the comments received from interested persons pursuant to Commission Rule 2.34, 16 C.F.R. § 2.34, now in further conformity with the procedure described in Commission Rule 2.34, the Commission hereby makes the following jurisdictional findings and issues the following Decision and Order ("Order"):

1. Respondent Cerberus Institutional Partners V, L.P. is a limited partnership organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its headquarters and principal place of business located at 875 Third Avenue, New York, New York.

2. Respondent AB Acquisition LLC is a company organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its headquarters and principal place of business located at 250 Parkcenter Boulevard, Boise, Idaho.

3. Respondent Safeway Inc. is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its headquarters and principal place of business located at 5918 Stoneridge Mall Road, Pleasanton, California.

4. The Federal Trade Commission has jurisdiction of the subject matter of this proceeding and of the Respondents, and the proceeding is in the public interest.

## ORDER

### I.

**IT IS ORDERED THAT**, as used in this Order, the following definitions shall apply:

A. "Cerberus" means Respondent Cerberus Institutional Partners V, L.P., its directors, officers, employees, agents, representatives, successors, and assigns; its joint ventures, subsidiaries, divisions, groups, and affiliates controlled by Cerberus Institutional Partners V, L.P. (including Respondent Albertson's), and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

B. "Albertson's" means Respondent AB Acquisition LLC, its directors, officers, employees, agents, representatives, successors, and assigns; its joint ventures, subsidiaries, divisions, groups, and affiliates controlled by AB Acquisition LLC (including Albertson's LLC, Albertson's Holdings LLC and, after the Acquisition is consummated, Safeway), and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

2

C.  "Safeway" means Respondent Safeway Inc., its directors, officers, employees, agents, representatives, successors, and assigns; its joint ventures, subsidiaries, divisions, groups, and affiliates controlled by Safeway Inc., and the respective directors, officers, employees, agents, representatives, successors, and assigns of each.

D.  "Respondents" means Cerberus, Albertson's, and Safeway, individually and collectively.

E.  "Acquirer" means any entity approved by the Commission to acquire any or all of the Assets To Be Divested pursuant to this Order.

F.  "Acquisition" means Albertson's proposed acquisition of Safeway pursuant to the Acquisition Agreement.

G.  "Acquisition Agreement" means the Agreement and Plan of Merger by and among AB Acquisition LLC, Albertson's Holdings LLC, Albertson's LLC, Saturn Acquisition Merger Sub, Inc., and Safeway Inc., dated as of March 6, 2014, as amended on April 7, 2014, and June 13, 2014.

H.  "Assets To Be Divested" means the Supermarkets identified on Schedule A, Schedule B, Schedule C, and Schedule D of this Order, or any portion thereof, and all rights, title, and interest in and to all assets, tangible and intangible, relating to, used in, and/or reserved for use in, the Supermarket business operated at each of those locations, including but not limited to all properties, leases, leasehold interests, equipment and fixtures, books and records, government approvals and permits (to the extent transferable), telephone and fax numbers, and goodwill.  Assets To Be Divested includes any of Respondents' other businesses or assets associated with, or operated in conjunction with, the Supermarket locations listed on Schedule A, Schedule B, Schedule C, and Schedule D of this Order, including any fuel centers (including any convenience store and/or car wash associated with such fuel center), pharmacies, liquor stores, beverage centers, gaming or slot machine parlors, store cafes, or other related business(es) that customers reasonably associate with the Supermarket business operated at each such location.  At each Acquirer's option, the Assets To Be Divested shall also include any or all inventory as of the Divestiture Date.

*Provided, however*, that the Assets To Be Divested shall not include those assets consisting of or pertaining to any of the Respondents' trademarks, trade dress, service marks, or trade names, *except* with respect to any purchased inventory (including private label inventory) or as may be allowed pursuant to any Remedial Agreement(s).

*Provided, further,* that in cases in which books or records included in the Assets To Be Divested contain information (a) that relates both to the Assets To Be Divested and to other retained businesses of Respondents or (b) such that Respondents have a legal obligation to retain the original copies, then Respondents shall be required to provide only copies or relevant excerpts of the materials containing such information.  In instances where such copies are provided to an Acquirer, the Respondents shall provide

3

to such Acquirer access to original materials under circumstances where copies of materials are insufficient for regulatory or evidentiary purposes.

I.   "Associated Food Stores" means Associated Food Stores, Inc., a corporation organized, existing, and doing business under and by virtue of the laws of the State of Utah, with its offices and principal place of business located at 1850 West 2100 South, Salt Lake City, Utah.

J.   "Associated Food Stores Divestiture Agreement" means the Amended and Restated Asset Purchase Agreement dated as of December 5, 2014, by and between Respondent Albertson's and Associated Food Stores, attached as non-public Appendix I, for the divestiture of the Schedule A Assets.

K.   "AWG" means Associated Wholesale Grocers, Inc., a corporation organized, existing, and doing business under and by virtue of the laws of the State of Kansas, with its offices and principal place of business located at 5000 Kansas Avenue, Kansas City, Kansas, and its direct and indirect subsidiaries, including LAS Acquisitions, LLC.

L.   "AWG Divestiture Agreement" means the Amended and Restated Asset Purchase Agreement dated as of December 11, 2014, by and between Respondent Albertson's, AWG, and LAS Acquisitions, LLC (a wholly owned subsidiary of AWG) ("LAS"), attached as non-public Appendix II, for the divestiture of the Schedule B Assets.

M.   "Divestiture Agreement" means any agreement between Respondents and an Acquirer (or a Divestiture Trustee appointed pursuant to Paragraph III of this Order and an Acquirer) and all amendments, exhibits, attachments, agreements, and schedules thereto, related to any of the Assets To Be Divested that have been approved by the Commission to accomplish the requirements of this Order.  The term "Divestiture Agreement" includes, as appropriate, the Associated Food Stores Divestiture Agreement, the AWG Divestiture Agreement, the Haggen Divestiture Agreement, and the Supervalu Divestiture Agreement.

N.   "Divestiture Date" means a closing date of any of the respective divestitures required by this Order.

O.   "Divestiture Trustee" means any person or entity appointed by the Commission pursuant to Paragraph III of this Order to act as a trustee in this matter.

P.   "Haggen" means Haggen Holdings, LLC, a company organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its offices and principal place of business located at 2221 Rimland Drive, Bellingham, Washington.

Q.   "Haggen Divestiture Agreement" means the Asset Purchase Agreement dated as of December 10, 2014, by and between Respondent Albertson's and Haggen, attached as non-public Appendix III, for the divestiture of the Schedule C Assets.

4

R.   "Proposed Acquirer" means any proposed acquirer of any of the Assets To Be Divested submitted to the Commission for its approval under this Order; "Proposed Acquirer" includes, as appropriate, Associated Food Stores, AWG, Haggen, and Supervalu.

S.   "Remedial Agreement(s)" means the following:

  1. Any Divestiture Agreement; and

  2. Any other agreement between Respondents and a Commission-approved Acquirer (or between a Divestiture Trustee and a Commission-approved Acquirer), including any Transition Services Agreement, and all amendments, exhibits, attachments, agreements, and schedules thereto, related to the Assets To Be Divested, that have been approved by the Commission to accomplish the requirements of this Order.

T.   "Relevant Areas" means: Coconino, Maricopa, Mohave, Pima, and Yavapai Counties in Arizona; Kern, Los Angeles, Orange, Riverside, San Bernardino, San Diego, San Luis Obispo, Santa Barbara, and Ventura Counties in California; Deer Lodge, Missoula, and Silver Bow Counties in Montana; Clark County in Nevada; Baker, Clackamas, Deschutes, Jackson, Josephine, Klamath, Lane, Marion, and Washington Counties in Oregon; Collin, Denton, Dallas, and Tarrant Counties in Texas; Chelan, Clallam, Island, King, Kitsap, Pierce, Snohomish, Spokane, Thurston, and Walla Walla Counties in Washington; and Albany, Natrona, and Sheridan Counties in Wyoming.

U.   "Schedule A Assets" means the Assets To Be Divested identified on Schedule A of this Order.

V.   "Schedule B Assets" means the Assets To Be Divested identified on Schedule B of this Order.

W.   "Schedule C Assets" means the Assets To Be Divested identified on Schedule C of this Order.

X.   "Schedule D Assets" means the Assets To Be Divested identified on Schedule D of this Order.

Y.   "Supervalu" means Supervalu Inc., a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its offices and principal place of business located at 7075 Flying Cloud Drive, Eden Prairie, Minnesota.

Z.   "Supervalu Divestiture Agreement" means the Asset Purchase Agreement dated as of December 5, 2014, by and between Respondent Albertson's and Supervalu, attached as non-public Appendix IV, for the divestiture of the Schedule D Assets.

AA. "Supermarket" means any full-line retail grocery store that enables customers to purchase substantially all of their weekly food and grocery shopping requirements in a single shopping visit with substantial offerings in each of the following product categories: bread and baked goods; dairy products; refrigerated food and beverage products; frozen food and beverage products; fresh and prepared meats and poultry; fresh fruits and vegetables; shelf-stable food and beverage products, including canned, jarred, bottled, boxed, and other types of packaged products; staple foodstuffs, which may include salt, sugar, flour, sauces, spices, coffee, tea, and other staples; other grocery products, including nonfood items such as soaps, detergents, paper goods, other household products, and health and beauty aids; pharmaceutical products and pharmacy services (where provided); and, to the extent permitted by law, wine, beer, and/or distilled spirits.

BB. "Third Party Consents" means all consents from any person other than the Respondents, including all landlords, that are necessary to effect the complete transfer to the Acquirer(s) of the Assets To Be Divested.

CC. "Transition Services Agreement" means an agreement that receives the prior approval of the Commission between one or more Respondents and an Acquirer of any of the assets divested under this Order to provide, at the option of each Acquirer, any services (or training for an Acquirer to provide services for itself) necessary to transfer the divested assets to the Acquirer in a manner consistent with the purposes of this Order.

## II.

**IT IS FURTHER ORDERED THAT**:

A. Respondents shall divest the Assets To Be Divested, absolutely and in good faith, as ongoing Supermarket businesses, as follows:

 1. Within 60 days of the date the Acquisition is consummated, the Schedule A Assets shall be divested to Associated Food Stores pursuant to and in accordance with the Associated Food Stores Divestiture Agreement;

 2. Within 60 days of the date the Acquisition is consummated, the Schedule B Assets shall be divested pursuant to and in accordance with the AWG Divestiture Agreement to either (i) LAS or (ii) RLS Supermarkets, LLC (d/b/a Minyard Food Stores) (as LAS's assignee, pursuant to the acquisition agreement between LAS and RLS Supermarkets, LLC);

 3. Within 150 days of the date the Acquisition is consummated, the Schedule C Assets shall be divested to Haggen pursuant to and in accordance with the Haggen Divestiture Agreement;

 > *Provided, however*, that if any permit or license necessary for the divestiture of pharmacy assets has not been secured by Haggen as of the divestiture deadline, then the pharmacy assets may be divested following receipt of the necessary

permit(s) and/or license(s), pursuant to and in accordance with the terms of the Pharmacy Transitional Services Agreement (attached as Exhibit 9(a) to the Haggen Divestiture Agreement);

4. Within 100 days of the date the Acquisition is consummated, the Schedule D Assets shall be divested to Supervalu pursuant to and in accordance with the Supervalu Divestiture Agreement.

B. *Provided, that,* if prior to the date this Order becomes final, Respondents have divested the Assets To Be Divested pursuant to Paragraph II.A and if, at the time the Commission determines to make this Order final, the Commission notifies Respondents that:

1. Any Proposed Acquirer identified in Paragraph II.A is not an acceptable Acquirer, then Respondents shall, within five days of notification by the Commission, rescind such transaction with that Proposed Acquirer, and shall divest such assets as ongoing Supermarket businesses, absolutely and in good faith, at no minimum price, to an Acquirer and in a manner that receives the prior approval of the Commission, within 90 days of the date the Commission notifies Respondents that such Proposed Acquirer is not an acceptable Acquirer; or

2. The manner in which any divestiture identified in Paragraph II.A was accomplished is not acceptable, the Commission may direct the Respondents, or appoint a Divestiture Trustee pursuant to Paragraph III of this Order, to effect such modifications to the manner of divesting those assets to such Acquirer (including, but not limited to, entering into additional agreements or arrangements, or modifying the relevant Divestiture Agreement) as may be necessary to satisfy the requirements of this Order.

C. Respondents shall obtain at their sole expense all required Third Party Consents relating to the divestiture of all Assets To Be Divested prior to the applicable Divestiture Date.

D. All Remedial Agreements approved by the Commission:

1. Shall be deemed incorporated by reference into this Order, and any failure by Respondents to comply with the terms of any such Remedial Agreement(s) shall constitute a violation of this Order; and

2. Shall not limit or contradict, or be construed to limit or contradict, the terms of this Order, it being understood that nothing in this Order shall be construed to reduce any rights or benefits of any Acquirer or to reduce any obligation of Respondents under such agreement.  If any term of any Remedial Agreement(s) varies from the terms of this Order ("Order Term"), then to the extent that Respondents cannot fully comply with both terms, the Order Term shall determine Respondents' obligations under this Order.

E.  At the option of each Acquirer of any Assets To Be Divested, and subject to the prior approval of the Commission, Respondents shall enter into a Transition Services Agreement for a term extending up to 180 days following the relevant Divestiture Date.  The services subject to the Transition Services Agreement shall be provided at no more than Respondents' direct costs and may include, but are not limited to, payroll, employee benefits, accounting, IT systems, distribution, warehousing, use of trademarks or trade names for transitional purposes, and other logistical and administrative support.

F.  Pending divestiture of any of the Assets To Be Divested, Respondents shall:

1.  Take such actions as are necessary to maintain the full economic viability, marketability, and competitiveness of the Assets To Be Divested, to minimize any risk of loss of competitive potential for the Assets To Be Divested, and to prevent the destruction, removal, wasting, deterioration, or impairment of the Assets To Be Divested, except for ordinary wear and tear; and

2.  Not sell, transfer, encumber, or otherwise impair the Assets To Be Divested (other than in the manner prescribed in this Decision and Order) nor take any action that lessens the full economic viability, marketability, or competitiveness of the Assets To Be Divested.

G.  With respect to each Divestiture Agreement:

1.  Respondents shall provide sufficient opportunity for the Proposed Acquirer to:

    a.  Meet personally, and outside of the presence or hearing of any employee or agent of any Respondents, with any or all of the employees of the Supermarket Assets To Be Divested pursuant to the Divestiture Agreement; and

    b.  Make offers of employment to any or all of the employees of the Supermarket Assets To Be Divested pursuant to the Divestiture Agreement; and

2.  Respondents shall: not interfere with the hiring or employing by the Acquirer of employees of the divested Supermarkets; remove any impediments within the control of Respondents that may deter those employees from accepting employment with such Acquirer (including, but not limited to, any non-compete or confidentiality provisions of employment or other contracts with Respondents that would affect the ability or incentive of those individuals to be employed by such Acquirer); and not make any counteroffer to any employee who has an outstanding offer of employment, or who has accepted an offer of employment, from such Acquirer.

H.  The purpose of the divestitures is to ensure the continuation of the Assets To Be Divested as ongoing, viable enterprises engaged in the Supermarket business and to remedy the lessening of competition resulting from the Acquisition as alleged in the Commission's Complaint.

# III.

**IT IS FURTHER ORDERED THAT**:

A.  If Respondents have not divested all of the Assets To Be Divested in the time and manner required by Paragraph II of this Order, the Commission may appoint a Divestiture Trustee to divest the remaining Assets To Be Divested in a manner that satisfies the requirements of this Order.  In the event that the Commission or the Attorney General brings an action pursuant to § 5(*l*) of the Federal Trade Commission Act, 15 U.S.C. § 45(*l*), or any other statute enforced by the Commission, Respondents shall consent to the appointment of a Divestiture Trustee in such action.  Neither the appointment of a Divestiture Trustee nor a decision not to appoint a Divestiture Trustee under this Paragraph shall preclude the Commission or the Attorney General from seeking civil penalties or any other relief available to it, including a court-appointed Divestiture Trustee, pursuant to § 5(*l*) of the Federal Trade Commission Act, or any other statute enforced by the Commission, for any failure by the Respondents to comply with this Order.

B.  If a Divestiture Trustee is appointed by the Commission or a court pursuant to this Order, Respondents shall consent to the following terms and conditions regarding the Divestiture Trustee's powers, duties, authority, and responsibilities:

1.  The Commission shall select the Divestiture Trustee, subject to the consent of Respondents, which consent shall not be unreasonably withheld.  The Divestiture Trustee shall be a person with experience and expertise in acquisitions and divestitures.  If Respondents have not opposed, in writing, including the reasons for opposing, the selection of any proposed Divestiture Trustee within ten (10) days after notice by the staff of the Commission to Respondents of the identity of any proposed Divestiture Trustee, Respondents shall be deemed to have consented to the selection of the proposed Divestiture Trustee.

2.  Subject to the prior approval of the Commission, the Divestiture Trustee shall have the exclusive power and authority to assign, grant, license, divest, transfer, contract, deliver, or otherwise convey the relevant assets or rights that are required to be assigned, granted, licensed, divested, transferred, contracted, delivered, or otherwise conveyed by this Order.

3.  Within ten (10) days after appointment of the Divestiture Trustee, Respondents shall execute a trust agreement that, subject to the prior approval of the Commission, transfers to the Divestiture Trustee all rights and powers necessary to permit the Divestiture Trustee to effect the relevant divestitures or transfers required by the Order.

4.  The Divestiture Trustee shall have twelve (12) months from the date the Commission approves the trust agreement described in Paragraph III.B.3. to accomplish the divestiture(s), which shall be subject to the prior approval of the Commission.  If,

9

however, at the end of the twelve-month period, the Divestiture Trustee has submitted a plan of divestiture or believes that the divestiture(s) can be achieved within a reasonable time, the divestiture period may be extended by the Commission; *provided, however*, the Commission may extend the divestiture period only two (2) times.

5. Subject to any demonstrated legally recognized privilege, the Divestiture Trustee shall have full and complete access to the personnel, books, records, and facilities relating to the assets that are required to be assigned, granted, licensed, divested, transferred, contracted, delivered, or otherwise conveyed by this Order or to any other relevant information, as the Divestiture Trustee may request. Respondents shall develop such financial or other information as the Divestiture Trustee may request and shall cooperate with the Divestiture Trustee. Respondents shall take no action to interfere with or impede the Divestiture Trustee's accomplishment of the divestiture(s). Any delays in divestiture caused by Respondents shall extend the time for divestiture under this Paragraph in an amount equal to the delay, as determined by the Commission or, for a court-appointed Divestiture Trustee, by the court.

6. The Divestiture Trustee shall use commercially reasonable best efforts to negotiate the most favorable price and terms available in each contract that is submitted to the Commission, subject to Respondents' absolute and unconditional obligation to divest expeditiously at no minimum price. The divestiture(s) shall be made in the manner and to an Acquirer as required by this Order; *provided, however*, if the Divestiture Trustee receives bona fide offers from more than one acquiring entity for any of the relevant Assets To Be Divested, and if the Commission determines to approve more than one such acquiring entity for such assets, the Divestiture Trustee shall divest such assets to the acquiring entity selected by Respondents from among those approved by the Commission; *provided further, however*, that Respondents shall select such entity within five (5) days of receiving notification of the Commission's approval.

7. The Divestiture Trustee shall serve, without bond or other security, at the cost and expense of Respondents, on such reasonable and customary terms and conditions as the Commission or a court may set. The Divestiture Trustee shall have the authority to employ, at the cost and expense of Respondents, such consultants, accountants, attorneys, investment bankers, business brokers, appraisers, and other representatives and assistants as are necessary to carry out the Divestiture Trustee's duties and responsibilities. The Divestiture Trustee shall account for all monies derived from the divestiture(s) and all expenses incurred. After approval by the Commission and, in the case of a court-appointed Divestiture Trustee, by the court, of the account of the Divestiture Trustee, including fees for his or her services, all remaining monies shall be paid at the direction of Respondents, and the Divestiture Trustee's power shall be terminated. The compensation of the Divestiture Trustee shall be based at least in significant part on a commission arrangement contingent on the divestiture of all of the relevant assets required to be divested by this Order.

8. Respondents shall indemnify the Divestiture Trustee and hold the Divestiture Trustee harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the Divestiture Trustee's duties, including all reasonable fees of counsel and other expenses incurred in connection with the preparation for, or defense of, any claim, whether or not resulting in any liability, except to the extent that such losses, claims, damages, liabilities, or expenses result from malfeasance, gross negligence, willful or wanton acts, or bad faith by the Divestiture Trustee.

9. If the Commission determines that the Divestiture Trustee has ceased to act or failed to act diligently, the Commission may appoint a substitute Divestiture Trustee in the same manner as provided in this Paragraph III.

10. The Commission or, in the case of a court-appointed trustee, the court, may on its own initiative or at the request of the Divestiture Trustee issue such additional orders or directions as may be necessary or appropriate to accomplish the divestiture(s) required by this Order.

11. The Divestiture Trustee shall have no obligation or authority to operate or maintain the relevant assets required to be divested by this Order.

12. The Divestiture Trustee shall report in writing to the Commission every thirty (30) days concerning the Divestiture Trustee's efforts to accomplish the divestiture(s).

13. Respondents may require the Divestiture Trustee and each of the Divestiture Trustee's consultants, accountants, attorneys, and other representatives and assistants to sign a customary confidentiality agreement; *provided, however*, such agreement shall not restrict the Divestiture Trustee from providing any information to the Commission.

14. The Commission may, among other things, require the Divestiture Trustee and each of the Divestiture Trustee's consultants, accountants, attorneys, representatives, and assistants to sign an appropriate confidentiality agreement relating to Commission materials and information received in connection with the performance of the Divestiture Trustee's duties and responsibilities.

## IV.

**IT IS FURTHER ORDERED THAT**:

A. Richard King shall serve as the Monitor pursuant to the agreement executed by the Monitor and Respondents, and attached as Appendix V ("Monitor Agreement") and Non-Public Appendix V-1 ("Monitor Compensation"). The Monitor is appointed to assure that Respondents expeditiously comply with all of their obligations and perform all of their responsibilities as required by this Order, the Order to Maintain Assets, and the Remedial Agreement(s);

11

B.  No later than one (1) day after the date the Acquisition is consummated, Respondents shall, pursuant to the Monitor Agreement, confer on the Monitor all rights, powers, and authorities necessary to permit the Monitor to monitor Respondents' compliance with the terms of this Order, the Order to Maintain Assets, and the Remedial Agreement(s), in a manner consistent with the purposes of the orders.

C.  Respondents shall consent to the following terms and conditions regarding the powers, duties, authorities, and responsibilities of the Monitor:

  1.  The Monitor shall have the power and authority to monitor Respondents' compliance with the divestiture and related requirements of this Order, the Order to Maintain Assets, and the Remedial Agreement(s), and shall exercise such power and authority and carry out the duties and responsibilities of the Monitor in a manner consistent with the purposes of the orders and in consultation with the Commission.

  2.  The Monitor shall act in a fiduciary capacity for the benefit of the Commission.

  3.  The Monitor shall serve until at least the latter of (i) the completion of all divestitures required by this Order, (ii) the end of any Transition Services Agreement in effect with any Acquirer, and (iii) September 30, 2015.

D.  Subject to any demonstrated legally recognized privilege, the Monitor shall have full and complete access to Respondents' personnel, books, documents, records kept in the ordinary course of business, facilities and technical information, and such other relevant information as the Monitor may reasonably request, related to Respondents' compliance with their obligations under this Order, the Order to Maintain Assets, and the Remedial Agreement(s).

E.  Respondents shall cooperate with any reasonable request of the Monitor and shall take no action to interfere with or impede the Monitor's ability to monitor Respondents' compliance with this Order, the Order to Maintain Assets, and the Remedial Agreement(s).

F.  The Monitor shall serve, without bond or other security, at the expense of Respondents, on such reasonable and customary terms and conditions as the Commission may set.  The Monitor shall have the authority to employ, at the expense of Respondents, such consultants, accountants, attorneys, and other representatives and assistants as are reasonably necessary to carry out the Monitor's duties and responsibilities.

G.  Respondents shall indemnify the Monitor and hold the Monitor harmless against any losses, claims, damages, liabilities, or expenses arising out of, or in connection with, the performance of the Monitor's duties, including all reasonable fees of counsel and other reasonable expenses incurred in connection with the preparations for, or defense of, any claim, whether or not resulting in any liability, except to the extent that such losses, claims, damages, liabilities, or expenses result from gross negligence, willful or wanton acts, or bad faith by the Monitor.  For purposes of this Paragraph IV.G., the term "Monitor" shall include all persons retained by the Monitor pursuant to Paragraph IV.F. of this Order.

H.  Respondents shall report to the Monitor in accordance with the requirements of this Order or the Order to Maintain Assets, and as otherwise provided in the Monitor Agreement approved by the Commission.  The Monitor shall evaluate the reports submitted by the Respondents with respect to the performance of Respondents' obligations under this Order and the Order to Maintain Assets.  Within thirty (30) days from the date the Monitor receives the first such report, and every sixty (60) days thereafter, the Monitor shall report in writing to the Commission concerning performance by Respondents of their obligations under the orders.

I.  Respondents may require the Monitor and each of the Monitor's consultants, accountants, and other representatives and assistants to sign a customary confidentiality agreement. *Provided, however,* that such agreement shall not restrict the Monitor from providing any information to the Commission.

J.  The Commission may require, among other things, the Monitor and each of the Monitor's consultants, accountants, attorneys, and other representatives and assistants to sign an appropriate confidentiality agreement related to Commission materials and information received in connection with the performance of the Monitor's duties.

K.  If the Commission determines that the Monitor has ceased to act or failed to act diligently, the Commission may appoint a substitute Monitor:

   1.  The Commission shall select the substitute Monitor, subject to the consent of Respondents, which consent shall not be unreasonably withheld.  If Respondents have not opposed, in writing, including the reasons for opposing, the selection of a proposed Monitor within ten (10) days after the notice by the staff of the Commission to Respondents of the identity of any proposed Monitor, Respondents shall be deemed to have consented to the selection of the proposed Monitor.

   2.  Not later than ten (10) days after the appointment of the substitute Monitor, Respondents shall execute an agreement that, subject to the prior approval of the Commission, confers on the Monitor all rights and powers necessary to permit the Monitor to monitor Respondents' compliance with the relevant terms of this Order, the Order to Maintain Assets, and the Remedial Agreement(s) in a manner consistent with the purposes of orders and in consultation with the Commission.

L.  The Commission may on its own initiative, or at the request of the Monitor, issue such additional orders or directions as may be necessary or appropriate to assure compliance with the requirements of this Order.

M.  The Monitor appointed pursuant to this Order may be the same Person appointed as a Divestiture Trustee pursuant to the relevant provisions of this Order.

13

## V.

**IT IS FURTHER ORDERED THAT** if Associated Food Stores purchases the Schedule A Assets pursuant to Paragraph II.A.1, Associated Food Stores shall not sell or otherwise convey, directly or indirectly, any of the Schedule A Assets, except to an Acquirer approved by the Commission and only in a manner that receives the prior approval of the Commission. *Provided*, *however*, that prior approval of the Commission is not required for the following buyers to acquire the following Supermarkets:

    A.  Missoula Fresh Market LLC  may acquire Safeway Store Nos. 1573 and  2619, pursuant to the assignment and assumption agreement between Missoula Fresh Market LLC and Associated Food Stores;

    B.  Ridley's Family Markets, Inc. may acquire Albertson's Store No. 2063 and Safeway Store Nos. 433, 2468, and 2664, pursuant to the assignment and assumption agreement between Ridley's Family Markets and Associated Food Stores; and

    C.  Stokes Inc. may acquire Albertson's Store No. 2007 and Safeway Store No. 3256, pursuant to the assignment and assumption agreement between Stokes Inc. and Associated Food Stores.

Associated Food Stores shall comply with this Paragraph until three (3) years after the date this Order is issued.

## VI.

**IT IS FURTHER ORDERED THAT** if LAS purchases the Schedule B Assets pursuant to Paragraph II.A.2, LAS shall not sell or otherwise convey, directly or indirectly, such Schedule B Assets, except to an Acquirer approved by the Commission and only in a manner that receives the prior approval of the Commission.  *Provided*, *however*, that prior approval of the Commission is not required for RLS Supermarkets, LLC (d/b/a Minyard Food Stores) to acquire the Schedule B Assets, pursuant to the acquisition agreement between RLS Supermarkets, LLC and LAS.  LAS shall comply with this Paragraph until three (3) years after the date this Order is issued.

## VII.

**IT IS FURTHER ORDERED THAT** if Supervalu purchases the Schedule D Assets pursuant to Paragraph II.A.4, Supervalu shall not sell or otherwise convey, directly or indirectly, any of the Schedule D Assets, except to an Acquirer approved by the Commission and only in a manner that receives the prior approval of the Commission.  Supervalu shall comply with this Paragraph until three (3) years after the date this Order is issued.

## VIII.

**IT IS FURTHER ORDERED THAT**:

A. For a period of ten (10) years commencing on the date this Order is issued, Respondents shall not, directly or indirectly, through subsidiaries, partnerships or otherwise, without providing advance written notification to the Commission:

    1. Acquire any ownership or leasehold interest in any facility that has operated as a Supermarket within six (6) months prior to the date of such proposed acquisition in any of the Relevant Areas.

    2. Acquire any stock, share capital, equity, or other interest in any entity that owns any interest in or operates any Supermarket, or owned any interest in or operated any Supermarket within six (6) months prior to such proposed acquisition, in any of the Relevant Areas.

    *Provided, however,* that advance written notification shall not apply to the construction of new facilities or the acquisition or leasing of a facility that has not operated as a Supermarket within six (6) months prior to Respondents' offer to purchase or lease such facility.

    *Provided, further*, that advance written notification shall not be required for acquisitions resulting in total holdings of one (1) percent or less of the stock, share capital, equity, or other interest in an entity that owns any interest in or operates any Supermarket, or owned any interest in or operated any Supermarket within six (6) months prior to such proposed acquisition, in any of the Relevant Areas.

B. Said notification under this Paragraph shall be given on the Notification and Report Form set forth in the Appendix to Part 803 of Title 16 of the Code of Federal Regulations as amended, and shall be prepared and transmitted in accordance with the requirements of that part, except that no filing fee will be required for any such notification, notification shall be filed with the Secretary of the Commission, notification need not be made to the United States Department of Justice, and notification is required only of Respondents and not of any other party to the transaction.  Respondents shall provide the notification to the Commission at least thirty (30) days prior to consummating any such transaction (hereinafter referred to as the "first waiting period").  If, within the first waiting period, representatives of the Commission make a written request for additional information or documentary material (within the meaning of 16 C.F.R. § 803.20), Respondents shall not consummate the transaction until thirty (30) days after substantially complying with such request.  Early termination of the waiting periods in this Paragraph may be requested and, where appropriate, granted by letter from the Bureau of Competition.  *Provided, however,* that prior notification shall not be required by this Paragraph for a transaction for which notification is required to be made, and has been made, pursuant to Section 7A of the Clayton Act, 15 U.S.C. § 18a.

## IX.

**IT IS FURTHER ORDERED THAT**:

A.  Within thirty (30) days after the date this Order is issued and every thirty (30) days thereafter until the Respondents have fully complied with the provisions of Paragraphs II and III of this Order, Respondents shall submit to the Commission verified written reports setting forth in detail the manner and form in which they intend to comply, are complying, and have complied with Paragraphs II and III of this Order.  Respondents shall submit at the same time a copy of their reports concerning compliance with this Order to the Monitor.  Respondents shall include in their reports, among other things that are required from time to time, a full description of the efforts being made to comply with Paragraphs II and III of this Order, including a description of all substantive contacts or negotiations for the divestitures and the identity of all parties contacted.  Respondents shall include in their reports copies of all material written communications to and from such parties, all non-privileged internal memoranda, reports, and recommendations concerning completing the obligations; and

B.  One (1) year from the date this Order is issued, annually for the next nine (9) years on the anniversary of the date this Order is issued, and at other times as the Commission may require, Respondents shall file verified written reports with the Commission setting forth in detail the manner and form in which they have complied and are complying with this Order.

## X.

**IT IS FURTHER ORDERED THAT** Respondents shall notify the Commission at least thirty (30) days prior to:

A.  Any proposed dissolution of Respondents;

B.  Any proposed acquisition, merger, or consolidation of Respondents; or

C.  Any other change in the Respondents, including but not limited to, assignment and the creation or dissolution of subsidiaries, if such change might affect compliance obligations arising out of this Order.

## XI.

**IT IS FURTHER ORDERED THAT**, for the purpose of determining or securing compliance with this Order, and subject to any legally recognized privilege, upon written request and upon five (5) days' notice to Respondents made to their principal United States office, Respondents shall permit any duly authorized representative of the Commission:

A.  Access, during office hours of Respondents and in the presence of counsel, to all facilities and access to inspect and copy all books, ledgers, accounts, correspondence, memoranda and all other records and documents in the possession or under the control of Respondents

16

relating to compliance with this Order, which copying services shall be provided by such Respondent at the request of the authorized representative(s) of the Commission and at the expense of Respondent; and

B.  To interview officers, directors, or employees of Respondents, who may have counsel present, regarding any such matters.

## XII.

**IT IS FURTHER ORDERED THAT** this Order shall terminate on July 2, 2025.

By the Commission.


Donald S. Clark
Secretary

SEAL:
ISSUED:  July 2, 2015

17

**Schedule A Assets**

**<u>Montana Stores</u>**:

1. Safeway Store No. 1573, located at 3801 S. Reserve Street, Missoula, Montana (Missoula County).

2. Albertson's Store No. 2007, located at 1301 Harrison Avenue, Butte, Montana (Silver Bow County).

3. Safeway Store No. 2619, located at 800 W. Broadway Street, Missoula, Montana (Missoula County).

4. Safeway Store No. 3256, located at 1525 West Park, Anaconda, Montana (Deer Lodge County).

**<u>Wyoming Stores</u>**:

5. Albertson's Store No. 2063, located at 3112 East Grand Avenue, Laramie, Wyoming (Albany County).

6. Safeway Store No. 433, located at 1375 Cy Avenue, Casper, Wyoming (Natrona County).

7. Safeway Store No. 2468, located at 300 S.E. Wyoming Boulevard, Casper, Wyoming (Natrona County).

8. Safeway Store No. 2664, located at 169 Coffeen, Sheridan, Wyoming (Sheridan County).

**Schedule B Assets**

**Texas Stores:**

1. Albertson's Store No. 4182, located at 3630 Forest Lane, Dallas, Texas (Dallas County).

2. Albertson's Store No. 4132, located at 6464 E. Mockingbird Lane, Dallas, Texas (Dallas County).

3. Albertson's Store No. 4134, located at 4349 W. Northwest Highway, Dallas, Texas (Dallas County).

4. Albertson's Store No. 4140, located at 7007 Arapaho Road, Dallas, Texas (Dallas County).

5. Albertson's Store No. 4149, located at 1108 N. Highway 377, Roanoke, Texas (Denton County).

6. Albertson's Store No. 4168, located at 3524 McKinney Avenue, Dallas, Texas (Dallas County).

7. Albertson's Store No. 4197, located at 8505 Lakeview Parkway, Rowlett, Texas (Dallas Counties).

8. Albertson's Store No. 4297, located at 10203 E. Northwest Highway, Dallas, Texas (Dallas County).

9. Safeway (Tom Thumb) Store No. 2568, located at 4836 West Park Boulevard, Plano, Texas (Collin County

10. Safeway (Tom Thumb) Store No. 3555, located at 3300 Harwood Road, Bedford, Texas (Tarrant County).

11. Safeway (Tom Thumb) Store No. 3573, located at 3001 Hardin Boulevard, McKinney, Texas (Collin County).

12. Safeway (Tom Thumb) Store No. 3576, located at 4000 William D. Tate Avenue., Grapevine, Texas (Tarrant County).

**Schedule C Assets**

**Arizona Stores**:

1. Albertsons Store No. 967, located at 1416 E Route 66, Flagstaff, Arizona (Coconino County).

2. Albertsons Store No. 979, located at 34442 N. Scottsdale Road, Scottsdale, Arizona (Maricopa County).

3. Albertsons Store No. 983, located at 11475 E. Via Linda, Scottsdale, Arizona (Maricopa County).

4. Safeway Store No. 1726, located at 3655 W. Anthem Way, Anthem, Arizona (Maricopa County).

5. Albertsons Store No. 1027, located at 1980 McCulloch Boulevard, Lake Havasu City, Arizona (Mohave County).

6. Safeway Store No. 234, located at 8740 East Broadway, Tucson, Arizona (Pima County).

7. Safeway Store No. 2611, located at 10380 East Broadway Boulevard, Tucson, Arizona (Pima County).

8. Albertsons Store No. 972, located at 1350 N. Silverbell Road, Tucson, Arizona (Pima County).

9. Albertsons Store No. 953, located at 174 East Sheldon Street, Prescott, Arizona (Yavapai County).

10. Albertsons Store No. 965, located at 7450 E. Highway 69, Prescott Valley, Arizona (Yavapai County).

**California Stores**:

11. Albertsons Store No. 6323, located at 3500 Panama Lane, Bakersfield, California (Kern County).

12. Albertsons Store No. 6325, located at 7900 White Lane, Bakersfield, California (Kern County).

13. Albertsons Store No. 6379, located at 8200 East Stockdale Highway, Bakersfield, California (Kern County).

14. Albertsons Store No. 6315, located at 3830 W. Verdugo Avenue, Burbank, California (Los Angeles County).

15. Albertsons Store No. 6168, located at 3443 S. Sepulveda Boulevard, Los Angeles, California (Los Angeles County).

16. Albertsons Store No. 6169, located at 8985 Venice Boulevard Suite B, Los Angeles, California (Los Angeles County).

17. Safeway (Vons) Store No. 2062, located at 240 S. Diamond Bar Boulevard, Diamond Bar, California (Los Angeles County).

18. Albertsons Store No. 6329, located at 5038 W. Avenue North, Palmdale, California (Los Angeles County).

19. Albertsons Store No. 6107, located at 2130 Pacific Coast Highway, Lomita, California (Los Angeles County).

20. Albertsons Store No. 6127, located at 1516 S. Pacific Coast Highway, Redondo Beach, California (Los Angeles County).

21. Albertsons Store No. 6138, located at 615 N. Pacific Coast Highway, Redondo Beach, California (Los Angeles County).

22. Albertsons Store No. 6153, located at 21035 Hawthorne Boulevard, Torrance, California (Los Angeles County).

23. Albertsons Store No. 6189, located at 2115 Artesia Boulevard, Redondo Beach, California (Los Angeles County).

24. Albertsons Store No. 6160, located at 1636 W. 25th Street, San Pedro, California (Los Angeles County).

25. Albertsons Store No. 6164, located at 28090 South Western Avenue, San Pedro, California (Los Angeles County).

26. Albertsons Store No. 6388, located at 5770 Lindero Canyon Road, Westlake Village, California (Los Angeles County).

27. Albertsons Store No. 6397, located at 6240 Foothill Boulevard, Tujunga, California (Los Angeles County).

28. Albertsons Store No. 6162, located at 2627 Lincoln Boulevard, Santa Monica, California (Los Angeles County).

29. Albertsons Store No. 6154, located at 6235 East Spring Street, Long Beach, California (Los Angeles County).

30. Safeway (Vons) Store No. 2031, located at 23381 Mulholland Drive, Woodland Hills, California (Los Angeles County).

31. Safeway (Vons) Store No. 1669, located at 26518 Bouquet Canyon Road, Saugus, California (Los Angeles County).

32. Safeway (Pavilions) Store No. 1961, located at 27095 McBean Parkway, Santa Clarita, California (Los Angeles County).

33. Safeway (Pavilions) Store No. 2703, located at 25636 Crown Valley Parkway, Ladera Ranch, California (Orange County).

34. Albertsons Store No. 6575, located at 30922 Coast Highway, Laguna Beach, California (Orange County).

35. Safeway (Vons) Store No. 1676, located at 30252 Crown Valley Parkway, Laguna Niguel, California (Orange County).

36. Safeway (Vons) Store No. 1670, located at 28751 Los Alisos Boulevard, Mission Viejo, California (Orange County).

37. Albertsons Store No. 6517, located at 25872 Muirlands Boulevard, Mission Viejo, California (Orange County).

38. Albertsons Store No. 6504, located at 3049 Coast Highway, Corona Del Mar, California (Orange County).

39. Safeway (Pavilions) Store No. 2822, located at 3901 Portola Parkway, Irvine, California (Orange County).

40. Albertsons Store No. 6510, located at 21500 Yorba Linda Boulevard, Yorba Linda, California (Orange County).

41. Albertsons Store No. 6521, located at 21672 Plano Trabuco Road, Trabuco Canyon, California (Orange County).

42. Safeway (Vons) Store No. 2146, located at 550 E. First Street, Tustin, California (Orange County).

43. Safeway (Vons) Store No. 2324, located at 17662 17th Street, Tustin, California (Orange County).

44. Safeway (Vons) Store No. 2383, located at 72675 Highway 111, Palm Desert, California (Riverside County).

45. Safeway (Pavilions) Store No. 3218, located at 36-101 Bob Hope Drive, Rancho Mirage, California (Riverside County).

46. Safeway (Vons) Store No. 2597, located at 4200 Chino Hills Parkway Suite 400, Chino Hills, California (San Bernardino County).

47. Albertsons Store No. 6523, located at 8850 Foothill Boulevard, Rancho Cucamonga, California (San Bernardino County).

48. Albertsons Store No. 6589, located at 1910 N. Campus Avenue, Upland, California (San Bernardino County).

49. Albertsons Store No. 6701, located at 955 Carlsbad Village Drive, Carlsbad, California (San Diego County).

50. Albertsons Store No. 6720, located at 7660 El Camino Real, Carlsbad, California (San Diego County).

51. Safeway (Vons) Store No. 2006, located at 505 Telegraph Canyon Road, Chula Vista, California (San Diego County).

52. Safeway (Vons) Store No. 2336, located at 360 East H Street, Chula Vista, California (San Diego County).

53. Safeway (Vons) Store No. 3063, located at 870 Third Avenue, Chula Vista, California (San Diego County).

54. Albertsons Store No. 6747, located at 150 B Avenue, Coronado, California (San Diego County).

55. Albertsons Store No. 6771, located at 1608 Broadway Street, El Cajon, California (San Diego County).

56. Safeway (Vons) Store No. 2064, located at 2800 Fletcher Parkway, El Cajon, California (San Diego County).

57. Safeway (Vons) Store No. 2137, located at 5630 Lake Murray Boulevard, La Mesa, California (San Diego County).

58. Albertsons Store No. 6741, located at 14837 Pomerado Road, Poway, California (San Diego County).

59. Albertsons Store No. 6763, located at 12475 Rancho Bernardo Road, Rancho Bernardo, California (San Diego County).

60. Albertsons Store No. 6760, located at 10633 Tierrasanta Boulevard, San Diego, California (San Diego County).

61. Albertsons Store No. 6714, located at 2235 University Avenue, San Diego, California (San Diego County).

62. Albertsons Store No. 6715, located at 422 W. Washington Street, San Diego, California (San Diego County).

63. Albertsons Store No. 6742, located at 7895 Highland Village Place, San Diego, California (San Diego County).

64. Albertsons Store No. 6770, located at 10740 Westview Parkway, San Diego, California (San Diego County).

65. Albertsons Store No. 6772, located at 14340 Penasquitos Drive, San Diego, California (San Diego County).

66. Albertsons Store No. 6788, located at 730 Turquoise Street, San Diego, California (San Diego County).

67. Albertsons Store No. 6781, located at 5950 Balboa Avenue, San Diego, California (San Diego County).

68. Safeway (Vons) Store No. 2174, located at 671 Rancho Santa Fe Road, San Marcos, California (San Diego County).

69. Albertsons Store No. 6727, located at 9870 Magnolia Avenue, Santee, California (San Diego County).

70. Albertsons Store No. 6702, located at 2707 Via De La Valle, Del Mar, California (San Diego County).

71. Safeway (Vons) Store No. 2365, located at 3681 Avocado Avenue, La Mesa, California (San Diego County).

72. Albertsons (Lucky) Store No. 6228, located at 350 W. San Ysidro Boulevard, San Ysidro, California (San Diego County).

73. Safeway (Vons) Store No. 2333, located at 13439 Camino Canada, El Cajon, California (San Diego County).

74. Albertsons Store No. 6304, located at 1132 West Branch Street, Arroyo Grande, California (San Luis Obispo County).

75. Albertsons Store No. 6390, located at 8200 El Camino Real, Atascadero, California (San Luis Obispo County).

76. Safeway (Vons) Store No. 2312, located at 1130 Los Osos Valley Road, Los Osos, California (San Luis Obispo County).

77. Safeway (Vons) Store No. 2317, located at 1191 E. Creston Road, Paso Robles, California (San Luis Obispo County).

78. Albertsons Store No. 6372, located at 771 Foothill Boulevard, San Luis Obispo, California (San Luis Obispo County).

79. Albertsons Store No. 6409, located at 1321 Johnson Avenue, San Luis Obispo, California (San Luis Obispo County).

80. Safeway (Vons) Store No. 2425, located at 850 Linden Avenue, Carpinteria, California (Santa Barbara County).

81. Albertsons Store No. 6339, located at 1500 North H Street, Lompoc, California (Santa Barbara County).

82. Albertsons Store No. 6351, located at 2010 Cliff Drive, Santa Barbara, California (Santa Barbara County).

83. Albertsons Store No. 6352, located at 3943 State Street, Santa Barbara, California (Santa Barbara County).

84. Safeway (Vons) Store No. 2048, located at 163 S. Turnpike Road, Goleta, California (Santa Barbara County).

85. Safeway (Vons) Store No. 2691, located at 175 N. Fairview Avenue, Goleta, California (Santa Barbara County).

86. Albertsons Store No. 6369, located at 1736 Avenida De Los Arboles, Thousand Oaks, California (Ventura County).

87. Albertsons Store No. 6318, located at 7800 Telegraph Road, Ventura, California (Ventura County).

88. Albertsons Store No. 6317, located at 5135 Los Angeles Avenue, Simi Valley, California (Ventura County).

89. Albertsons Store No. 6363, located at 2800 Cochran Street, Simi Valley, California (Ventura County).

90. Safeway (Vons) Store No. 2163, located at 660 E. Los Angeles Avenue, Simi Valley, California (Ventura County).

91. Albertsons Store No. 6385, located at 2400 East Las Posas Road, Camarillo, California (Ventura County).

92. Albertsons Store No. 6217, located at 920 N. Ventura Road, Oxnard, California (Ventura County).

93. Safeway (Vons) Store No. 1793, located at 2100 Newbury Road, Newbury Park, California (Ventura County).

**Nevada Stores**:

94. Safeway (Vons) Store No. 2391, located at 1031 Nevada Highway, Boulder City, Nevada (Clark County).

95. Albertsons Store No. 6028, located at 2910 Bicentennial Parkway, Henderson, Nevada (Clark County).

96. Safeway (Vons) Store No. 1688, located at 820 S. Rampart Boulevard, Las Vegas, Nevada (Clark County).

97. Safeway (Vons) Store No. 2392, located at 7530 W. Lake Mead Boulevard, Las Vegas, Nevada (Clark County).

98. Safeway (Vons) Store No. 2395, located at 1940 Village Center Circle, Las Vegas, Nevada (Clark County).

99. Albertsons Store No. 6014, located at 575 College Drive, Henderson, Nevada (Clark County).

100. Albertsons Store No. 6019, located at 190 North Boulder Highway, Henderson, Nevada (Clark County).

**Oregon Stores**:

101. Albertsons Store No. 261, located at 1120 Campbell Street, Baker City, Oregon (Baker County).

102. Albertsons Store No. 503, located at 14800 S.E. Sunnyside Road, Clackamas, Oregon (Clackamas County).

103. Albertsons Store No. 521, located at 16199 Boones Ferry Road, Lake Oswego, Oregon (Clackamas County).

104. Albertsons Store No. 506, located at 1855 Blankenship Road, West Linn, Oregon (Clackamas County).

105. Albertsons Store No. 566, located at 10830 S.E. Oak Street, Milwaukie, Oregon (Clackamas County).

106. Albertsons Store No. 587, located at 1800 N.E. 3rd Street, Bend, Oregon (Deschutes County).

107. Albertsons Store No. 588, located at 61155 S. Highway 97, Bend, Oregon (Deschutes County).

108. Safeway Store No. 4292, located at 585 Siskiyou Boulevard, Ashland, Oregon (Jackson County).

109. Albertsons Store No. 501, located at 340 N.E. Beacon Drive, Grants Pass, Oregon (Josephine County).

110. Albertsons Store No. 537, located at 1690 Allen Creek Road, Grants Pass, Oregon (Josephine County).

111. Safeway Store No. 1766, located at 2740 S. 6th Street, Klamath Falls, Oregon (Klamath County).

112. Safeway Store No. 4395, located at 211 North Eighth Street, Klamath Falls, Oregon (Klamath County).

113. Albertsons Store No. 507, located at 1675 W. 18th Avenue, Eugene, Oregon (Lane County).

114. Albertsons Store No. 568, located at 3075 Hilyard Street, Eugene, Oregon (Lane County).

115. Safeway Store No. 311, located at 5415 Main Street, Springfield, Oregon (Lane County).

116. Albertsons Store No. 562, located at 5450 River Road North, Keizer, Oregon (Marion County).

117. Albertsons Store No. 559, located at 8155 S.W. Hall Boulevard, Beaverton, Oregon (Washington County).

118. Albertsons Store No. 565, located at 16200 S.W. Pacific Highway, Tigard, Oregon (Washington County).

119. Albertsons Store No. 576, located at 14300 S.W. Barrows Road, Tigard, Oregon (Washington County).

120. Albertsons Store No. 579, located at 16030 S.W. Tualatin Sherwood Road, Sherwood, Oregon (Washington County).

**<u>Washington Stores</u>**:

121. Albertsons Store No. 244, located at 1128 N. Miller, Wenatchee, Washington (Chelan County).

122. Albertsons Store No. 404, located at 114 E. Lauridsen Boulevard, Port Angeles, Washington (Clallam County).

123. Safeway Store No. 3518, located at 31565 SR 20 #1, Oak Harbor, Washington (Island County).

124. Albertsons Store No. 411, located at 15840 1st Avenue South, Burien, Washington (King County).

125. Albertsons Store No. 473, located at 12725 First Avenue South, Burien, Washington (King County).

126. Albertsons Store No. 425, located at 17171 Bothell Way NE, Seattle, Washington (King County).

127. Albertsons Store No. 470, located at 14215 SE Petrovitsky Road, Renton, Washington (King County).

128. Safeway Store No. 1468, located at 4300 N.E. 4th Street, Renton, Washington (King County).

129. Albertsons Store No. 403, located at 3925 236th Avenue NE, Redmond, Washington (King County).

130. Safeway Store No. 442, located at 15332 Aurora Avenue North, Shoreline, Washington (King County).

131. Albertsons Store No. 496, located at 31009 Pacific Highway South, Federal Way, Washington (King County).

132. Albertsons Store No. 443, located at 2900 Wheaton Way, Bremerton, Washington (Kitsap County).

133. Albertsons Store No. 492, located at 2222 NW Bucklin Hill Road, Silverdale, Washington (Kitsap County).

134. Safeway Store No. 1082, located at 3355 Bethel Road SE, Port Orchard, Washington (Kitsap County).

135. Safeway Store No. 2949, located at 4831 Point Fosdick Drive NW, Gig Harbor, Washington (Pierce County).

136. Albertsons Store No. 472, located at 2800 Milton Way, Milton, Washington (Pierce County).

137. Albertsons Store No. 468, located at 11012 Canyon Road East, Puyallup, Washington (Pierce County).

138. Safeway Store No. 551, located at 15805 Pacific Avenue South, Tacoma, Washington (Pierce County).

139. Albertsons Store No. 498, located at 111 S. 38th Street, Tacoma, Washington (Pierce County).

140. Albertsons Store No. 465, located at 8611 Steilacoom Boulevard SW, Tacoma, Washington (Pierce County).

141. Safeway Store No. 517, located at 7601 Evergreen Way, Everett, Washington (Snohomish County).

142. Albertsons Store No. 476, located at 19881 SR 2, Monroe, Washington (Snohomish County).

143. Albertsons Store No. 401, located at 17520 SR 9 Southeast, Snohomish, Washington (Snohomish County).

144. Safeway Store No. 1741, located at 1233 N. Liberty Lake Road, Liberty Lake, Washington (Spokane County).

145. Albertsons Store No. 415, located at 3520 Pacific Avenue SE, Olympia, Washington (Thurston County).

146. Albertsons Store No. 225, located at 450 N. Wilbur Avenue, Walla Walla, Washington (Walla Walla County).

**Schedule D Assets**

**<u>Washington Stores</u>**:

1.Albertson's Store No. 459, located at 14019 Woodinville-Duvall Road, Woodinville, Washington (King County).

2. Albertson's Store No. 477, located at 303 91st Avenue NE, Lake Stevens, Washington (Snohomish County).

**APPENDIX I**
**Associated Food Stores Divestiture Agreement**

**[Redacted From the Public Record Version, But Incorporated By Reference]**

**APPENDIX II**

**AWG Divestiture Agreement**

**[Redacted From the Public Record Version, But Incorporated By Reference]**

**APPENDIX III**

**Haggen Divestiture Agreement**

**[Redacted From the Public Record Version, But Incorporated By Reference]**

**APPENDIX IV**

**Supervalu Divestiture Agreement**

**[Redacted From the Public Record Version, But Incorporated By Reference]**

**APPENDIX V**

**Monitor Agreement**

**APPENDIX V-1**

**Monitor Compensation**

**[Redacted From the Public Record Version]**

# Exhibit E

141 0108

### UNITED STATES OF AMERICA
### BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:      **Edith Ramirez, Chairwoman**
                                  **Julie Brill**
                                  **Maureen K. Ohlhausen**
                                  **Joshua D. Wright**
                                  **Terrell McSweeny**

|  |  |
|---|---|
| **In the Matter of**<br><br>**Cerberus Institutional Partners V, L.P.**<br> **a limited partnership;**<br><br>**AB Acquisition LLC,**<br> **a limited liability company;**<br><br>**and**<br><br>**Safeway Inc.,**<br> **a corporation.** | **Docket No. C-4504** |

### COMPLAINT

       Pursuant to the Clayton Act and the Federal Trade Commission Act ("FTC Act"), and by virtue of the authority vested in it by said Acts, the Federal Trade Commission ("Commission"), having reason to believe that Respondents AB Acquisition LLC ("Albertson's"), and Cerberus Institutional Partners V, L.P. ("Cerberus"), both subject to the jurisdiction of the Commission, agreed to acquire Respondent Safeway Inc. ("Safeway"), a corporation subject to the jurisdiction of the Commission, in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, and it appearing to the Commission that a proceeding in respect thereof would be in the public interest, hereby issues its Complaint, stating its charges as follows:

### I. RESPONDENTS

    1.  Respondent Cerberus is a limited partnership organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its headquarters and principal place of business located at 875 Third Avenue, New York, New York.

    2.  Respondent Albertson's is a company organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its headquarters and principal place of business located at 250 Parkcenter Boulevard, Boise, Idaho.

3.   Respondent Cerberus, through Albertson's, of which Cerberus is the majority owner, owns and operates a number of supermarkets chains throughout the United States, including supermarkets operating under the Albertsons, Lucky, and United banners.

4.   Respondent Safeway is a corporation organized, existing, and doing business under and by virtue of the laws of the State of Delaware, with its headquarters and principal place of business located at 5918 Stoneridge Mall Road, Pleasanton, California.

5.   Respondent Safeway owns and operates a number of supermarket chains throughout the United States, including supermarkets operating under the Safeway, Vons, Pavilions, and Tom Thumb banners.

6.   Albertson's and Safeway own and operate supermarkets in each of the geographic markets relevant to this Complaint and compete and promote their businesses in these areas.

## II. JURISDICTION

7.   Respondents, and each of their relevant operating subsidiaries and parent entities, are, and at all times relevant herein have been, engaged in commerce, or in activities affecting commerce, within the meaning of Section 1 of the Clayton Act, 15 U.S.C. § 12, and Section 4 of the FTC Act, 15 U.S.C. § 44.

## III. THE ACQUISITION

8.   Pursuant to an Agreement and Plan of Merger dated as of March 6, 2014, as amended on April 7, 2014, and June 13, 2014, Albertson's proposes to purchase all of the issued and outstanding common stock of Safeway in a transaction valued at approximately $9.2 billion ("the Acquisition").

## IV. THE RELEVANT PRODUCT MARKET

9.   The relevant line of commerce in which to analyze the Acquisition is the retail sale of food and other grocery products in supermarkets.

10.   For purposes of this Complaint, the term "supermarket" means any full-line retail grocery store that enables customers to purchase substantially all of their weekly food and grocery shopping requirements in a single shopping visit with substantial offerings in each of the following product categories: bread and baked goods; dairy products; refrigerated food and beverage products; frozen food and beverage products; fresh and prepared meats and poultry; fresh fruits and vegetables; shelf-stable food and beverage products, including canned, jarred, bottled, boxed, and other types of packaged products; staple foodstuffs, which may include salt, sugar, flour, sauces, spices, coffee, tea, and other staples; other grocery products, including nonfood items such as soaps, detergents, paper goods, other household products, and health and beauty aids; pharmaceutical products and pharmacy services (where provided); and, to the extent permitted by law, wine, beer, and/or distilled spirits.

2

11.  Supermarkets provide a distinct set of products and services and offer consumers convenient one-stop shopping for food and grocery products.  Supermarkets typically carry more than 10,000 different items, typically referred to as stock-keeping units (SKUs), as well as a deep inventory of those items.  In order to accommodate the large number of food and non-food products necessary for one-stop shopping, supermarkets are large stores that typically have at least 10,000 square feet of selling space.

12.  Supermarkets compete primarily with other supermarkets that provide one-stop shopping opportunities for food and grocery products.  Supermarkets base their food and grocery prices primarily on the prices of food and grocery products sold at other nearby competing supermarkets.  Supermarkets do not regularly conduct price checks of food and grocery products sold at other types of stores and do not typically set or change their food or grocery prices in response to prices at other types of stores.

13.  Although retail stores other than supermarkets may also sell food and grocery products, these types of stores—including convenience stores, specialty food stores, limited assortment stores, hard-discounters, and club stores—do not, individually or collectively, provide sufficient competition to effectively constrain prices at supermarkets.  These retail stores do not offer a supermarket's distinct set of products and services that provide consumers with the convenience of one-stop shopping for food and grocery products.  The vast majority of consumers shopping for food and grocery products at supermarkets are not likely to start shopping at other types of stores, or significantly increase grocery purchases at other types of stores, in response to a small but significant price increase by supermarkets.

## V.  <u>THE RELEVANT GEOGRAPHIC MARKETS</u>

14.  Customers shopping at supermarkets are motivated by convenience and, as a result, competition for supermarkets is local in nature.  Generally, the overwhelming majority of consumers' grocery shopping occurs at stores located very close to where they live.

15.  Respondents currently operate supermarkets under the Safeway, Vons, Pavilions, Tom Thumb, Albertsons, and United banners within approximately two-tenths of a mile to ten miles of each other in each of the relevant geographic markets.  The primary trade areas of Respondents' banners in each of the relevant geographic markets overlap significantly.

16.  The 130 geographic markets in which to assess the competitive effects of the Acquisition are localized areas in (1) Anthem, Arizona; (2) Carefree, Arizona; (3) Flagstaff, Arizona; (4) Lake Havasu, Arizona; (5) Prescott, Arizona; (6) Prescott Valley, Arizona; (7) Scottsdale, Arizona; (8) Tucson (Eastern), Arizona; (9) Tucson (Southwest), Arizona; (10) Alpine, California; (11) Arroyo Grande/Grover Beach, California; (12) Atascadero, California; (13) Bakersfield, California; (14) Burbank, California; (15) Calabasas, California; (16) Camarillo, California; (17) Carlsbad (North), California; (18) Carlsbad (South), California; (19) Carpinteria, California; (20) Cheviot Hills/Culver City, California; (21) Chino Hills, California; (22) Coronado Island, California; (23) Diamond Bar, California; (24) El Cajon, California; (25) Hermosa Beach, California; (26) Imperial Beach, California; (27) La Jolla, California; (28) La

Mesa, California; (29) Ladera Ranch, California; (30) Laguna Beach, California; (31) Laguna Niguel, California; (32) Lakewood, California; (33) Lemon Grove, California; (34) Lomita, California; (35) Lompoc, California; (36) Mira Mesa (North), California; (37) Mira Mesa (South), California; (38) Mission Viejo/Laguna Hills, California; (39) Mission Viejo (North), California; (40) Morro Bay, California; (41) National City, California; (42) Newbury Park, California; (43) Newport Beach, California; (44) Oxnard, California; (45) Palm Desert/Rancho Mirage, California; (46) Palmdale, California; (47) Paso Robles, California; (48) Poway, California; (49) Rancho Cucamonga/Upland, California; (50) Rancho Santa Margarita, California; (51) San Diego (Clairemont), California; (52) San Diego, (Hillcrest/University Heights), California; (53) San Diego (Tierrasanta), California; (54) San Luis Obispo, California; (55) San Marcos, California; (56) San Pedro, California; (57) Santa Barbara, California; (58) Santa Barbara/Goleta Heights, California; (59) Santa Clarita, California; (60) Santa Monica, California; (61) Santee, California; (62) Simi Valley, California; (63) Solana Beach, California; (64) Thousand Oaks, California; (65) Tujunga, California; (66) Tustin (Central), California; (67) Tustin/Irvine, California; (68) Ventura, California; (69) Westlake Village, California; (70) Yorba Linda, California; (71) Butte, Montana; (72) Deer Lodge, Montana; (73) Missoula, Montana; (74) Boulder City, Nevada; (75) Henderson (East), Nevada; (76) Henderson (Southwest), Nevada; (77) Summerlin, Nevada; (78) Ashland, Oregon; (79) Baker County, Oregon; (80) Bend, Oregon; (81) Eugene, Oregon; (82) Grants Pass, Oregon; (83) Happy Valley/Clackamas, Oregon; (84) Keizer, Oregon; (85) Klamath Falls, Oregon; (86) Lake Oswego, Oregon; (87) Milwaukie, Oregon; (88) Sherwood, Oregon; (89) Springfield, Oregon; (90) Tigard, Oregon; (91) West Linn, Oregon; (92) Colleyville, Texas; (93) Dallas (Far North), Texas; (94) Dallas (Farmers Branch/North Dallas), Texas; (95) Dallas (University Park/Highland Park), Texas; (96) Dallas (University Park/Northeast Dallas), Texas; (97) McKinney, Texas; (98) Plano, Texas; (99) Roanoke, Texas; (100) Rowlett, Texas; (101) Bremerton, Washington; (102) Burien, Washington; (103) Everett, Washington; (104) Federal Way, Washington; (105) Gig Harbor, Washington; (106) Lake Forest, Washington; (107) Lake Stevens, Washington; (108) Lakewood, Washington; (109) Liberty Lake, Washington; (110) Milton, Washington; (111) Monroe, Washington; (112) Oak Harbor, Washington; (113) Olympia (East), Washington; (114) Port Angeles, Washington; (115) Port Orchard, Washington; (116) Puyallup, Washington; (117) Renton (New Castle), Washington; (118) Renton (East Hill-Meridian), Washington; (119) Sammamish, Washington; (120) Shoreline, Washington; (121) Silverdale, Washington; (122) Snohomish, Washington; (123) Tacoma (Eastside), Washington; (124) Tacoma (Spanaway), Washington; (125) Walla Walla, Washington; (126) Wenatchee, Washington; (127) Woodinville, Washington; (128) Casper, Wyoming; (129) Laramie, Wyoming; and (130) Sheridan, Wyoming.  A hypothetical monopolist controlling all supermarkets in these areas could profitably raise prices by a small but significant amount.

## VI. **MARKET CONCENTRATION**

17.  Under the 2010 Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines") and relevant case law, the Acquisition is presumptively unlawful in the markets for the retail sale of food and other grocery products in supermarkets in all 130 geographic markets listed in Paragraph 16.  Under the Merger Guidelines' standard measure of market concentration, the Herfindahl-Hirschman Index ("HHI"), an acquisition is presumed to create or enhance market power or facilitate its exercise if

4

it increases the HHI by more than 200 points and results in a post-acquisition HHI that exceeds 2,500 points. The Acquisition would result in market concentration levels well in excess of these thresholds.

18. Post-acquisition HHI levels in the relevant geographic markets would range from 2,562 to 10,000, and the Acquisition would result in HHI increases ranging from 225 to 5,000. Exhibit A presents market concentration levels for each of the relevant geographic markets.

19. The Acquisition would reduce the number of meaningful competitors from two to one in 13 relevant geographic markets, three to two in 42 relevant geographic markets, and 4 to 3 (or greater) in 75 relevant geographic markets.

## VII. <u>ENTRY CONDITIONS</u>

20. Entry into the relevant markets would not be timely, likely, or sufficient in magnitude to prevent or deter the likely anticompetitive effects of the Acquisition. Significant entry barriers include the time and costs associated with conducting necessary market research, selecting an appropriate location for a supermarket, obtaining necessary permits and approvals, constructing a new supermarket or converting an existing structure to a supermarket, and generating sufficient sales to have a meaningful impact on the market.

## VIII. <u>EFFECTS OF THE ACQUISITION</u>

21. The Acquisition, if consummated, is likely to substantially lessen competition for the retail sale of food and other grocery products in supermarkets in the relevant geographic markets identified in Paragraph 16 in the following ways, among others:

> (a) by eliminating direct and substantial competition between Respondents Albertson's and Safeway;

> (b) by increasing the likelihood that Respondent Albertson's will unilaterally exercise market power; and

> (c) by increasing the likelihood of, or facilitating, coordinated interaction between the remaining participants in each of the relevant markets.

22. The ultimate effect of the Acquisition would be to increase the likelihood that the prices of food, groceries, or services will increase, and that the quality and selection of food, groceries, or services will decrease, in the relevant geographic markets.

## IX. <u>VIOLATIONS CHARGED</u>

23. The agreement described in Paragraph 8 constitutes a violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45, and the acquisition, if consummated, would violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

**WHEREFORE, THE PREMISES CONSIDERED,** the Federal Trade Commission on this twenty-seventh day of January, 2015, issues its complaint against said Respondents.

By the Commission.


Donald S. Clark
Secretary

SEAL:

**EXHIBIT A**

| Area Number (See Para. 16 of Complaint) | City | State | Merger Result | HHI (pre) | HHI (post) | Delta |
|---|---|---|---|---|---|---|
| 1 | Anthem | AZ | 4 to 3 | 2768 | 3423 | 655 |
| 2 | Carefree | AZ | 5 to 4 | 2298 | 2976 | 678 |
| 3 | Flagstaff | AZ | 5 to 4 | 2744 | 3365 | 621 |
| 4 | Lake Havasu | AZ | 4 to 3 | 2609 | 3401 | 792 |
| 5 | Prescott | AZ | 4 to 3 | 2675 | 3405 | 730 |
| 6 | Prescott Valley | AZ | 4 to 3 | 2828 | 3340 | 512 |
| 7 | Scottsdale | AZ | 3 to 2 | 3797 | 5001 | 1204 |
| 8 | Tucson (Eastern) | AZ | 4 to 3 | 3341 | 4130 | 789 |
| 9 | Tucson (Southwest) | AZ | 5 to 4 | 2018 | 2909 | 891 |
| 10 | Alpine | CA | 3 to 2 | 3857 | 5002 | 1145 |
| 11 | Arroyo Grande/ Grover Beach | CA | 3 to 2 | 3690 | 6864 | 3174 |
| 12 | Atascadero | CA | 3 to 2 | 3456 | 6242 | 2786 |
| 13 | Bakersfield | CA | 6 to 5 | 1923 | 2562 | 639 |
| 14 | Burbank | CA | 3 to 2 | 4199 | 5011 | 812 |
| 15 | Calabasas | CA | 3 to 2 | 3400 | 5415 | 2015 |
| 16 | Camarillo | CA | 5 to 4 | 2950 | 4215 | 1265 |
| 17 | Carlsbad (North) | CA | 4 to 3 | 2977 | 3888 | 911 |
| 18 | Carlsbad (South) | CA | 5 to 4 | 2209 | 3210 | 1001 |
| 19 | Carpinteria | CA | 2 to 1 | 5012 | 10,000 | 4988 |
| 20 | Cheviot Hills/ Culver City | CA | 4 to 3 | 2394 | 3914 | 1520 |
| 21 | Chino Hills | CA | 4 to 3 | 3596 | 4047 | 451 |
| 22 | Coronado Island | CA | 2 to 1 | 5025 | 10,000 | 4975 |
| 23 | Diamond Bar | CA | 3 to 2 | 4466 | 5231 | 765 |
| 24 | El Cajon | CA | 4 to 3 | 2983 | 3597 | 614 |
| 25 | Hermosa Beach | CA | 5 to 4 | 2752 | 4371 | 1619 |
| 26 | Imperial Beach | CA | 2 to 1 | 5869 | 10,000 | 4131 |

| 27 | La Jolla | CA | 3 to 2 | 5505 | 7083 | 1578 |
|----|----------|----|--------|------|------|------|
| 28 | La Mesa | CA | 3 to 2 | 3382 | 5997 | 2615 |
| 29 | Ladera Ranch | CA | 2 to 1 | 5081 | 10,000 | 4919 |
| 30 | Laguna Beach | CA | 3 to 2 | 3335 | 5799 | 2464 |
| 31 | Laguna Niguel | CA | 4 to 3 | 3190 | 3883 | 693 |
| 32 | Lakewood | CA | 6 to 5 | 2073 | 2581 | 508 |
| 33 | Lemon Grove | CA | 3 to 2 | 3581 | 6059 | 2478 |
| 34 | Lomita | CA | 3 to 2 | 3695 | 5040 | 1345 |
| 35 | Lompoc | CA | 4 to 3 | 2566 | 3713 | 1147 |
| 36 | Mira Mesa (North) | CA | 5 to 4 | 2412 | 3808 | 1396 |
| 37 | Mira Mesa (South) | CA | 2 to 1 | 6904 | 10,000 | 3096 |
| 38 | Mission Viejo/ Laguna Hills | CA | 4 to 3 | 3157 | 3784 | 627 |
| 39 | Mission Viejo (North) | CA | 3 to 2 | 3933 | 5012 | 1079 |
| 40 | Morro Bay | CA | 5 to 4 | 2965 | 4056 | 1091 |
| 41 | National City | CA | 3 to 2 | 3748 | 5013 | 1265 |
| 42 | Newbury Park | CA | 3 to 2 | 3629 | 5833 | 2204 |
| 43 | Newport Beach | CA | 5 to 4 | 3160 | 3811 | 651 |
| 44 | Oxnard | CA | 4 to 3 | 2939 | 3375 | 436 |
| 45 | Palm Desert/ Rancho Mirage | CA | 6 to 5 | 2196 | 3094 | 898 |
| 46 | Palmdale | CA | 4 to 3 | 3056 | 4039 | 983 |
| 47 | Paso Robles | CA | 4 to 3 | 2851 | 5427 | 2576 |
| 48 | Poway | CA | 4 to 3 | 2540 | 3526 | 986 |
| 49 | Rancho Cucamonga/ Upland | CA | 4 to 3 | 3266 | 4118 | 852 |
| 50 | Rancho Santa Margarita | CA | 4 to 3 | 2628 | 4300 | 1672 |
| 51 | San Diego (Clairemont) | CA | 3 to 2 | 4066 | 6374 | 2308 |
| 52 | San Diego (Hillcrest/ University Heights) | CA | 3 to 2 | 4436 | 6571 | 2135 |
| 53 | San Diego, CA (Tierrasanta) | CA | 2 to 1 | 5586 | 10,000 | 4414 |
| 54 | San Luis Obispo | CA | 4 to 3 | 2896 | 5306 | 2410 |
| 55 | San Marcos | CA | 3 to 2 | 5991 | 6282 | 291 |

| 56 | San Pedro | CA | 3 to 2 | 3518 | 6442 | 2924 |
|---|---|---|---|---|---|---|
| 57 | Santa Barbara | CA | 4 to 3 | 2741 | 3462 | 721 |
| 58 | Santa Barbara/ Goleta | CA | 3 to 2 | 3909 | 7469 | 3560 |
| 59 | Santa Clarita | CA | 4 to 3 | 2646 | 3732 | 1086 |
| 60 | Santa Monica | CA | 4 to 3 | 3293 | 4879 | 1586 |
| 61 | Santee | CA | 3 to 2 | 3477 | 6133 | 2656 |
| 62 | Simi Valley | CA | 5 to 4 | 3633 | 7101 | 3468 |
| 63 | Solana Beach | CA | 3 to 2 | 3830 | 6188 | 2358 |
| 64 | Thousand Oaks | CA | 3 to 2 | 4057 | 6047 | 1990 |
| 65 | Tujunga | CA | 3 to 2 | 3688 | 3969 | 281 |
| 66 | Tustin (central) | CA | 4 to 3 | 3474 | 4348 | 874 |
| 67 | Tustin/Irvine | CA | 4 to 3 | 3939 | 4485 | 546 |
| 68 | Ventura | CA | 4 to 3 | 2732 | 3550 | 818 |
| 69 | Westlake Village | CA | 5 to 4 | 1955 | 3563 | 1608 |
| 70 | Yorba Linda | CA | 4 to 3 | 2803 | 4588 | 1785 |
| 71 | Butte | MT | 3 to 2 | 4701 | 5189 | 488 |
| 72 | Deer Lodge | MT | 2 to 1 | 5000 | 10,000 | 5000 |
| 73 | Missoula | MT | 4 to 3 | 3107 | 4063 | 956 |
| 74 | Boulder City | NV | 2 to 1 | 5051 | 10,000 | 4949 |
| 75 | Henderson (East) | NV | 4 to 3 | 2705 | 3356 | 651 |
| 76 | Henderson (Southwest) | NV | 3 to 2 | 3653 | 5042 | 1389 |
| 77 | Summerlin | NV | 4 to 3 | 3107 | 4367 | 1260 |
| 78 | Ashland | OR | 2 to 1 | 5013 | 10,000 | 4987 |
| 79 | Baker County | OR | 2 to 1 | 5102 | 10,000 | 4898 |
| 80 | Bend | OR | 6 to 5 | 2632 | 3824 | 1192 |
| 81 | Eugene | OR | 5 to 4 | 2392 | 3414 | 1022 |
| 82 | Grants Pass | OR | 4 to 3 | 2769 | 3537 | 768 |
| 83 | Happy Valley/ Clackamas | OR | 2 to 1 | 5006 | 10,000 | 4994 |
| 84 | Keizer | OR | 5 to 4 | 2852 | 3367 | 515 |

9

| 85 | Klamath Falls | OR | 5 to 4 | 2511 | 2917 | 406 |
| 86 | Lake Oswego | OR | 4 to 3 | 3176 | 5604 | 2428 |
| 87 | Milwaukie | OR | 3 to 2 | 5729 | 6082 | 353 |
| 88 | Sherwood | OR | 3 to 2 | 3989 | 5028 | 1039 |
| 89 | Springfield | OR | 3 to 2 | 4400 | 5197 | 797 |
| 90 | Tigard | OR | 5 to 4 | 2261 | 2984 | 723 |
| 91 | West Linn | OR | 3 to 2 | 3611 | 6268 | 2657 |
| 92 | Colleyville | TX | 5 to 4 | 2686 | 3465 | 779 |
| 93 | Dallas (Far North) | TX | 5 to 4 | 2413 | 2891 | 478 |
| 94 | Dallas (Farmers Branch/ North Dallas) | TX | 4 to 3 | 3746 | 5175 | 1429 |
| 95 | Dallas (University Park/ Highland Park) | TX | 4 to 3 | 2755 | 4261 | 1506 |
| 96 | Dallas (University Park/ Northeast Dallas) | TX | 5 to 4 | 2345 | 3065 | 720 |
| 97 | McKinney | TX | 5 to 4 | 2692 | 3613 | 921 |
| 98 | Plano | TX | 4 to 3 | 3105 | 3541 | 436 |
| 99 | Roanoke | TX | 3 to 2 | 4680 | 5351 | 671 |
| 100 | Rowlett | TX | 3 to 2 | 3386 | 5450 | 2064 |
| 101 | Bremerton | WA | 4 to 3 | 2721 | 3399 | 678 |
| 102 | Burien | WA | 5 to 4 | 1979 | 4489 | 2510 |
| 103 | Everett | WA | 5 to 4 | 2301 | 2586 | 285 |
| 104 | Federal Way | WA | 5 to 4 | 2312 | 2709 | 397 |
| 105 | Gig Harbor | WA | 3 to 2 | 3396 | 5235 | 1839 |
| 106 | Lake Forest Park | WA | 5 to 4 | 3889 | 4352 | 463 |
| 107 | Lake Stevens | WA | 5 to 4 | 2646 | 3455 | 809 |
| 108 | Lakewood | WA | 5 to 4 | 2333 | 3170 | 837 |
| 109 | Liberty Lake | WA | 3 to 2 | 3483 | 5090 | 1607 |
| 110 | Milton | WA | 3 to 2 | 3960 | 5010 | 1050 |
| 111 | Monroe | WA | 4 to 3 | 2911 | 3352 | 441 |
| 112 | Oak Harbor | WA | 3 to 2 | 4296 | 6446 | 2150 |
| 113 | Olympia (East) | WA | 6 to 5 | 2205 | 2566 | 361 |

| 114 | Port Angeles | WA | 3 to 2 | 3773 | 5588 | 1815 |
|---|---|---|---|---|---|---|
| 115 | Port Orchard | WA | 4 to 3 | 2747 | 3362 | 615 |
| 116 | Puyallup | WA | 3 to 2 | 4160 | 5072 | 912 |
| 117 | Renton (East Hill-Meridian) | WA | 4 to 3 | 3304 | 3719 | 415 |
| 118 | Renton (New Castle) | WA | 4 to 3 | 4417 | 5274 | 857 |
| 119 | Sammamish | WA | 2 to 1 | 5761 | 10,000 | 4239 |
| 120 | Shoreline | WA | 4 to 3 | 3792 | 4017 | 225 |
| 121 | Silverdale | WA | 4 to 3 | 2845 | 3516 | 671 |
| 122 | Snohomish | WA | 2 to 1 | 5595 | 10,000 | 4405 |
| 123 | Tacoma (Eastside) | WA | 4 to 3 | 3260 | 3727 | 467 |
| 124 | Tacoma (Spanaway) | WA | 5 to 4 | 2707 | 3360 | 653 |
| 125 | Walla Walla | WA | 5 to 4 | 2624 | 3417 | 793 |
| 126 | Wenatchee | WA | 3 to 2 | 3744 | 5047 | 1303 |
| 127 | Woodinville | WA | 3 to 2 | 3568 | 5192 | 1624 |
| 128 | Casper | WY | 4 to 3 | 3816 | 4353 | 537 |
| 129 | Laramie | WY | 3 to 2 | 3793 | 5000 | 1207 |
| 130 | Sheridan | WY | 3 to 2 | 4802 | 5421 | 619 |

# Exhibit F



Michael C. Marsh

Akerman LLP
One Southeast Third Avenue
25th Floor
Miami, FL  33131
Tel:  305.374.5600
Fax:  305.374.5095
michael.marsh@akerman.com

June 29, 2015

**VIA EMAIL & FEDERAL EXPRESS**

Albertson's LLC
P.O. Box 20
250 Parkcenter Boulevard
Boise, Idaho 83726 (street zip – 83706)
Attention: General Counsel
paul.rowan@albertsons.com

**Re:     Notice of Claims**

Dear Mr. Rowan:

This Notice of Claim is delivered to you on behalf of our client, Haggen Holdings, LLC, pursuant to that certain Asset Purchase Agreement (the "Purchase Agreement"), dated December 10, 2014, as amended, by and among Albertson's LLC ("Albertson's"), Albertson's Holdings, LLC ("Albertson's Holdings") and Haggen Holdings, LLC ("Buyer").  Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Purchase Agreement.

Pursuant to the indemnification provisions set forth in Section 17.1(c) of the Purchase Agreement, the Buyer Indemnified Parties are entitled to indemnification from the Sellers for Losses sustained or incurred by them as a result of any breach of any of Sellers' covenants or agreements contained in the Purchase Agreement.  In addition, pursuant to Section 17.5 of the Purchase Agreement, in the case of intentional misrepresentation or fraud, indemnification pursuant to the provisions of Article 17 is not the exclusive remedy of the Parties for any misrepresentation or breach of any warranty or covenant contained in the Purchase Agreement. This written Indemnity Notice is hereby given to the Sellers of the following claims asserted by Buyer on behalf of the Buyer Indemnified Parties under the Purchase Agreement (the following is a listing of the nature of the breaches to which the claims asserted herein relate, and is not an exhaustive list of the nature of the breaches of the Purchase Agreement or the provisions thereof, but each entitles the Buyer Indemnified Parties to indemnification or other recovery):

1.  Improper Transfer of Inventory out of Purchased Store(s).  Following the Closings,

akerman.com

Albertson's LLC
Attn: General Counsel
June 29, 2015
Page 2

Buyer has discovered that Sellers and their Subsidiaries intentionally removed and discarded Inventory and equipment from Store 2048 outside the Sellers' inventory counting system. See the email correspondence attached hereto as <u>Exhibit A</u>. These circumstances purportedly resulted in Buyer having an obligation to pay Sellers for such Inventory, without such Inventory being present at Store 2048. What is most troubling to Buyer is that this removal and discarding was ordered to occur outside the inventory system, when it was ordered "No 120 needed" with respect to such removal and discarding. This indicates intentional, fraudulent misconduct by the Sellers. It is also a breach of Sellers' obligations pursuant to Section 21.4 of the Purchase Agreement. Given Buyer's experiences throughout the conversion process, Buyer does not believe that this type of intentional misconduct was an isolated incident, particularly at the Safeway Stores. For example, Buyer has also discovered evidence that Inventory was ordered and billed to a purchased Store in advance of Closing, and then diverted and delivered to a store not being acquired by Buyer. This type of wrongdoing leaves Buyer in a position where is must review certain of Sellers' email correspondence during the period from the signing of the Purchase Agreement to the end of the Closing process and to interview certain of Seller's management and store-level employees to determine the scope of similar types of misconduct. Buyer's losses from such misconduct may include lost Inventory, lost business time and attention during the conversion process, lost sales, and permanently decreased customer base. Such losses are likely substantial. Buyer is continuing to investigate this matter, and per above, would like to speak with the Sellers to discuss how they may formally assist with such investigation via review of certain Seller email correspondence and interviewing of key Seller personnel. The total amount of Losses suffered by the Buyer Indemnified Parties as a result of the foregoing breaches by Sellers has not been ascertained as of the date hereof.

      2. <u>Overstocking and Understocking of Inventory</u>. Following the Closings, Buyer has discovered instances of substantial overstocking and substantial understocking of Inventory in the Stores. For example, the Shoreline, WA Store was acquired on February 26, 2015, and the "in-stock" conditions were highly substandard, with entire sets missing from the shelves. The final inventory purchased for this Store was approximately $878,000. In the first 10 days after closing, Buyer purchased approximately $208,000 of new inventory to help refill the store, which represents almost 24% of the total inventory value. This is highly abnormal and these circumstances damaged the value of this store and Buyer's customer base. In addition, Buyer has been advised by its Bakery manager at Store #2333 that she was instructed by her superiors while still employed by Sellers (and shortly before Buyer purchased this Store) to purchase and/or bake 2 times her normal inventory levels; most of this excess inventory went out of code-date prior to completing the conversion. To date we have completed a limited number of full store physical inventories which in three cases resulted in writing off more than 10% of the inventory value in the store, including a 21.4% inventory value write off at Store #2139 and a 19.6% inventory value write off at Store #2160. Additionally, we have seen unusually high shrink results across our fresh departments shortly after conversion; results substantially higher than expected after a 40 hour store closure. Not only have the results been higher than industry norm and Haggen's past experience, but the variances among stores have been drastic as well. In

Albertson's LLC
Attn: General Counsel
June 29, 2015
Page 3

many instances we have experienced shrink in the fresh departments ranging from 20% to as high as 95%. The foregoing constitutes a breach of Sellers' obligations pursuant to Section 21.4 of the Purchase Agreement, including Section 21.4(a)(iii). Related to these occurrences, and in light of the email attached hereto as Exhibit A and the fact that Buyer has suffered post-Closing Inventory write-offs substantially in excess of historical norms, Buyer again must review certain of Sellers' email correspondence during the period from the signing of the Purchase Agreement to the end of the Closing process and to interview certain management and store-level employees of the Sellers to determine the scope of similar types of breaches and circumstances related thereto.  Buyer's losses from such misconduct may include overpayment for Inventory, lost business time and attention during the conversion process, lost sales, and permanently decreased customer base. Such losses are likely substantial. Buyer is continuing to investigate this matter, and per above, would like to speak with the Sellers to discuss how they may formally assist with such investigation via review of certain Seller email correspondence and interviewing of key Seller personnel. The total amount of Losses suffered by the Buyer Indemnified Parties as a result of the foregoing breaches by Sellers has not been ascertained as of the date hereof.

3.     Failure to Advertise in the Ordinary Course of Business.  Buyer has learned that within certain markets and with respect to certain Store Properties, the Sellers did not continue to advertise to the public for such Store Properties in the ordinary course of business.  In fact, based upon an email from a Seller Advertising Director, Sellers sought to "provide those impacted customers with a different version [of the ad] and route them to their next closest [non-divested] store."  See Exhibit B attached hereto.  This indicates intentional misconduct on behalf of the Sellers.  It is also a breach of Sellers' obligations pursuant to Section 21.4 of the Purchase Agreement.  Buyer does not believe that this type of intentional misconduct with respect to advertising patterns was an isolated incident.  Buyer must review certain of Sellers' email correspondence during the period from the signing of the Purchase Agreement to the end of the Closing process and to interview certain management and store-level employees of the Sellers to determine the scope of similar types of misconduct.  Buyer's losses from such misconduct may include lost sales and a permanently decreased customer base.  Such losses are likely substantial. Buyer is continuing to investigate this matter, and per above, would like to speak with the Sellers to discuss how they may formally assist with such investigation via review of certain Seller email correspondence and interviewing of key Seller personnel.  The total amount of Losses suffered by the Buyer Indemnified Parties as a result of the foregoing breaches by Sellers has not been ascertained as of the date hereof.

4.     Misuse of Confidential Information and Failure to Use Commercially Reasonable Efforts to Preserve Existing Relationships.  Based upon the timing and patterns of couponing in connection with store conversions, Buyer believes that during the Closing process the Sellers substantially increased their advertising and marketing in markets in which Buyer purchased Stores pursuant to the Purchase Agreement, and that the Sellers did so, in part, based upon their knowledge of the Store Closing cadence.  For example, it appears that managers of certain Seller stores voiced complaints when coupon drops resulted in unwelcome discounts at their stores

Albertson's LLC
Attn: General Counsel
June 29, 2015
Page 4

before the closing in several instances when their store closing had been delayed in connection
with changes in the closing cadence. Such complaints indicate that the cadence was being used
to orchestrate the timing of unusual coupon drops which impacted stores still owned by Sellers
when the cadence was changed. It also appears that Sellers rotated Safeway and Albertson's
coupon drops in accordance with the closing cadence such that, in a market where an Albertson's
store was converted, Safeway stores ramped up coupon drops in connection with the closing and
vice versa. The Store Closing cadence constituted confidential information, under Section 21.2
of the Purchase Agreement. Buyer believes that the foregoing actions by the Sellers constitute
an intentional breach of Sellers' (a) non-use of confidential information obligations pursuant to
Section 21.2 of the Purchase Agreement and (b) obligations to use commercially reasonable
efforts to preserve the existing relationships with each Store Property's customers pursuant to
Section 21.4(a)(x) of the Purchase Agreement. Related to these occurrences, and in light of the
emails attached hereto as Exhibit A and Exhibit B, Buyer must review certain of Sellers' email
correspondence during the period from the signing of the Purchase Agreement to the end of the
Closing process and to interview certain management and store-level employees of the Sellers to
determine the scope of similar types of breaches and circumstances related thereto. Buyer's
losses from such misconduct may include lost sales and a permanently decreased customer base.
Such losses are likely substantial. Buyer is continuing to investigate this matter, and per above,
would like to speak with the Sellers to discuss how they may formally assist with such
investigation via review of certain Seller email correspondence and interviewing of key Seller
personnel. The total amount of Losses suffered by the Buyer Indemnified Parties as a result of
the foregoing breaches by Sellers has not been ascertained as of the date hereof.

     As of the date hereof, Buyer is not able to ascertain the scope, extent and amount of the
Losses incurred by the Buyer Indemnified Parties as a result of the circumstances and breaches
set forth above; however, it is anticipated that such Losses are highly substantial and may be in
the tens of millions of dollars. In addition, as a result of the foregoing circumstances and
breaches, Buyer is not able to agree, under Article 6 of the Purchase Agreement, on the
Inventory Purchase Price for the unpaid Inventory amounts, until further investigation has been
completed as contemplated above. As a result of the foregoing, and in light of the fact that
several of the circumstances referenced herein relate to improper conduct related to Inventory in
the Stores, Buyer will not make further payments of Inventory Purchase Price under Article 6 of
the Purchase Agreement until the investigations requested herein have been completed and the
matters contemplated herein have been satisfactorily resolved.

     The adverse conditions that Buyer has experienced in connection with the acquisition of
the Stores, the material drop-off in sales that Buyer has experienced in a large number of Stores,
and the Seller correspondence cited herein are indicative of pervasive unfair competitive
practices by Sellers. Buyer is obligated, on behalf of its stakeholders, to take these matters very
seriously and to investigate them thoroughly. While certain issues were discussed with the
monitor appointed by the Federal Trade Commission during the Closing process, Buyer has not

Albertson's LLC
Attn:  General Counsel
June 29, 2015
Page 5

yet given formal notification to the Federal Trade Commission of the matters outlined in this
letter, but will continue to evaluate whether such a notification should be given.

Nothing set forth in this written Indemnity Notice and claim notice shall prevent any
Buyer Indemnified Parties from submitting subsequent requests for indemnification or recovery,
including indemnification or recovery for facts or circumstances not arising from those noticed
herein, or from receiving indemnification or recovery for any further Losses relating to the facts,
circumstances or breaches noticed herein or supplementing or amending the claims noticed
herein, regardless of whether information about such Losses is currently available or known to
the Buyer Indemnified Parties.  The Buyer Indemnified Parties expressly reserve all rights,
remedies and defenses available to them under the Purchase Agreement, at law, in equity or
otherwise.

Sincerely,

Michael C. Marsh

cc:     Greenberg Traurig LLP
        77 W. Wacker Drive, Suite 3100
        Chicago, Illinois 60601
        Attn:  Corey E. Light and Melissa Seiler
        E-mail: lightc@gtlaw.com and seilerm@gtlaw.com

        Haggen Holdings, LLC
        525 Okeechobee Blvd., Suite 1050
        West Palm Beach, FL 33401
        Attn:  John Caple and Michael Niegsch
        E-mail: johnc@comvest.com and m.niegsch@comvest.com

        Akerman LLP
        One Southeast Third Avenue
        Miami, FL 33131
        Attention:  Carl Roston
        E-mail: carl.roston@akerman.com

**Exhibit A**

[See attached.]

From: Brad Jones <Brad.Jones@safeway.com<mailto:Brad.Jones@safeway.com>>
Date: June 12, 2015 at 12:58:39 PM PDT
To: Store 2048 c90 - Store Manager <S2048C90@safeway.com<mailto:S2048C90@safeway.com>>,
"Store 2048 c40 - Inventory Control Clerk (ICC)"
<S2048C40@safeway.com<mailto:S2048C40@safeway.com>>
Cc: Ryan Adams <Ryan.Adams@safeway.com<mailto:Ryan.Adams@safeway.com>>, Garrett Mc
Laughlin <garrett.mclaughlin@safeway.com<mailto:garrett.mclaughlin@safeway.com>>, Kathleen
Dellaganna <Kathleen.Thompson@safeway.com<mailto:Kathleen.Thompson@safeway.com>>
Subject: 2048 excess floral supply


Kirk

I spoke to Kathy regarding the excess supply.

Please transfer the pallet of steps and boxes to 1738 immediately. No 120 needed. You will most likely
have to cross dock it unless you can arrange a direct ship through Vons transportantion.

As for the mess in the storage area, you need to go through what's there,  keep only a rack full of
current supplies that you are using right now, and throw away the rest.


Please have this done by tuesday.

Also

Please make sure you have 2or 3 people scheduled in produce 6-8 to empty the produce tables as well
as 2 or 3 people 6-8 to empty the grocery ends.

See you Tuesday

Thanks

**Exhibit B**

[See attached.]

From: Dunn, Sonya N.
Sent: Tuesday, May 12, 2015 5:13 PM
To: Justin Davis
Cc: Tipton, Gene; Todaro, Joseph A.
Subject: Re: Ad Contact
Yes, we were instructed to turn them off for now. I'm working with the marketing director, Mel, to see if we can provide those impacted customers with a different version and route them to their next closest store.

Sonya Dunn
Advertising Director, Ivie Client Services Albertsons | Safeway | VONS | Southwest Division
20227 N. 27th Avenue, Phoenix, AZ 85027
em: sonya.dunn@albertsons.com<mailto:sonya.dunn@albertsons.com>
O – 623.869.4746<tel:623.869.4746>

Ivie & Associates | www.ivieinc.com<http://www.ivieinc.com/>
601 Silveron Blvd, Suite 200 | Flower Mound, TX 75028

We don't tell our clients no. We find ways to get things done.


From: Justin Davis <Justin.Davis@albertsons.com<mailto:Justin.Davis@albertsons.com>>
Date: Tuesday, May 12, 2015 at 5:01 PM
To: Administrator Ivie <sonya.dunn@albertsons.com<mailto:sonya.dunn@albertsons.com>>
Cc: "Tipton, Gene" <Gene.Tipton@albertsons.com<mailto:Gene.Tipton@albertsons.com>>, "Todaro, Joseph A." <Joseph.Todaro@albertsons.com<mailto:Joseph.Todaro@albertsons.com>>
Subject: Re: Ad Contact

Ok thank you!

What about the zip codes that are affected by the divested stores? Have those been turned off and are not getting to ads delivered to their address? Store 6028 is having customers stating they are not getting ads any longer and the store didn't get their ads last week as well.
Justin Davis
District Customer Service Manager
D7 & D8
Cell 602-317-0730<tel:602-317-0730>
Sent from my iPhone

On May 12, 2015, at 4:52 PM, "Dunn, Sonya N."
<Sonya.Dunn@albertsons.com<mailto:Sonya.Dunn@albertsons.com>> wrote:
Sorry Justin -
You can send that over to me for now...

Sonya Dunn
Advertising Director, Ivie Client Services Albertsons | Safeway | VONS | Southwest Division
20227 N. 27th Avenue, Phoenix, AZ 85027

em: sonya.dunn@albertsons.com<mailto:sonya.dunn@albertsons.com>
O – 623.869.4746<tel:623.869.4746>

Ivie & Associates | www.ivieinc.com<http://www.ivieinc.com/>
601 Silveron Blvd, Suite 200 | Flower Mound, TX 75028

We don't tell our clients no. We find ways to get things done.


From: Justin Davis <Justin.Davis@albertsons.com<mailto:Justin.Davis@albertsons.com>>
Date: Tuesday, May 12, 2015 at 3:09 PM
To: Administrator Ivie <sonya.dunn@albertsons.com<mailto:sonya.dunn@albertsons.com>>
Cc: "Tipton, Gene" <Gene.Tipton@albertsons.com<mailto:Gene.Tipton@albertsons.com>>, "Todaro,
Joseph A." <Joseph.Todaro@albertsons.com<mailto:Joseph.Todaro@albertsons.com>>
Subject: RE: Ad Contact

Sonya,

Any update on this?

From: Dunn, Sonya N.
Sent: Tuesday, April 28, 2015 11:05 AM
To: Justin Davis
Cc: Tipton, Gene
Subject: Re: Ad Contact

Hi Justin,
I'm looking in to this...
-Sonya

Sonya Dunn
Advertising Director, Ivie Client Services Albertsons | Safeway | VONS | Southwest Division
20227 N. 27th Avenue, Phoenix, AZ 85027
em: sonya.dunn@albertsons.com<mailto:sonya.dunn@albertsons.com>
O – 623.869.4746<tel:623.869.4746>

Ivie & Associates | www.ivieinc.com<http://www.ivieinc.com/>
601 Silveron Blvd, Suite 200 | Flower Mound, TX 75028

We don't tell our clients no. We find ways to get things done.


From: Justin Davis <Justin.Davis@albertsons.com<mailto:Justin.Davis@albertsons.com>>
Date: Monday, April 27, 2015 at 8:53 AM
To: Administrator Ivie <sonya.dunn@albertsons.com<mailto:sonya.dunn@albertsons.com>>
Cc: "Tipton, Gene" <Gene.Tipton@albertsons.com<mailto:Gene.Tipton@albertsons.com>>

Subject: FW: Ad Contact

Sonya,

Would you know who we can contact to add a customers to a mailing list so they can receive our weekly ad in the mail?

Justin Davis
District Customer Service Manager
D7 & D8
Cell 602-317-0730<tel:602-317-0730>
Justin.Davis@albertsons.com<mailto:Justin.Davis@albertsons.com>